# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued December 1, 2015        Decided October 20, 2016

No. 11-1324

ALI HAMZA AHMAD SULIMAN AL BAHLUL,
PETITIONER

v.

UNITED STATES OF AMERICA,
RESPONDENT

---

On Petition for Rehearing En Banc

---

*Michel Paradis*, Counsel, Office of the Chief Defense Counsel, argued the cause for petitioner. With him on the briefs were *Mary R. McCormick* and *Todd E. Pierce*, Counsel.

*David Weissbrodt* and *William J. Aceves* were on the brief for *amici curiae* International Law Scholars in support of petitioner.

*J. Douglas Richards* was on the brief for *amicus curiae* National Institute of Military Justice in support of petitioner.

*Robert Barton* was on the brief for *amicus curiae* Professor David Glazier in support of petitioner.

*Ian Heath Gershengorn*, Principal Deputy Solicitor General, U.S. Department of Justice, argued the cause for

respondent. On the brief were *Steven M. Dunne*, Chief, Appellate Unit, and *John F. De Pue* and *Joseph Palmer*, Attorneys.

*James A. Schoettler Jr.* was on the brief for *amici curiae* Former Government Officials, Former Military Lawyers, and Scholars of National Security Law in support of respondent.

*Richard A. Samp* was on the brief for *amici curiae* John D. Altenburg, Maj. Gen., U.S. Army (Ret)., *et al*. in support of respondent.

Before: GARLAND,[*] *Chief Judge*, and HENDERSON, ROGERS, TATEL, BROWN, GRIFFITH, KAVANAUGH, SRINIVASAN,[**] MILLETT, PILLARD, and WILKINS, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Concurring opinion filed by *Circuit Judge* HENDERSON.

Concurring opinion filed by *Circuit Judge* KAVANAUGH, with whom *Circuit Judges* BROWN and GRIFFITH join.

Concurring opinion filed by *Circuit Judge* MILLETT.

Concurring opinion filed by *Circuit Judge* WILKINS.

Joint Dissenting opinion filed by *Circuit Judges* ROGERS, TATEL, and PILLARD.

---

[*] Chief Judge Garland was a member of the *en banc* court at the time the case was argued but did not participate in this opinion.

[**] Circuit Judge Srinivasan did not participate in this matter.

PER CURIAM:  Bahlul is a member of al Qaeda who assisted Osama bin Laden in planning the September 11, 2001, attacks on the United States.  Bahlul was convicted by a U.S. military commission of the offense of conspiracy to commit war crimes, among other offenses.  The U.S. Court of Military Commission Review affirmed Bahlul's conviction.

In a prior en banc decision, we recounted the facts and considered Bahlul's Ex Post Facto Clause objection to the conspiracy conviction.  Applying plain error review, we concluded that the Ex Post Facto Clause did not preclude the conspiracy charge against Bahlul.  *See Al Bahlul v. United States*, 767 F.3d 1 (D.C. Cir. 2014) (en banc).

In this en banc case, Bahlul argues that Articles I and III of the Constitution bar Congress from making conspiracy an offense triable by military commission, because conspiracy is not an offense under the international law of war.

We affirm the judgment of the U.S. Court of Military Commission Review upholding Bahlul's conspiracy conviction.  Six judges – Judges Henderson, Brown, Griffith, Kavanaugh, Millett, and Wilkins – have voted to affirm.  Three judges – Judges Rogers, Tatel, and Pillard – dissent.

Of the six-judge majority, four judges (Judges Henderson, Brown, Griffith, and Kavanaugh) would affirm because they conclude that, consistent with Articles I and III of the Constitution, Congress may make conspiracy to commit war crimes an offense triable by military commission.  They would uphold Bahlul's conspiracy conviction on that basis.

Judge Millett would apply plain error review and affirm Bahlul's conviction under that standard of review. She would not reach the question of whether Congress may make inchoate conspiracy an offense triable by military commission.

Judge Wilkins would affirm because he concludes that the particular features of Bahlul's conviction demonstrate that Bahlul was not convicted of an inchoate conspiracy offense. He further concludes that Bahlul's conviction complies with the Constitution because the particular features of Bahlul's conviction have sufficient roots in international law. He therefore would not reach the question of whether Congress may make inchoate conspiracy an offense triable by military commission.

Judges Rogers, Tatel, and Pillard have filed a Joint Dissent. They conclude that Article III of the Constitution bars Congress from making inchoate conspiracy an offense triable by a law-of-war military commission.

Bahlul has also raised First Amendment and Equal Protection challenges to his conviction. The Court rejects those challenges. *See* Kavanaugh Concurring Op. at 24 n.12; Millett Concurring Op. at 2, 44-45; Wilkins Concurring Op. at 14. The Joint Dissent neither reaches those claims nor adopts the above characterization of the facts.

* * *

We affirm the judgment of the U.S. Court of Military Commission Review upholding Bahlul's conspiracy conviction.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring: I join the Court's judgment affirming Bahlul's conspiracy conviction.  I do so for the reasons stated in my dissent in *Al Bahlul v. United States*, 792 F.3d 1, 27-72 (D.C. Cir. 2015) (since vacated).   I incorporate by reference thereto that previously published opinion as my concurrence here.

KAVANAUGH, *Circuit Judge*, with whom *Circuit Judges* BROWN and GRIFFITH join, concurring: Pursuant to congressional authorization, Presidents throughout U.S. history have employed military commissions to try enemy war criminals for conspiracy to commit war crimes. That history includes the two most significant U.S. military commission trials: the 1865 military commission trial of the Confederate conspirators who plotted to kill President Lincoln and the 1942 military commission trial of the Nazi conspirators who secretly entered the United States during World War II and planned to attack U.S. infrastructure and military facilities.

In the wake of al Qaeda's attacks on the United States on September 11, 2001, Congress has twice passed laws (signed by President Bush in 2006 and President Obama in 2009) expressly reaffirming that military commissions may try unlawful enemy combatants for conspiracy to commit war crimes. Pursuant to those express congressional authorizations, President Bush and later President Obama have employed military commissions to try alleged al Qaeda war criminals for the offense of conspiracy to commit war crimes. Indeed, Khalid Sheikh Mohammed, one of the alleged masterminds of the September 11th attacks, faces a conspiracy charge in his pending military commission trial. Several other al Qaeda members likewise have been charged with conspiracy before U.S. military commissions.

Bahlul is an al Qaeda member who worked closely with Osama bin Laden in plotting al Qaeda's September 11th attacks on the United States. In December 2001, Bahlul was captured in Pakistan. In 2008, he was tried and convicted before a U.S. military commission of conspiracy to commit war crimes.

Citing Article I and Article III of the Constitution, Bahlul argues that Congress may establish military commissions only

for offenses under the *international* law of war. Bahlul further argues (and the Government concedes) that conspiracy is not an offense under the international law of war. Therefore, Bahlul contends that he may not be tried for conspiracy before a U.S. military commission.

On its face, Bahlul's argument is extraordinary. It would incorporate international law into the U.S. Constitution as a judicially enforceable constraint on Congress and the President. As a matter of U.S. constitutional law, the wartime decisions of Congress and the President to try unlawful enemy combatants before military commissions would be subject to the dictates of foreign nations and the international community, as embodied in international law.

The Government responds that, under the Constitution, Congress may establish military commissions to try, at a minimum, (i) international law of war offenses *and* (ii) offenses that are not international law of war offenses but have historically been tried by U.S military commissions. As the Government points out, conspiracy has historically been tried by U.S. military commissions.

This case therefore raises one central legal question: Under the U.S. Constitution, may Congress establish military commissions to try unlawful enemy combatants for the offense of conspiracy to commit war crimes, even if conspiracy is not an offense under the international law of war? The answer is yes. We know that from the text and original understanding of the Constitution; the structure of the Constitution; landmark Supreme Court precedent; longstanding congressional practice, as reflected in venerable

and contemporary federal statutes; and deeply rooted Executive Branch practice, from the 1800s to the present.[1]

---

[1] The Government argues that Bahlul forfeited this claim. Even if that were true, the Court should review the claim de novo, not simply for plain error. In rare and extraordinarily important cases, the Court has discretion to hear even a forfeited claim de novo. *See Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 232 (1995). The question of whether conspiracy may constitutionally be tried by military commission is extraordinarily important and deserves a "definitive answer." *Al Bahlul v. United States*, 767 F.3d 1, 62 (D.C. Cir. 2014) (en banc) (separate opinion of Brown, J.). The question implicates an important part of the U.S. Government's war strategy. And other cases in the pipeline require a clear answer to the question. This case unfortunately has been pending in this Court *for more than five years*. It is long past time for us to resolve the issue squarely and definitively.

Judge Kavanaugh adds that he would apply de novo review for that reason, as well as for any of five other independent reasons. *First*, before the military judge, Bahlul objected to the military commission's authority to try him for the charged offenses. Bahlul did not forfeit this claim. *Second*, even if Bahlul had not objected, the question of whether the Constitution requires Article III courts to try conspiracy offenses is a structural question of subject matter jurisdiction, and cannot be forfeited or waived. *See Ex Parte Quirin*, 317 U.S. 1, 25 (1942) (describing the question as one of "jurisdiction"). *Third*, in any event, Rules 905 and 907 of the Rules for Military Commissions require de novo judicial review of the question whether a charged offense may be tried by military commission. *Fourth*, even if all of those points are incorrect, the Government has repeatedly forfeited any forfeiture argument during the course of this litigation. For example, before the U.S. Court of Military Commission Review, the Government expressly acknowledged that Bahlul's argument was *not* forfeited or waived. *See* Bahlul Appendix at 161 n.5 (quoting Government's submission: "The Government does not argue" that Bahlul's argument "questioning jurisdiction" is "waived."). Only at the 11th hour has the Government belatedly claimed that Bahlul forfeited his

4

I

We first address the Article I issue. Bahlul acknowledges that Congress possesses authority under Article I to establish military commissions to try war crimes. But he contends that military commissions may try only *international* law of war offenses. Bahlul further argues (and the Government concedes) that conspiracy is not an international law of war offense. Therefore, Bahlul says he may not be tried by military commission for conspiracy.

Contrary to Bahlul's argument, Article I of the Constitution does not impose international law as a limit on Congress's authority to make offenses triable by military commission.[2] That is apparent from five sources of law: the text and original understanding of Article I, the overall structure of the Constitution, landmark Supreme Court precedent, longstanding federal statutes, and deeply rooted U.S. military commission practice.

---

constitutional argument. *Fifth*, even if Bahlul forfeited his argument and plain error review applied here, the Court when applying plain error often holds that there was no error, rather than merely holding that any possible error was not plain. We should do the same here.

[2] To be clear, Congress may and sometimes does incorporate international law principles into statutes. In doing so, Congress may on occasion enact statutes that simply refer to "international law" in general terms. *See, e.g.*, 22 U.S.C. §§ 5604-5605 (empowering the President to impose sanctions on foreign countries that use chemical or biological weapons "in violation of international law"). Likewise, the President and Senate may enter into self-executing treaties with foreign nations. *See Medellin v. Texas*, 552 U.S. 491, 505 n.2 (2008). Those statutes and self-executing treaties are U.S. law, not international law.

*First*, the text and original understanding of Article I demonstrate that international law does not impose a limit on Congress's authority to make offenses triable by military commission.

The premise of Bahlul's Article I argument is that Congress's *sole* source of constitutional authority to make offenses triable by military commission is the Define and Punish Clause of Article I. That Clause grants Congress authority to "define and punish . . . Offences against the Law of Nations." U.S. CONST. art. I, § 8, cl. 10. Bahlul argues that the "law of nations" is a synonym for international law, and further contends that conspiracy is not an offense under the international law of war. Therefore, according to Bahlul, Congress lacks power under Article I, Section 8 to make conspiracy an offense triable by military commission.

We need not decide the scope of the Define and Punish Clause in this case.[3] That is because the premise of Bahlul's Article I argument is flawed. Regardless of the scope of the Define and Punish Clause, an issue we do not decide, Congress's Article I authority to establish military commissions – including its authority to determine which crimes may be tried by military commission – does not derive exclusively from that Clause.

---

[3] Judge Henderson and Judge Brown have previously concluded that the Define and Punish Clause grants Congress authority to make conspiracy an offense triable by military commission. *See Al Bahlul v. United States*, 792 F.3d 1, 44-55 (D.C. Cir. 2015) (Henderson, J., dissenting); *Al Bahlul v. United States*, 767 F.3d 1, 53-62 (D.C. Cir. 2014) (en banc) (separate opinion of Brown, J.).

Rather, the war powers clauses in Article I, Section 8 – including the Declare War Clause and the Captures Clause, together with the Necessary and Proper Clause – supply Congress with ample authority to establish military commissions and make offenses triable by military commission. And the Declare War Clause and the other war powers clauses in Article I do not refer to international law or otherwise impose international law as a constraint on Congress's authority to make offenses triable by military commission. *Cf. Al Bahlul v. United States*, 792 F.3d 1, 55-56 (D.C. Cir. 2015) (Henderson, J., dissenting).

As the Supreme Court has long recognized, a congressional authorization of war pursuant to the Declare War Clause is understood "by universal agreement and practice" to encompass all of the traditional incidents of war – including the power to kill, capture, and detain enemy combatants, and most relevant here, the power to try unlawful enemy combatants by military commission for war crimes. *Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (binding opinion of O'Connor, J.); *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 593-94 (2006); *In re Yamashita*, 327 U.S. 1, 11-12 (1946).[4] As Colonel William Winthrop, described by the Supreme Court as the "Blackstone of Military Law," *Reid v. Covert,* 354 U.S. 1, 19 n.38 (1957) (plurality opinion), summarized it: "[I]n general, it is those provisions of the Constitution which empower Congress to 'declare war' and 'raise armies,' and which, in authorizing the initiation of *war*, authorize the employment of all necessary and proper agencies for its due prosecution, from which this tribunal derives its original sanction. . . . The commission is simply an

---

[4] On September 18, 2001, Congress authorized the use of force against al Qaeda and related terrorist groups. *See* Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224.

instrumentality for the more efficient execution of the war powers vested in Congress and the power vested in the President as Commander-in-chief in war." WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS 831 (rev. 2d ed. 1920); *see also Hamdan*, 548 U.S. at 592 n.21 (quoting Winthrop's statement that the Declare War Clause, among others, supplies Congress with authority to establish military commissions to try war crimes). So too, Justice Story explained that Congress's power to make substantive and procedural rules for military commissions is a "natural incident to the preceding powers to make war, to raise armies, and to provide and maintain a navy." 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1192 (1833).[5]

In short, it would be textually and historically inaccurate to deem the Define and Punish Clause, whatever its scope, as the *sole* source of Congress's authority here. The Declare War Clause and the other war powers clauses in Article I authorize Congress to establish military commissions and make offenses triable by military commission. And those clauses do not refer to international law or otherwise impose international law as a constraint on Congress's authority to make offenses triable by military commission. By their terms, therefore, those clauses do not confine U.S. military commissions to trying only international law of war offenses.

---

[5] Contrary to the suggestion advanced by Bahlul and the joint dissent, it would be absurd to say that the war powers clauses grant Congress authority to establish military commissions but not to specify which offenses may be tried by military commission. There is no support in Supreme Court precedent for slicing and cabining Congress's war powers authority in that way. Moreover, the longstanding historical practice in the Legislative and Executive Branches flatly contravenes that suggestion.

*Second*, the overall structure of the Constitution strongly reinforces the conclusion that international law does not impose a limit on Congress's authority to make offenses triable by military commission.

The Framers of the Constitution paid careful attention to the allocation of war powers between the national government and the states, and within the national government. The Framers assigned the national government – in particular, Congress and the President – the authority to make wartime decisions on behalf of the United States. The Framers assigned that power to the national government in part because the inability to wage war effectively had been one of the key weaknesses of the Articles of Confederation, and the Framers sought to fix that flaw.

What matters most for present purposes is that the Framers certainly did not purport to afford foreign nations (acting through the international law of war or otherwise) any constitutional authority over the wartime decisions of the United States, such as the determination of which war crimes may be prosecuted by U.S. military commissions. It would be a historical anomaly to conclude that "We the People of the United States" gave foreign or international bodies the power to constrain U.S. war-making authority in that way. Yet that would be the necessary consequence of the argument put forward by Bahlul and the joint dissent. They would incorporate international law into the U.S. Constitution as a *judicially enforceable constraint* on the wartime decisions of the Congress and the President. *As a matter of U.S. constitutional law*, Congress and the President would be subject to the dictates of the international community, a community that at any given time may be unsupportive of or even hostile to U.S. national security interests.

Put simply, the argument advanced by Bahlul and the joint dissent does not comport with the Constitution's structure. The Constitution does not give foreign nations (acting through the international law of war or otherwise) a de facto veto over Congress's determination of which war crimes may be tried by U.S. military commissions.

*Third*, consistent with the Constitution's text and structure, landmark Supreme Court precedent likewise supports the conclusion that Congress's authority to establish offenses triable by military commission is not confined by international law.

The Supreme Court's leading constitutional decision regarding military commissions is *Ex Parte Quirin*. There, the Supreme Court ruled that use of military commissions to try war crimes was constitutionally permissible. In doing so, the Court emphasized that U.S. military commissions have long been authorized by Congress, and the Court noted in particular that military commissions have long tried the offense of spying. *See Ex Parte Quirin*, 317 U.S. 1, 41-42 & n.14 (1942). But spying was not and has never been an offense under the international law of war. *See* Government Br. 45 (spying not an international law of war offense); *see also* National Institute of Military Justice Amicus Br. 14-15 n.6 (same); Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 HARV. L. REV. 2047, 2132 (2005) (same). The Court nonetheless relied on and approved of trying spying offenses by military commission.[6] *Quirin* is admittedly a difficult

---

[6] The *Quirin* Court's discussion of spying was not dicta. One primary basis for the Court's finding a military commission exception to Article III was the longstanding statute that made spying an offense triable by military commission. *See Quirin*, 317 U.S. at 41-42. But even if the Supreme Court's reference to spying

decision to decipher. But the Supreme Court's reliance on spying, a non-international-law-of-war offense, as an offense triable by military commission at least suggests – even if it does not conclusively show – that Congress has authority under Article I to make offenses triable by military commission even if those offenses are not war crimes under the international law of war.[7]

The Court in *Quirin* did not say that military commissions are constitutionally permitted only for international law of war offenses. Nor did any later Supreme Court case hold that military commissions are constitutionally permitted only for international law of war offenses. One would have expected the Court at some point to say as much if the Court actually thought as much.

---

were dicta, we as a lower court generally treat Supreme Court dicta as authoritative. *See United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006) ("[C]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.") (internal quotation marks and citations omitted); *Bangor Hydro-Electric Co. v. FERC*, 78 F.3d 659, 662 (D.C. Cir. 1996) ("It may be *dicta*, but Supreme Court *dicta* tends to have somewhat greater force – particularly when expressed so unequivocally."). The *Quirin* Court's discussion of spying was hardly the kind of stray comment that a lower court can or should cast aside.

[7] To be sure, the *Quirin* Court did not expressly *state* that Congress may make non-international-law-of-war offenses triable by military commission. Had it explicitly done so, the question would be indisputably resolved and we would not be facing the current litigation, after all. But in considering an objection to trial by military commission, the Court did *rely on* a longstanding statute that made spying, a non-international-law-of-war offense, triable by military commission.

An amicus brief nonetheless argues that the *Quirin* Court thought that international law was a constitutional constraint on Congress but that the *Quirin* Court believed, albeit mistakenly, that spying was an international law of war offense. *See* National Institute of Military Justice Amicus Br. at 14 n.6. The joint dissent agrees. *See* Dissenting Op. at 25-26. That argument lacks foundation. To begin with, the Supreme Court never said anything to the effect that Congress's *constitutional* authority to make offenses triable by military commission is constrained by the international law of war. Moreover, the idea that the Court actually thought spying was an international law offense necessarily assumes that the *Quirin* Court – with Justices such as Harlan Fiske Stone, Felix Frankfurter, Robert Jackson, and Hugo Black – was ignorant of the content of international law. We cannot plausibly make such an assumption. There is no indication in the opinion or historical record that the *Quirin* Court actually believed that spying was an international law of war offense. Nor do any later Supreme Court cases suggest as much. On the contrary, the *Quirin* Court cited authorities that indicated that spying was *not* an international law of war offense. *See Quirin*, 317 U.S. at 30 n.7, 31 n.8, 32, 34, 37 (citing, among other authorities, (i) the Hague Convention No. IV, art. 1 (annex), 36 Stat. 2295 and (ii) the 1940 U.S. War Department's Rules of Land Warfare, which states in Paragraph 203 that spying "involves no offense against international law").

To be sure, the *Quirin* Court discussed international law authorities. Those international law authorities were relevant for, among other things, determining whether the charged offenses could be tried by military commission under Article 15 of the Articles of War, which is present-day Article 21 of the Uniform Code of Military Justice, or 10 U.S.C. § 821. That statute has long used the broad term "law of war" to

define the scope of offenses triable by military commission. The Court discussed those authorities in part because an offense's status as an international law of war offense is *sufficient* but not *necessary* to make an offense triable by U.S. military commission under the "law of war" prong of 10 U.S.C. § 821. *See Quirin*, 317 U.S. at 46; *Al Bahlul v. United States*, 767 F.3d 1, 65-72 (D.C. Cir. 2014) (en banc) (separate opinion of Kavanaugh, J.); *see also Hamdan*, 548 U.S. at 594-95. But the *Quirin* Court never stated that the international law of war constituted a *constitutional* limit on Congress's authority to make offenses triable by military commission.

*Fourth*, when we interpret the Constitution, especially the provisions related to the separation of powers, the historical practice of the Legislative and Executive Branches matters. *See Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2091, slip op. at 20 (2015) ("In separation-of-powers cases this Court has often put significant weight upon historical practice.") (internal quotation marks omitted); *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2560, slip op. at 7 (2014) ("[L]ongstanding practice of the government can inform our determination of what the law is.") (internal quotation marks and citations omitted); *The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions   . . . ."); *McCulloch v. Maryland*, 17 U.S. 316, 401 (1819) (when considering a separation of powers question, court should "receive a considerable impression" from longstanding practice).

In this case, turning first to the Legislative Branch, Congress's longstanding practice strongly supports the conclusion that international law is not a constitutional constraint on Congress's authority to make particular crimes triable by military commission. From the earliest days of the

Republic, Congress has gone beyond international law in specifying the offenses that may be tried by military commission. Beginning in 1776, the Continental Congress codified the offense of spying – a non-international-law offense – as a crime triable by military tribunal. *See* Resolution of the Continental Congress (Aug. 21, 1776), *in* 5 JOURNALS OF THE CONTINENTAL CONGRESS 1774 – 1789, at 693 (Worthington Chauncey Ford ed. 1906) [hereinafter "JOURNALS"] (authorizing trial by military court of "all persons, not members of, nor owing allegiance to, any of the United States of America . . . who shall be found lurking as spies"); *see also* WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS 765-66 & n.88 (rev. 2d ed. 1920). Likewise, in September 1776, Congress authorized trial by military tribunal for another non-international-law offense: aiding the enemy. *See* Articles of War (Sept. 20, 1776), *in* 5 JOURNALS, at 799. In 1789, after the Constitution was ratified, the First Congress adopted the same Articles of War that had been promulgated by the Continental Congress, including the offenses of spying and aiding the enemy. *See* Act of Sept. 29, 1789, ch. 25, §4, 1 Stat. 95, 96 (1789). Again in 1806, Congress updated those provisions and, in doing so, was careful to preserve the offenses of spying and aiding the enemy as crimes triable by military tribunal. *See* Articles of War of 1806, ch. 20, arts. 56, 57, § 2, 2 Stat. 359, 366, 371 (1806). Both of those prohibitions remain on the books today. *See* 10 U.S.C. §§ 950t(26), 950t(27). Congress has made those two crimes triable by military commission even though they are *not* international law of war offenses.

Congress's practice of going beyond international law has continued to the present. As recently as 2006 and 2009, Congress enacted new laws making several non-international-law offenses, such as solicitation and material support for terrorism, triable by military commission. *See* Military

Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600, 2630; Military Commissions Act of 2009, Pub. L. No. 111-84, 123 Stat. 2574, 2611.

That consistent congressional practice requires our respect. As the Supreme Court has stated, the "uniform, long-continued and undisputed legislative practice just disclosed rests upon an admissible view of the Constitution which, even if the practice found far less support in principle than we think it does, we should not feel at liberty at this late day to disturb." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 329 (1936).

The joint dissent responds that Congress, over the course of more than two centuries, actually thought itself bound by international law but believed (mistakenly) that those offenses – spying and aiding the enemy, for example – were in fact international law offenses. *See* Dissenting Op. at 34-36. That assertion seems to materialize out of thin air. We are aware of no credible support for the notion that Congress has believed itself bound by international law in this context or has thought that those offenses were in fact international law offenses. Moreover, the joint dissent does not deal with the persistence of congressional practice – from the Founding to the recent 2006 and 2009 Acts. In short, the deeply rooted congressional practice directly contradicts the joint dissent's position.

*Fifth*, in addition to the historical practice in Congress, the historical practice in the Executive Branch demonstrates that international law is not a constraint on which offenses may be tried by military commissions. Indeed, perhaps the most telling factor when considering this constitutional question is the deeply rooted history of U.S. military commission trials of the offense of conspiracy, which is not

and has never been an offense under the international law of war. *Cf. Zivotofsky*, 135 S. Ct. at 2091, slip op. at 20 ("In separation-of-powers cases this Court has often put significant weight upon historical practice.") (internal quotation marks omitted); *Noel Canning*, 134 S. Ct. at 2560, slip op. at 7 ("[L]ongstanding practice of the government can inform our determination of what the law is") (internal quotation marks and citations omitted).

The two most important military commission precedents in U.S. history – the trials of the Lincoln conspirators and the Nazi saboteurs – were trials for the offense of conspiracy.

Consider the trial of the Lincoln conspirators. After seeking the advice of the Attorney General, President Andrew Johnson decided to try the Lincoln conspirators by military commission rather than by criminal trial in civilian court. *See* Military Commissions, 11 Op. Attorney Gen. 297, 298 (1865). The Lincoln conspirators were expressly charged with and convicted of *conspiracy* – in that case, conspiracy to violate the law of war by killing the President and Commander in Chief of the Union Army, Abraham Lincoln. Indeed, conspiracy was the *only* offense charged against them. After an extensive multi-week trial that gripped the Nation and after vigorous argument about the facts and the commission's jurisdiction, numerous conspirators were convicted of conspiracy.

The joint dissent tries to cast doubt on whether the Lincoln conspirators were actually tried for conspiracy. There is no doubt. Consider what a contemporary court said in response to a habeas petition filed by three of the Lincoln conspirators: "[T]he prisoners are guilty of the charge on which they were convicted – of a conspiracy to commit the military crime which one of their number did commit, and

some of them of more or less participation." *Ex parte Mudd*, 17 F. Cas. 954 (S.D. Fla. 1868).[8]  Indeed, in the prior en banc decision in this case, our Court (joined by one of the judges who joins the joint dissent today) described the Lincoln case as a trial for conspiracy and stated that "the sole offense alleged was conspiracy." *Al Bahlul v. United States*, 767 F.3d 1, 25 (D.C. Cir. 2014) (en banc).  Our en banc Court explained that the Lincoln case was a "particularly significant precedent" and a "high-profile example of a conspiracy charge tried by a military commission." *Id.*; *see also Al Bahlul v. United States*, 792 F.3d 1, 59-61 (D.C. Cir. 2015) (Henderson, J., dissenting).

Consider also the military commission trial of the eight Nazi saboteurs who had been selected to execute Operation Pastorius – Adolf Hitler's plan to destroy America's war industries and facilities – and secretly entered the United States during World War II.  The defendants were expressly charged with and convicted of *conspiracy*, as well as of other offenses.  Attorney General of the United States Francis Biddle, who would later represent the United States as a judge at Nuremberg, personally prosecuted the case before the military commission. President Franklin Roosevelt reviewed and approved all of the convictions.  The defendants filed habeas corpus petitions to block the proceedings as unconstitutional.  The Supreme Court affirmed the legality of

---

[8] Although the original records for the Southern District of Florida from that time period were initially lost, a copy of Judge Boynton's opinion for the court is on file with the Library of Congress. Moreover, the opinion was published in full in the *New York Times* on October 1, 1868 – precisely one month after the decision was handed down by the court. *The Application in Behalf of Dr. Mudd, Arnold and Spangler – Opinion of Judge Boynton*, N.Y. TIMES at 2 (Oct. 1, 1868).

the trial, and in doing so, did not disturb the conspiracy charge. *See Quirin*, 317 U.S. at 46.

Later in World War II, moreover, the Government prosecuted another set of Nazi saboteurs for conspiracy and tried them before a military commission. In that case, Assistant Attorney General Tom Clark, who would later serve on the Supreme Court, produced a formal memorandum – based in large part on the precedents involving the Lincoln conspirators and the earlier Nazi saboteurs – concluding that conspiracy was an offense triable by military commission. *See* Memorandum from Tom C. Clark, Assistant Attorney General, to Myron C. Kramer, Judge Advocate General (Mar. 12, 1945), *reprinted in* Government Supplemental Appendix 104-10. In Assistant Attorney General Clark's words, it was "well established that a conspiracy to commit an offense against the laws of war is itself an offense cognizable by a commission administering military justice." *Id.* at 110. The military commission subsequently convicted the defendants of conspiracy. President Truman reviewed and affirmed the convictions. After one of those Nazi saboteurs later challenged his conviction in court, the Tenth Circuit affirmed the denial of his habeas petition, and the Supreme Court denied certiorari. The Tenth Circuit stated the charges against him were clearly "within the jurisdiction of the duly constituted Military Commission with power to try, decide and condemn." *Colepaugh v. Looney*, 235 F.2d 429, 432 (10th Cir. 1956), *cert. denied*, 352 U.S. 1014 (1957).

Put simply, the most well-known and important U.S. military commissions in American history tried and convicted the defendants of *conspiracy*. That history matters. *See Zivotofsky*, 135 S. Ct. at 2091, slip op. at 20; *Noel Canning*, 134 S. Ct. at 2559-60, slip op. at 6-7. And that history is directly on point here because conspiracy is not an

international law of war offense and because conspiracy is the precise offense that Bahlul was charged with committing.

In response to all of this, the joint dissent says that there is no "robust history." Dissenting Op. at 37. But to reiterate, the two most important military commission trials in U.S. history were trials for conspiracy, which is not an international law of war offense. From the beginning of the Nation, Congress and the President have gone well beyond international law when enacting legislation making offenses triable by military commission. To be sure, military commissions were not employed by the United States during the Korean War, the Vietnam War, or the Persian Gulf War. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 597 (2006) (plurality opinion) ("The last time the U.S. Armed Forces used the law-of-war military commission was during World War II.").[9] So those wars do not supply us with any additional examples of military commission trials, and thus do not tell us anything one way or the other about trying conspiracy or other non-international-law offenses before military commissions.

But in the two most significant U.S. wars of the last 200 years – the Civil War and World War II – as well as in the current war against al Qaeda and its associated forces, the

---

[9] In the Korean War, General Douglas MacArthur – who was serving as the head of the U.S. and United Nations forces in Korea – issued regulations specifying conspiracy to commit war crimes as an offense triable by military commission. *See* U.N. COMMAND, RULES OF CRIMINAL PROCEDURE FOR MILITARY COMMISSIONS OF THE UNITED NATIONS COMMAND at Rule 4 (Oct. 22, 1950) (establishing that "all attempts to commit, or conspiracies and agreements to commit . . . violations of the laws and customs of war" committed during the Korean War were to be punishable by U.N. military commission). But no U.S. military commissions ultimately were convened during that war.

U.S. has employed military commissions. And the *most important* military commission trials during those wars were trials for conspiracy, which is not an international law of war offense. That historical and contemporary practice cannot be airbrushed out of the picture. Prosecuting conspiracy and other non-international-law-of-war offenses is not at the periphery of U.S military commission history and practice. Prosecuting conspiracy and other non-international-law-of-war offenses lies at the core of U.S. military commission history and practice.

As the Supreme Court cautioned in *Noel Canning*, we must be "reluctant to upset this traditional practice where doing so would seriously shrink the authority that Presidents have believed existed and have exercised for so long." *Noel Canning*, 134 S. Ct. at 2573. Moreover, the Supreme Court has explained that historical practice constitutes "an important interpretive factor even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era." *Id.* at 2560.

In short, the text and original understanding of the Constitution; the structure of the Constitution; landmark Supreme Court precedent; the deeply rooted historical practice of the Legislative Branch, as seen in federal statutes; and the longstanding practice of the Executive Branch, as seen in U.S. military commission practice stretching back over two centuries, all point decisively to the same conclusion:  The war powers clauses of Article I of the Constitution do not impose international law as a constraint on Congress's authority to establish offenses triable by military commission.

II

Bahlul also contends that Article III of the U.S. Constitution confines U.S. military commissions to international law of war offenses.

This iteration of Bahlul's argument begins with the premise that Article III vests the judicial power in Article III courts and requires crimes to be tried by jury, not before military commissions.[10]  Based solely on the text of Article III, Bahlul might have a point. But the Supreme Court has long recognized an exception to Article III for military commissions to try enemy war crimes. *See Ex Parte Quirin*, 317 U.S. 1, 38-45 (1942); *see also Hamdan v. Rumsfeld*, 548 U.S. 557 (2006).

Exceptions to Article III, including the exception for military commissions, are established and interpreted in light of historical practice. *See Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 64 (1982) (plurality opinion) ("[T]he literal command of Art. III . . . must be interpreted in light of the historical context in which the Constitution was written, and of the structural imperatives of the Constitution as a whole."); *Quirin* 317 U.S. at 39 ("[I]t was not the purpose or effect of  § 2 of Article III, read in the light of the common law, to enlarge the then existing right to a jury trial."); *see also Stern v. Marshall*, 564 U.S. 462, 504-05 (2011) (Scalia, J., concurring) ("[A]n Article III judge is required in *all* federal adjudications, unless there is a firmly established historical practice to the contrary."); *see generally*

---

[10] *See* U.S. CONST. art. III, § 1 ("The judicial Power of the United States, shall be vested . . . ."); *id.* § 2, cl. 3 ("The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury . . . .").

*Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2091, slip op. at 20 (2015) ("In separation-of-powers cases this Court has often put significant weight upon historical practice.") (internal quotation marks omitted); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring) ("Deeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a text or supply them."); *The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions of this character."); *McCulloch v. Maryland*, 17 U.S. 316, 401 (1819) ("[A] doubtful question, one on which human reason may pause, and the human judgment be suspended, in the decision of which the great principles of liberty are not concerned, but the respective powers of those who are equally the representatives of the people, are to be adjusted; if not put at rest by the practice of the government, ought to receive a considerable impression from that practice.").

In this context, if historical practice demonstrates that an offense is triable by U.S. military commission, that history resolves the Article III issue. As explained in Part I of this opinion, the history of U.S. military commissions trying non-international-law-of-war offenses is extensive and dates from the beginning of the Republic. That historical practice therefore amply demonstrates that Article III is not a barrier to U.S. military commission trials of non-international-law-of-war offenses, including the offense of conspiracy to commit war crimes.

Notwithstanding that history, Bahlul says that *Quirin* already considered the military commission exception to

Article III and limited the exception to international law of war offenses.

Bahlul's reading of *Quirin* is incorrect. In *Quirin*, the Nazi saboteur defendants claimed that they had a right under Article III to be tried by jury in an Article III federal court and therefore could not be tried by military commission. At some length, the *Quirin* Court specifically considered and rejected the defendants' Article III objection. *See Quirin*, 317 U.S. at 38-45.[11] The Court explained that Article III did not "enlarge the then existing right to a jury trial" beyond the right as it existed at common law. *Id.* at 39. Because the common law did not preclude trial by military commission for war crimes, Article III "cannot be taken to have extended the right to demand a jury to trials by military commission, or to have required that offenses against the law of war not triable by jury at common law be tried only in the civil courts." *Id.* at 40.

As explained above, in reaching its conclusion on the Article III issue, the *Quirin* Court emphasized that Congress – exercising its Article I powers – had made spying an offense triable by military commission since the earliest days of the Republic. The Court stated that the early Congress's enactment of the spying statute "must be regarded as a contemporary construction" of Article III "as not foreclosing trial by military tribunals, without a jury, of offenses against the law of war committed by enemies not in or associated with our Armed Forces." *Id.* at 41. "Such a construction," the Court said, "is entitled to the greatest respect." *Id.* at 41-42.

---

[11] The Court also referred to the Fifth and Sixth Amendments when talking about Article III, but the Court analyzed them together. For ease of reference, we will refer only to Article III.

The Supreme Court's analysis in *Quirin* is instructive for present purposes because, as noted above, the offense of spying on which the *Quirin* Court relied to answer the Article III objection was not (and is not) an offense under the international law of war. It thus makes little sense to read *Quirin* as barring military commission trials of non-international-law-of-war offenses when *Quirin*, in rejecting a jury trial objection to military commissions, expressly relied on a longstanding statute making spying – a *non-*international-law-of-war offense – triable by military commission.

In addition, as previously discussed, nothing about the Court's reasoning in *Quirin* rested on whether the offense tried by a military commission was an international law of war offense. The Court never suggested that military commissions are constitutionally permitted only for international law of war offenses. Nor has the Court ever said anything like that in its several later military commission cases. One would have expected the Court to say as much if the Court actually thought as much.

To be sure, the *Quirin* Court referred to international law authorities. But as noted above, the Court discussed those authorities in part because an offense's status as an international law offense is sufficient but not necessary to make an offense triable by military commission under 10 U.S.C. § 821, the statute that used the broad term "law of war" to define offenses triable by military commission.

In short, Article III does not limit U.S. military commissions to international law of war offenses or otherwise

foreclose trial of the offense of conspiracy to commit war crimes before U.S. military commissions.[12]

All of that said, the Constitution does not grant Congress unlimited authority to designate crimes as triable by military commission. At oral argument, the Government stated that the charges must at least involve an enemy combatant who committed a proscribed act during or in relation to hostilities against the United States. *See* Tr. of Oral Arg. at 37. In general, if an offense is an international law of war offense *or* has historically been tried by U.S. military commission, that is *sufficient* to uphold Congress's constitutional authority to make the offense triable by military commission. *See generally Quirin*, 317 U.S. at 24-48. As Winthrop explained, the war crimes triable by U.S. military commission are "derived from International Law, supplemented by acts and orders of the military power and a few legislative provisions." WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS 773 (rev. 2d ed. 1920).

But is one of those conditions *necessary*? In other words, what if an offense is neither an international law of war offense nor historically rooted in U.S. military commission practice? Consider a hypothetical new statute that makes cyber-attacks by enemy forces a war crime triable by military commission. *Quirin* stated that Article III does "not restrict whatever authority was conferred by the Constitution to try offenses against the law of war by military commission," and does not bar "the practice of trying, before military tribunals without a jury, offenses committed by enemy belligerents

---

[12] Bahlul also has raised equal protection and First Amendment challenges to his conviction. Those arguments are frivolous, for reasons explained in *Al Bahlul v. United States*, 767 F.3d 1, 75-76 (D.C. Cir. 2014) (en banc) (separate opinion of Kavanaugh, J.).

against the law of war." *Quirin*, 317 U.S. at 45, 41. Perhaps that language suggests that Article III permits what Article I authorizes with respect to which enemy war crimes may be tried by U.S. military commission. But we need not answer that hypothetical in this case and need not define with precision the outer limits of the Constitution in this context, other than to say that international law is not such a limit. Wherever one might ultimately draw the outer boundaries of Congress's authority to establish offenses triable by military commission, the historically rooted offense of conspiracy to commit war crimes is well within those limits. An enemy of the United States who engages in a conspiracy to commit war crimes – in Bahlul's case, by plotting with Osama bin Laden to murder thousands of American civilians – may be tried by a U.S. military commission for conspiracy to commit war crimes.

## III

In light of the importance of this case, and the serious and passionate arguments advanced by the joint dissent, we close with a few additional responses to points made by the joint dissent.

*First*, in reaching its conclusion, the joint dissent relies in part on *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006). That reliance is misplaced. As relevant here, *Hamdan* was a statutory case interpreting the phrase "law of war" in 10 U.S.C. § 821. Nowhere did the Supreme Court ever say (or even hint) that the *United States Constitution* imposed international law as a limit on what offenses may be tried by U.S. military commissions. The joint dissent's citations to *Hamdan* therefore do not support its *constitutional* position.

In fact, the *Hamdan* decision and its aftermath only highlight the extraordinary nature of the joint dissent's position. In *Hamdan*, the Court confronted but ultimately did not resolve the question of whether the relevant statute in effect at the time, 10 U.S.C. § 821, barred military commission trials of alleged war criminals *for conspiracy*. But four of the Justices in the majority expressly invited Congress to clarify the scope of military commission power. *Hamdan*, 548 U.S. at 636 (Breyer, J., concurring, joined by Kennedy, Souter, and Ginsburg, JJ.); *id.* at 653 (Kennedy, J., concurring in part, joined in relevant part by Souter, Ginsburg, and Breyer, JJ.). In response to the Justices' invitation, Congress and the President promptly enacted new legislation to make crystal clear that conspiracy is an offense triable by military commission. Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600, 2625, 2630 (expressly authorizing trials before military commissions for conspiracy offenses).

A decade after *Hamdan*, Bahlul and the joint dissent have now come back with a novel and extraordinary constitutional interpretation that would thwart the considered wartime decisions of two Congresses and two Presidents – decisions invited by the Supreme Court in *Hamdan* – to authorize military commission trials of conspiracy offenses. Under the joint dissent's theory, the congressional action invited by the Supreme Court was all a waste of time because U.S. military commissions are *constitutionally* barred from trying the offense of conspiracy, regardless of statutory authorization. But in *Hamdan*, not a single Justice hinted at a lurking constitutional problem with trying conspiracy offenses before military commissions (nor did Hamdan himself in his arguments to the Supreme Court, either directly or through a constitutional avoidance argument). To be sure, the *Hamdan* decision does not formally preclude the Supreme Court from

now returning to the scene and finding a previously missed constitutional problem with trying conspiracy offenses by military commission. But in this wartime context, one should not lightly assume that the Supreme Court expressly encouraged the political branches to launch into an utterly meaningless, decade-long exercise.

*Second*, the joint dissent says: "It is not international law, however, that constrains Congress's authority here – it is Article III." Dissenting Op. at 46. That sentence glides over the key question. The question is whether Article III (or Article I) incorporates international law as a constraint on U.S. military commissions. The joint dissent says yes. But the constitutional text and structure, Supreme Court precedents, and deeply rooted U.S. history tell us that the answer is no.

Of course, the consistent U.S. history is the consistent U.S. history for a reason. As explained above, the consequences for the United States of *judicially* incorporating international law into the U.S. Constitution would be deeply problematic and run afoul of our most fundamental constitutional principles and traditions. International law often embodies a majority or consensus view of nations. Does the United States Constitution really allow foreign nations, through the guise of international law, to set *constitutional* limits *enforceable in U.S. courts* against the U.S. war effort? Under Bahlul's argument, and under the theory advanced by the joint dissent, the answer would be yes. We think not. We see no basis in U.S. law, precedent, or history – not to mention, common sense – for that position. To paraphrase Justice Jackson, the Constitution is not "a suicide pact." *Terminiello v. Chicago*, 337 U.S. 1, 37 (1949) (Jackson, J., dissenting).

To be sure, the Judiciary plays a critical role in enforcing constitutional and statutory limits in justiciable wartime cases, and this Court must not hesitate (and has not hesitated) in doing so, even when the consequences are significant. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *Al Bahlul v. United States*, 767 F.3d 1 (D.C. Cir. 2014) (en banc) (Ex Post Facto Clause bars Congress and the President from making material support for terrorism a war crime that can be retroactively prosecuted before a military commission); *Hamdan v. United States*, 696 F.3d 1238 (D.C. Cir. 2012) (same, via constitutional avoidance doctrine). But in this case, neither Article I nor Article III confines Congress to international law of war offenses when Congress establishes war crimes triable by military commission.

To be clear, we take no position on the *policy* question of whether the U.S. Government should use military commissions to try the offense of conspiracy or other non-international-law-of-war offenses, or indeed whether the Government should use military commissions at all. That policy decision belongs first to Congress and the President in the legislative process, and then to the President in the exercise of his or her Commander-in-Chief power. Likewise, we take no position on the general question of when and how Congress and the President should weigh international law principles in making those decisions. International law is important, and the political branches have good reason to adhere to international law when determining what offenses will be tried before U.S. military commissions. But international law has its own enforcement mechanisms. The federal courts are not roving enforcers of international law. And the federal courts are not empowered to smuggle international law into the U.S. Constitution and then wield it as a club against Congress and the President in wartime.

*Third*, the joint dissent seeks to explain away the history and practice of U.S. military commissions. But that effort is entirely unpersuasive.

In the face of the deeply rooted U.S. history and practice of trying conspiracy offenses by military commission, the joint dissent had two options. It could discount the importance of history to the constitutional analysis, and try to explain that the constitutional text and structure matter most here. The joint dissent did not choose that approach, no doubt because the constitutional text and structure also show what the history shows: that international law is not a constraint on Congress when Congress determines which offenses may be tried by military commission.

Alternatively, the joint dissent could attack the history head-on on the theory that the history does not actually show what it seems to show. That is the route that the joint dissent chose. But it does not work. Consider all of the contortions the joint dissent has to make in attempting to wriggle out of the history. First, faced with the historical fact that Congress since the Founding has consistently made non-international-law offenses triable by military commission, the joint dissent unconvincingly posits that those Congresses all mistakenly believed that those offenses actually were international law offenses (even though they were not and even though there is no persuasive evidence that Congress thought they were). *See* Dissenting Op. at 34-35. Second, faced with the historical fact that the Executive Branch's two most important military commissions in the history of the country were trials of conspiracy offenses, which are not international law offenses, the joint dissent implausibly suggests that the Lincoln case was not really a conspiracy case (even though it plainly was), and it notes that the conspiracy charges against the eight Nazis at issue in *Quirin* were never directly reviewed by a

court (even though the relevant point is that the military commission trial of the Nazis for conspiracy remains a central part of Executive Branch historical practice). *See id.* at 37-39, 42-44. Third, faced with the fact that the Supreme Court relied on a non-international-law offense, spying, in its landmark *Quirin* decision upholding military commissions, the joint dissent seeks to sweep that inconvenient snippet under the rug by suggesting that the Court mistakenly believed that spying was an international law offense (even though there is no persuasive evidence that the Court actually thought as much). *See id.* at 25-26.

The bottom line here is that the history matters, the history is overwhelming, and the history devastates the joint dissent's position.

*Fourth*, in justifying its position, the joint dissent posits a hypothetical of non-U.S.-citizens living together in an apartment in Virginia with pipe bombs, al Qaeda propaganda, and a map of the Washington Metro. The joint dissent says it would be "dangerous" to apprehend such a group and then try them for conspiracy before a military commission. Dissenting Op. at 63-64. We are mystified by the joint dissent's apparent belief that this is a helpful hypothetical for its position. We take it that the point of the hypothetical is to suggest that military commissions should not be used to try non-citizen enemy terrorists who are (i) captured in the United States (ii) before they commit their planned attacks. Of course, the current war has no such neat geographical boundaries. And neither did World War II, for that matter. After all, the Nazi saboteurs were captured in the United States before their planned attacks on U.S. facilities. They were then prosecuted before U.S. military commissions. And if Mohamad Atta and his fellow attackers had been captured on the night of September 10, 2001, in Portland, Maine, and

elsewhere, and then tried before congressionally authorized U.S. military commissions for conspiracy, we certainly would not have characterized that scenario as "dangerous."

*Fifth*, the joint dissent insists that the mission of the military is to defeat enemies on the battlefield, not to punish enemy wrongdoers. *See* Dissenting Op. at 49-50. The dissent's effort to define U.S. military strategy in that way is both legally and factually flawed. As the Supreme Court has long recognized, including in landmark cases such as *Hamdi*, war is waged not only by killing enemy combatants, but also by surveilling, capturing, and detaining enemy forces, and by trying unlawful enemy combatants for war crimes. And in the current war, the modus operandi of the enemy is to target citizens; to frighten, unsettle, disrupt, and demoralize; to make normal peaceful life impossible and carnage routine. In response to the enemy's tactics, two Congresses and two Presidents – like their predecessors throughout U.S. history – have determined that employing military commissions to try unlawful enemy combatants for their war crimes is an important part of the overall war effort. The Constitution assigns that question of military strategy to Congress and the President, not to the joint dissenters.

*Sixth*, and relatedly, in seeking to minimize the consequences of its theory, the joint dissent suggests that military commissions are not essential to the U.S. war effort because the U.S. Government can simply try al Qaeda war criminals in federal courts, including for conspiracy to commit war crimes. *See, e.g.*, Dissenting Op. at 1, 47-48. With all respect, the joint dissent has no business making such a statement. It has no basis to express such confidence and no relevant expertise on that question of wartime strategy. Unlike the joint dissenters, Presidents Bush and Obama, as well as the two Congresses in 2006 and 2009, determined that

the ordinary federal court process is not suitable for trying certain enemy war criminals. The only question for us as judges is one of law: whether the U.S. Constitution permits that policy choice by Congress and the President. If the answer were no, then we would enforce the Constitution. *Cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 577 (2004) (Scalia, J., dissenting). But here, the answer is yes.

\* \* \*

We vote to affirm Bahlul's conviction for conspiracy to commit war crimes.

MILLETT, *Circuit Judge*, concurring: "[T]here is no liberty if the power of judging be not separated from the Legislative and Executive powers." THE FEDERALIST NO. 78, at 425 (Alexander Hamilton) (E.H. Scott ed. 1898) (citation omitted). Under our system of separated powers, that means that the Judicial Branch bears both distinct responsibilities and distinct constraints. In particular, the Judicial Branch must declare and enforce the Constitution's limitations against the actions of the Political Branches in cases when that is necessary. And we must not do so when it is not necessary. "After all, a longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."[1]

Pursuant to the Military Commissions Act of 2006 ("2006 Act"), Pub. L. No. 109-366, 120 Stat. 2600, a military commission found petitioner Hamza Ahmad Suliman al Bahlul guilty of conspiracy to violate the law of war, in violation of 10 U.S.C. § 950v(b)(28). The parties framed for our review the important constitutional questions of whether a conviction for inchoate conspiracy by an Article I military commission either exceeds Congress's legislative authority under Article I or violates Article III's assignment of the judicial power to the federal courts.

I would decline to resolve those constitutional questions because they are not directly presented by this case. *First*, Bahlul forfeited those challenges by failing to raise them

---

[1] *Camreta v. Greene*, 563 U.S. 692, 705 (2011) (internal quotation marks and citation omitted); *see also Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346–347 (1936) (Brandeis, J., concurring) (explaining that courts should not "anticipate a question of constitutional law in advance of the necessity of deciding it"; neither should they "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied").

before the military commission, making plain-error review appropriate.

*Second*, whatever broad constitutional issues may lurk within the 2006 Act, Bahlul challenges only his judgment of conviction, and thus the application of the 2006 Act's conspiracy provision to him in this prosecution. *See* Oral Arg. Tr. 6; Pet. Br. 57. And the conspiracy for which Bahlul was convicted rested on proof of more statutory elements than ordinary inchoate conspiracy requires, including intent to further the commission of war crimes, Pet. Supp. App. 137, and proof of an overt act in furtherance of a violation of the law of war, *id.* In addition, the conspiracy's objects included completed war crimes. *Id.*

*Third*, the specific findings made by the commission, on which Bahlul's conviction rests, largely eliminated the gap between his conviction and those types of conspiracies that are indisputably triable by military commission. Whatever remaining distance Congress might have closed in an exercise of its power to define and punish violations of the law of nations does not, in my view, amount to plain constitutional error.

Finally, I join the court's determination that Bahlul's First Amendment and Equal Protection claims are foreclosed.[2]

---

[2] I refer to the defendant as Bahlul, rather than al Bahlul, because that is the appellation employed by his counsel on his behalf.

3

**I**

**A**

This case concerns Bahlul's conviction by a military commission of conspiracy to violate the law of war, as that offense is defined in 10 U.S.C. § 950v(b)(28). A person commits conspiracy under Section 950v(b)(28) if he "conspires to commit one or more substantive offenses triable by military commission under this chapter, and * * * knowingly does any overt act to effect the object of the conspiracy." 10 U.S.C. § 950v(b)(28). The substantive offenses triable by military commission under the chapter include murder of protected persons, attacking civilians, attacking civilian objects, murder in violation of the law of war, destruction of property in violation of the law of war, terrorism, and providing material support for terrorism. *See id.* § 950v(b)(1), (2), (3), (15), (16), (24) & (25). The 2006 Act further provides that conspiracy "shall be punished, if death results to one or more of the victims, by death or other such punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct." *Id.* § 950v(b).

In what is known as the "Define and Punish Clause," Article I of the Constitution empowers Congress to "define and punish * * * Offences against the Law of Nations." U.S. CONST., Art. I, § 8, cl. 10. The Supreme Court has explained that "[o]ffences * * * against the law of nations, cannot, with any accuracy, be said to be completely ascertained and defined in any public code recognized by the common consent of nations." *United States v. Smith*, 18 U.S. 153, 158 (1820). Thus, "there is a peculiar fitness in giving the power to define as well as to punish" to Congress, "and there is not

the slightest reason to doubt that this consideration had very great weight in producing the phraseology in question." *Id.*; *see Ex parte Quirin*, 317 U.S. 1, 28 (1942).

At the same time, Congress's power to punish offenses by military commission is constrained by the Constitution's Judicial Power Clause, Art. III, § 2, cl. 1. That Clause provides that "[t]he judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority," and "to Controversies to which the United States shall be a Party." *Id.* Those "Cases" and "Controversies" include criminal prosecutions. *See United States ex rel. Toth v. Quarles*, 350 U.S. 11, 15 (1987). If a suit falls within the judicial power, then "the responsibility for deciding that suit rests with Article III judges in Article III courts," and the Constitution forbids Congress to assign its resolution to another tribunal. *See Stern v. Marshall*, 564 U.S. 462, 484 (2011).

**B**

While our prior en banc opinion catalogued the factual background of this case, *see Bahlul v. United States* (*Bahlul I*), 767 F.3d 1, 5–8 (D.C. Cir. 2014) (en banc), portions of that factual history help to frame the legal questions that Bahlul presents.

Bahlul is a native of Yemen. In the late 1990s, he traveled to Afghanistan to join al Qaeda, and there he met Usama bin Laden. On October 12, 2000, al Qaeda attacked the USS *Cole*, killing seventeen American sailors and injuring thirty-nine others. Bahlul created a recruiting video for al Qaeda celebrating that attack, which he considered one of the best recruiting videos al Qaeda had produced. Pet. App. 134; *see Bahlul I*, 767 F.3d at 5.

Bin Laden subsequently appointed Bahlul his personal assistant and secretary for public relations. Bahlul actively prepared for al Qaeda's attacks on the United States on September 11, 2001. He arranged the loyalty oaths and prepared "martyr wills" for Mohamed Atta and Ziad al Jarrah, two of the hijackers who flew planes into the World Trade Center. Those "martyr wills" were propaganda declarations made in preparation for the attack and in which Atta and al Jarrah documented their and al Qaeda's roles in the atrocities. Bahlul also provided research to bin Laden regarding the economic effects of the attacks. In addition, Bahlul volunteered to participate in the 9/11 attacks himself, but bin Laden thought he was too important to lose. Just before 9/11, Bahlul evacuated al Qaeda's headquarters in Afghanistan with bin Laden and other senior al Qaeda leaders. *Bahlul I*, 767 F.3d at 6. After the attacks, Bahlul fled to Pakistan, where he was captured and turned over to the United States military. *Id.* at 6.

As relevant here, the United States charged Bahlul under the 2006 Act with conspiracy to commit war crimes. *See* 10 U.S.C. § 950v(b)(28). Bahlul was tried before a military commission convened at Guantanamo Bay. During the trial, Bahlul "flatly refused to participate in the military commission proceedings and instructed his trial counsel not to present a substantive defense." *Bahlul I*, 767 F.3d at 10. At no time did he raise any argument that Congress lacked the constitutional power to authorize a trial by military commission for conspiracy, or that in doing so, Congress ran afoul of the Define and Punish Clause or the Judicial Power Clause.

Before its deliberations, the commission was instructed that, to convict Bahlul of conspiracy under the 2006 Act, it must find "beyond a reasonable doubt" that Bahlul "entered

into an agreement" with other members of al Qaeda to commit a substantive offense under the Act, "knew the unlawful purpose of the agreement and joined in it willingly," and "knowingly committed" an overt act to bring about one of the objects of the agreement. Pet. Supp. App. 137. The military commission subsequently found Bahlul guilty of conspiracy under 10 U.S.C. § 950v(b)(28). In so doing, the commission specifically found that Bahlul committed ten overt acts as part of the conspiracy:

1. Traveled to Afghanistan with the purpose and intent of joining al Qaeda;
2. Met with Saif al'Adl, the head of the al Qaeda Security Committee, as a step toward joining the al Qaeda organization;
3. Underwent military-type training at an al Qaeda sponsored training camp then located in Afghanistan;
4. Pledged fealty, or "bayat," to the leader of al Qaeda, Usama bin Laden, joined al Qaeda, and provided personal services in support of al Qaeda;
5. Prepared and assisted in the preparation of various propaganda products, including the video "The Destruction of the American Destroyer U.S.S. Cole," to solicit material support for al Qaeda, to recruit and indoctrinate personnel to the organization and objectives of al Qaeda, and to solicit, incite and advise persons to commit Terrorism;
6. Acted as personal secretary and media secretary of Usama bin Laden in support of al Qaeda;
7. Arranged for Muhammed Atta, also known as Abu Abdul Rahman al Masri, and Zaiad al Jarrah, also known as Abu al Qa'qa al Lubnani, to pledge fealty or "bayat," to Usama bin Laden;
8. Prepared the propaganda declarations styled as martyr wills for two of the 9/11 hijackers, Muhammed Atta

and Ziad al Jarrah, in preparation for the acts of terrorism perpetrated by them in the United States on September 11, 2001;

9. At the direction of Usama bin Laden, researched the economic effects of the September 11, 2001, attacks on the United States, and provided the results to Usama bin Laden; and

10. Operated and maintained data processing equipment and media communications equipment for the benefit of Usama bin Laden and other members of the al Qaeda leadership.

Pet. App. at 116–117.

The commission also found Bahlul guilty of conspiracy to commit seven charged object offenses:  (i) murder of protected persons, (ii) attacking civilians, (iii) attacking civilian objects, (iv) murder in violation of the law of war, (v) destruction of property in violation of the law of war, (vi) terrorism, and (vii) providing material support for terrorism. Pet. App. 115; *see* 10 U.S.C. § 950(v)(b)(1), (3), (15), (16), (24) & (25).  The military commission sentenced Bahlul to life imprisonment.  Pet. App. 86.

## II

### A

Before wading into any constitutional dispute, courts must first decide how deeply they should go—that is, which standard of review should apply.  Those review standards are critical components of our justice system because they promote fairness, stability, and finality within the judicial process, and they give effect to the relative expertise of both the appellate court and the tribunals whose judgments are under review. *See Puckett v. United States*, 556 U.S. 129, 134

(2009); *United States v. Frady*, 456 U.S. 152, 163 (1982) (Standards of review "encourage all trial participants to seek a fair and accurate trial the first time around[.]").

Ordinarily, questions of constitutional law in criminal cases are decided *de novo*, and we plunge into plenary review. *See, e.g.*, *United States v. Straker*, 800 F.3d 570, 629 (D.C. Cir. 2015). But this case is not ordinary. Bahlul seeks to overturn his conviction on the basis of constitutional arguments that he could have made before the military commission, but did not. Bahlul nonetheless insists that we *must* consider his challenges *de novo*. *See* Pet. Br. 41.

Bahlul is wrong, in my view. Appellate courts are supposed to be courts of review, not first view. *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1430 (2012). And "'[n]o procedural principle is more familiar * * * than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.'" *United States v. Olano*, 507 U.S. 725, 731 (1993) (quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944)); *United States v. Baucum*, 80 F.3d 539, 541 (D.C. Cir. 1996) (noting "established Supreme Court precedent declining to address constitutional questions not put in issue by the parties"); *see also, e.g.*, *United States v. David*, 96 F.3d 1477, 1482 (D.C. Cir. 1996) (criminal defendant waived constitutional challenge under the Commerce Clause).

In a civil case, Bahlul's forfeiture would be fatal; we would not review his newly raised claims at all. *See Nemariam v. Federal Democratic Republic of Ethiopia*, 491 F.3d 470, 483 (D.C. Cir. 2007) ("[A]bsent exceptional circumstances, the court of appeals is not a forum in which a litigant can present legal theories that it neglected to raise in a

timely manner in proceedings below.") (internal quotation marks omitted). Criminal cases, however, are different. Typically, when a criminal defendant forfeits a challenge, even a constitutional one, an appellate court will still review the claim for "plain error." FED. R. CRIM. P. 52(b); *see, e.g.*, *United States v. Cotton*, 535 U.S. 625, 631–632 (2002). A forfeited error warrants reversal as "plain error" only if the error was "clear" or "obvious" at the time it was made. *Olano*, 507 U.S. at 734. Even then, the decision whether to correct the forfeited error lies "within the sound discretion of the court of appeals." *Id.* at 732. Courts should not exercise that discretion unless the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *United States v. Young*, 470 U.S. 1, 15 (1985); *see also* FED. R. CRIM. P. 52(b) ("A plain error *that affects substantial rights* may be considered even though it was not brought to the court's attention.") (emphasis added).

While my colleagues believe that the constitutional importance of the issues presented and their implications warrant a discretionary exercise of *de novo* review, *see* Wilkins Concurring Op. at 1; Joint Dissent at 4–9; *see also* Kavanaugh Concurring Op. at 3 n.1, limiting appellate review to plain errors when a criminal defendant fails to object at trial serves a vital function within the criminal justice system. The plain-error rule "induce[s] the timely raising of claims and objections," which in turn affords the trial court the opportunity both "to determine the relevant facts and adjudicate the dispute" in the first instance and, if warranted, to "correct or avoid the mistake so that it cannot possibly affect the ultimate outcome." *Puckett*, 556 U.S. at 134.

The contemporaneous-objection rule also prevents a defendant from "'sandbagging' the court—remaining silent about his objection and belatedly raising the error only if the

case does not conclude in his favor," *Puckett*, 556 U.S. at 134—which is exactly what Bahlul is doing. "[E]ncourag[ing] all trial participants" instead "to seek a fair and accurate trial the first time around" promotes fairness to the court, to all of the parties, *Frady*, 456 U.S. at 163, and to the public, as well as stability in the law. *See generally Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487 n.6 (2008) ("[W]aiver and forfeiture rules * * * ensure that parties can determine when an issue is out of the case, and that litigation remains, to the extent possible, an orderly progression.").

As our prior en banc opinion explained, Bahlul "flatly refused to participate in the military commission proceedings," and to the extent that he objected at all to his trial, the objection "was couched entirely in political and religious terms." *Bahlul I*, 767 F.3d at 10; *see id*. at 7 ("Bahlul waived all pretrial motions, asked no questions during voir dire, made no objections to prosecution evidence, presented no defense and declined to make opening and closing arguments."). Bahlul declared that he was a "prisoner[] of war and legal combatant[] based on [his] religion," rejected the United States' "earthly laws and international earthly laws," questioned "how can there be a tribunal, a court, a complete court, and a fair court as long as they do not—when they do not accept our rules, our laws," and then concluded that "there is going to be the tribunal of God on the day of judgments." Pet. App. 109–112.

That generic diatribe against the proceedings writ large did not preserve the specific constitutional challenges that Bahlul now presses. His complaints were far "too general to have alerted the trial court to the substance of [his] point," *United States v. Bolla*, 346 F.3d 1148, 1152 (D.C. Cir. 2003) (Roberts, J.) (quotation marks omitted), or to have given the court or opposing counsel any notice of the constitutional

character of his claim, *see also United States v. Love*, 593 F.3d 1, 11 (D.C. Cir. 2010) (defendant's "general objection * * * was insufficient to preserve his arguments for appeal"); *United States v. Breedlove*, 204 F.3d 267, 270 (D.C. Cir. 2000) (an objection "couched in terms too general" to have put the trial court on notice of "the substance of the [claim]" was not preserved).

To be sure, I do not believe a defendant must cite to any particular case or style arguments in a particular way to sufficiently preserve a claim. *See United States v. Rashad*, 396 F.3d 398, 401 (D.C. Cir. 2005). All Bahlul had to do was "inform the court and opposing counsel of the ruling he want[ed] the court to make and the ground for so doing." *Id*. But Bahlul failed to do even that. He did not so much as mention the Constitution. He just categorically disdained the trial process. Accordingly, I would hold Bahlul to the same standard that courts apply every day to other criminal defendants who fail to preserve claims, and would review his new constitutional challenges only for plain error.

**B**

To evade the consequences of his forfeiture, Bahlul tries to package his Article III claim as a challenge to the military commission's subject-matter jurisdiction, presumably because "defects in subject-matter jurisdiction require correction regardless of whether the error was raised" below. *Cotton*, 535 U.S. at 630. That tactic fails. This Court has already held that the 2006 Act "explicitly confers jurisdiction on military commissions to try the charged offenses." *Bahlul I*, 767 F.3d at 10 n.6. There thus should be no question that the military commission acted within its statutorily assigned jurisdiction.

12

What Bahlul's challenge really goes to is whether, in authorizing a law-of-war military commission to decide the conspiracy charge, Congress exceeded its constitutional authority under either Article I's Define and Punish Clause or Article III's Judicial Power Clause. In general, if a suit falls within the judicial power, then "the responsibility for deciding that suit rests with Article III judges in Article III courts." *Stern*, 564 U.S. at 484. But an exception exists for certain criminal prosecutions—specifically, criminal violations of the international laws of war—which constitutionally may be tried before military commissions. *See Johnson v. Eisentrager*, 339 U.S. 763, 786 (1950) ("The jurisdiction of military authorities, during or following hostilities, to punish those guilty of offenses against the laws of war is long-established.").

Bahlul argues that his prosecution for conspiracy before the military commission did not fall within any such exception because it did not charge a violation of the international law of war. And because of that, Bahlul says, he was constitutionally entitled to have the charges against him brought before an Article III court.

The problem for Bahlul's effort to frame that argument as jurisdictional is that "[e]ven the unconstitutionality of the statute under which the proceeding is brought does not oust a court of jurisdiction." *United States v. Williams*, 341 U.S. 58, 65 (1951). As long as the military commission "exercises its power under a presumptively valid federal statute, it acts within its subject-matter jurisdiction[.]" *Baucum*, 80 F.3d at 540. Indeed, in this Court's previous en banc decision, we reviewed another separation-of-powers claim pressed by Bahlul—his *Ex Post Facto* Clause claim—for plain error, even though that challenge concerned the constitutionality of the 2006 Act, and thus the power of the United States to

proceed against him.  *See Bahlul I*, 767 F.3d at 10 & n.6; *see also Carmell v. Texas*, 529 U.S. 513, 531 n.21 (2000) (the *Ex Post Facto* Clause is in part "aimed at * * * reinforcing the separation of powers").

Bahlul's claims here have no more jurisdictional aspect than did his *ex post facto* claims.  His Define and Punish Clause argument is a challenge to the constitutionality of the 2006 Act.  So too is Bahlul's Judicial Power Clause argument:  "The 'Article III' label changes nothing; by this Clause, Article III restricts *the Congress's* power, not the power of the courts or military commissions."  *Bahlul v. United States* (*Bahlul II*), 792 F.3d 1, 31 (D.C. Cir. 2015) (Henderson, J., dissenting).  To hold otherwise would mean that "a court would be required to raise [a Judicial Power Clause challenge] *sua sponte* each time it reviews a decision of a non-Article III tribunal," even if the parties do not contest that issue.  *Id.* at 32; *see generally Baucum*, 80 F.3d at 541 (Courts have "an obligation to address jurisdictional questions *sua sponte*.").

In short, Bahlul's "belated assertion of a constitutional defect" does "not work to divest" the military commission of its jurisdiction to try him.  *Baucum*, 80 F.3d at 541.  Accordingly, his constitutional challenge to Congress's authorization of his conspiracy prosecution before a military commission should be subject to the same contemporaneous-objection requirement as any other constitutional claim.

## C

## 1

After that long preface, I arrive at the heart of Bahlul's argument for *de novo* review:  He contends that a criminal defendant can *never* forfeit an Article III structural claim.

Specifically, Bahlul argues that the Judicial Power Clause of Article III prohibits Congress from assigning the trial of criminal conspiracies to a non-Article III tribunal, and that such a structural Article III claim is not subject to plain-error review.

For support, Bahlul points to the Supreme Court's decision in *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833 (1986). In that case, Schor challenged the Commodity Futures Trading Commission's jurisdiction over certain common-law counterclaims in civil reparations proceedings. Schor argued that Article III required that those traditionally common-law claims be decided by the Judicial Branch, not by an Executive Branch tribunal. *Id.* at 835–836. While acknowledging that "Schor indisputably waived any right he may have possessed [by] expressly demand[ing] that [the other party] proceed on its counterclaim" before the Commission, the Supreme Court addressed the merits of his structural challenge *de novo*. *Id.* at 849–851. In so doing, the Supreme Court explained that "Article III, § 1 safeguards the role of the Judicial Branch in our tripartite system by barring congressional attempts to transfer jurisdiction to non-Article III tribunals for the purpose of emasculating constitutional courts[.]" *Id.* at 850 (quotation marks omitted, alterations in original). When that "structural principle is implicated in a given case," the Court added, traditional rules "of consent and waiver cannot be dispositive" because those Article III limitations "serve institutional interests that the parties cannot be expected to protect." *Id.* at 850–851 (quotation marks, citations, and alterations omitted); *see also Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868, 880 (1991) ("Neither Congress nor the Executive can agree to waive * * * structural protection[s]."); *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1945 n.10 (2015) ("What *Schor*

forbids is using consent to excuse an actual violation of Article III.").

Bahlul takes those passages to mean that an Article III structural claim can never be forfeited, and that we are thus obligated to review his claim *de novo*.  That overreads *Schor*. What the Supreme Court said is that "notions of consent and waiver *cannot be dispositive*."  *Schor*, 478 U.S. at 851 (emphasis added).  At most, that means that appellate courts have *discretion* to hear unpreserved Article III structural claims *de novo* in appropriate cases, not that they are *obligated* to do so.  Subsequent Supreme Court precedent proves that point.

To begin with, in *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995), the Supreme Court held that the Securities Exchange Act's requirement that federal courts reopen certain final judgments in private civil actions violated Article III because the Article III judicial power is the power to decide cases conclusively.  *Id.* at 213, 218.  The government had invoked *Schor*'s non-waiver language in defense of the statute, reasoning that if the finality of federal court judgments implicated Article III, then *res judicata* would not be waivable either.  *Id.* at 231.  The Supreme Court gave no quarter to that reading of *Schor*:  "The proposition that legal defenses based upon doctrines central to the courts' structural independence can never be waived simply does not accord with our cases."  *Id.*  What *Schor* meant, the Supreme Court explained, was that a court could still "*choose* to consider his Article III challenge," notwithstanding a litigant's consent to an alternative tribunal, because when "'Article III limitations are at issue, notions of consent and waiver cannot be *dispositive*[.]'"  *Id.* at 232 (first emphasis added; quoting *Schor*, 478 U.S. at 851).

The Supreme Court reconfirmed twice just two Terms ago that courts may treat Article III structural claims as subject to waiver and forfeiture. In *B&B Hardware, Inc. v. Hargis Industries, Inc.*, 135 S. Ct. 1293 (2015), the Court held that a decision by the Trademark Trial and Appeal Board—a non-Article III tribunal—is entitled to the same preclusive effect as a district court decision if the ordinary elements of issue preclusion are met, *id.* at 1299. In so holding, the Court eschewed consideration of any potentially "meritorious constitutional objection" under Article III because that argument was abandoned by Hargis Industries, and thus "it is not before us." *Id.* at 1304 (citing *Plaut*, 514 U.S. at 231–232).

Continuing that pattern, in *Wellness International Network*, *supra*, the Court held that "Article III is not violated when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge" of a state-law claim that arose independently of bankruptcy law, 135 S. Ct. at 1939. In *Stern v. Marshall*, *supra*, the Court had held that, as a general matter, Article III forbids bankruptcy courts to enter final judgments on such claims, 564 U.S. at 500–501. *Wellness*, however, created an exception to that general rule where both parties consent to bankruptcy-court adjudication.

Critically, at the end of its *Wellness* opinion, the Supreme Court remanded the case to the Seventh Circuit to decide whether Sharif's consent was knowing and voluntary, and whether "Sharif forfeited his *Stern* argument below." 135 S. Ct. at 1949. That remand would, of course, have been pointless if Article III structural claims like the *Stern* claim can never be waived or forfeited. *See also Sharif*, 135 S. Ct. at 1949 (Alito, J., concurring in part and concurring in the judgment) ("[R]espondent forfeited any *Stern* objection by failing to present that argument properly in the courts below.

*Stern* vindicates Article III, but that does not mean that *Stern* arguments are exempt from ordinary principles of appellate procedure.").

Of course, as the panel majority and concurrence well chronicled, the Supreme Court's pronouncements in this area have been far from crystalline. *See Bahlul II*, 792 F.3d at 3–5; 23–24 (Tatel, J., concurring). But *B&B Hardware* and *Wellness* have done much to lift the fog. I accordingly conclude that *Schor* does not *require* us to wade into a constitutional thicket and review *de novo* Bahlul's forfeited Article III structural challenge.

## 2

I agree with my colleagues, however, that *Schor* affords this Court some discretion to review a forfeited Article III claim *de novo*. *See* Kavanaugh Concurring Op. at 3 n.1, Joint Dissent at 4-6. But I would decline to exercise that discretion in this case for three reasons.

*First*, there is no structural reason to take up Bahlul's fight with the Political Branches. Unlike *Schor*, *Freytag*, *Stern*, *Plaut*, *B&B Hardware*, and *Wellness*, which were all civil cases, this is a criminal case. That distinction matters because the consequences of forfeiture are materially different in civil and criminal contexts. In civil cases, a claim that a party waives or forfeits is generally gone for good. An appellate court will not review it under any standard of review. *See Salazar ex rel. Salazar v. District of Columbia*, 602 F.3d 431, 437 (D.C. Cir. 2010); *Nemariam*, 491 F.3d at 482–483; *cf. Singleton v. Wulff*, 428 U.S. 106, 121 (1976) (noting rare "circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt * * * or where injustice might otherwise result").

In addition, civil cases can pose the risk of parties colluding and consenting to a non-Article III forum for resolution of their dispute. Absent discretionary review, such joint waivers of challenges to the judicial forum could effectively strip Article III courts of the ability ever to address the constitutionality of legislation reassigning the judicial power.

That perceived need to ensure some mechanism for enforcing the separation of powers and protecting the judicial power against incursions by the Political Branches seemingly motivated *Schor*'s discretionary exception to traditional principles of waiver and forfeiture in civil cases. As the Supreme Court explained, Article III "limitations serve institutional interests that the parties cannot be expected to protect." *Schor*, 478 U.S. at 851; *see also Peretz v. United States*, 501 U.S. 923, 950 (1991) ("Article III serves as an inseparable element of the constitutional system of checks and balances by preserving the role of the Judicial Branch in our tripartite system of government.") (quotation marks omitted).

Unlike civil cases, however, criminal cases like Bahlul's present no similar need to work around the ordinary contemporaneous-objection rule. The whole reason my colleagues and I are even debating the application of the "plain-error" standard of review is that, in criminal cases, forfeited claims are not really forfeited at all. They are still subject to judicial review and decision; all that changes is the level of scrutiny. *See* FED. R. CIV. P. 52(b); *Olano*, 507 U.S. at 733–735. In other words, in criminal cases, a "forfeited" Article III claim is still reviewed and decided; it is just harder to win. *See, e.g.*, *Olano*, 507 U.S. at 734 ("A court of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law."); *In re Sealed Case*, 573 F.3d 844, 851 (D.C. Cir. 2009) ("[A]n error can be plain if it violates an

absolutely clear legal norm.") (quotation marks omitted). That means that, unlike civil cases, the availability of plain-error review in criminal cases ensures that clear or obvious usurpations of Article III will not escape judicial scrutiny, regardless of whether a criminal defendant timely raised such objections below.

Likewise, even when a criminal defendant affirmatively waives (rather than forfeits) a structural Article III challenge, the argument may, if warranted, still be reviewed later through the lens of an ineffective-assistance-of-counsel claim. If the constitutional transgression is so clear that a failure to raise it was not "within the range of competence demanded of attorneys in criminal cases," and if it prejudiced the defendant's case, *see United States v. Streater*, 70 F.3d 1314, 1318 (D.C. Cir. 1995) (quoting *Hill v. Lockhart*, 474 U.S. 52, 56, 59 (1985)), an appellate court may decide the constitutional question.[3]

---

[3] In a series of cases challenging the Federal Magistrates Act, Pub. L. No. 90-578, 82 Stat. 1107–1119 (1968), the Supreme Court addressed constitutional objections to adjudications by non-Article III federal magistrate judges in criminal cases. However, none of those cases presented a *structural* Article III question because the district court's *de novo* review ensured that the operative decision was made by an Article III judge. *See, e.g.*, *Peretz*, 501 U.S. at 937 ("[N]o * * * structural protections are implicated" because "[t]he ultimate decision whether to invoke the magistrate's assistance is made by the district court, subject to veto by the parties.") (quotation omitted); *United States v. Raddatz*, 447 U.S. 667, 683 (1980) (The "delegation does not violate Art. III so long as the ultimate decision is made by the district court."); *see also Gomez v. United States*, 490 U.S. 858, 874 (1989) (construing the Act *not* to authorize magistrate judges to supervise jury selection in part because the court "harbor[ed] serious doubts that a district judge could review this function meaningfully").

*Second*, in almost all of the Supreme Court cases granting review of a structural Article III question, the barrier to judicial review was waiver, not forfeiture. *See Wellness*, 135 S. Ct. at 1939 (noting "the parties' consent" to bankruptcy court adjudication); *Freytag*, 501 U.S. at 878 ("[P]etitioners gave their consent to trial before the Special Trial Judge."); *Schor*, 478 U.S. at 837 (Schor himself "invoked the [Commission's] reparations jurisdiction[.]"). The waivers arose, moreover, because Congress designed the challenged statutory schemes so that litigants would first choose to bring their claim in a non-Article III forum. In that way, Congress baked the barrier to judicial review right into the allegedly Article III-circumventing statutory scheme, thus presenting the question whether Congress could team up with litigants to divert the judicial power to a non-Article III tribunal. *See Wellness*, 135 S. Ct. at 1939 (considering "whether Article III allows bankruptcy judges to adjudicate [*Stern*] claims with the parties' consent"); *Schor*, 478 U.S. at 851 ("[T]he parties cannot by consent cure the constitutional difficulty.").

By definition, the constitutionality of such statutory schemes could not be determined without bypassing the element of private choice that Congress used to trigger the non-Article III tribunal in the first instance. That presumably is why the Supreme Court explained in *Plaut* that "[w]aiver *subject to the control of the courts themselves*"—rather than imposed by Congress—would be materially different to the constitutional analysis, "would obviously raise no issue of separation of powers, and would be precisely in accord with" *Schor*. *Plaut*, 514 U.S. at 231–232 (emphasis added).

This case, however, involves a forfeiture, not a waiver, of an Article III objection that was fully available to Bahlul throughout the military commission proceeding. Bahlul, like criminal defendants generally, had every opportunity and

incentive to raise objections that (if successful) would have foreclosed his conviction or would have provided grounds for a full reversal on appeal. Indeed, criminal defendants as a class are profoundly self-interested when it comes to preserving substantial legal challenges to exercises of prosecutorial power. Thus the risk that criminal defendants will team up with the prosecution in a way that would otherwise preclude judicial enforcement of the separation of powers is something short of negligible.

For those reasons, the contemporaneous-objection rule does not pose the same practical barrier to constitutional review in criminal cases that it did in *Schor*'s civil litigation context. Instead, in criminal prosecutions, "the claims of individuals * * * have been the principal source of judicial decisions concerning separation of powers and checks and balances." *Bond v. United States*, 564 U.S. 211, 222 (2011). Here as well, all that would be needed for a court to decide *de novo* the structural Article III question that Bahlul belatedly raises is for a defendant in one of the other pending military commission proceedings to timely raise it as a defense to prosecution in that forum.

*Third*, Bahlul has identified no unusual obstacles or exceptional circumstances that excuse his failure to raise his Article III claim before the military commission. He had the benefit of trained counsel and multiple procedural opportunities to voice his constitutional objections. Bahlul's knowing and willful refusal to participate in his trial should not now be rewarded by addressing his constitutional arguments *de novo* rather than under plain-error review. To the contrary, excusing Bahlul's failure to bring his Article III structural claim would encourage similar sandbagging behavior from other military commission defendants. They would have nothing to lose by first trying their chances before

the commission and, if unhappy with the results, pulling an Article III challenge out of their pocket in the hope of trying the case all over again in federal court (with the added benefit of the prosecution's hand having been revealed).

Bahlul argues (Pet. Br. 37), and Judge Kavanaugh's concurring opinion agrees (at 3 n.1), that the government failed to raise any forfeiture argument before the Court of Military Commission Review, or to argue for plain-error review, and thus it "has—in a word—forfeited [its] forfeiture argument here," Pet. Br. 37 (quoting *Solomon v. Vilsack*, 763 F.3d 1, 13 (D.C. Cir. 2014)); *see also* Joint Dissent at 2–4. I read our precedent and the record differently.

For starters, the rule that a party may forfeit a forfeiture argument applies to the preservation of a substantive legal claim in a civil case, like the discriminatory retaliation claim that was at issue in *Solomon*, 763 F.3d at 13. The issue in this criminal appeal, however, is not whether Bahlul's constitutional claims get reviewed at all—the special plain-error rule in criminal cases ensures some type of review. The only question is which standard of review governs the appeal, and "[t]he Government cannot alter our *standard of review*— by concession, inadvertence, poor oral advocacy or otherwise." *Bahlul II*, 792 F.3d at 32 n.3 (Henderson, J., dissenting); *see United States v. Nueci-Pena*, 711 F.3d 191, 196 n.5 (D.C. Cir. 2013) (reviewing for plain error although the government "erroneously assert[ed] that *de novo* review applie[d]"). That is because, as an appellate court, this court "must apply *some* standard of review to every issue it considers * * * [so] no party has the power to control our standard of review." *United States v. Vontsteen*, 950 F.2d 1086, 1091 (5th Cir. 1992) (emphasis omitted).

Said another way, standards of review are not claims that parties can choose to make or not in a case. Those review standards instead enforce structural judgments about the relative expertise of trial and appellate courts, and the need for efficiency, fairness, and stability in the judicial process. *See Puckett*, 556 U.S. at 134. To illustrate, trial courts bear primary responsibility for fact-finding because they see the evidence and witnesses firsthand, and superintend evidentiary rules and the creation of the record in the case. An appellate court reviewing only the paper record is ill-positioned to make factual findings, and so we review factual determinations only for clear error. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985); *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). We would not find facts *de novo* if a party failed to argue for—or even agreed to waive—clear-error review.

Plain-error review likewise enforces structural interests by ensuring that (i) potential errors can be stopped before harm occurs and resources are invested in a trial that must be redone; (ii) trial court determinations are not ambushed on appeal by never-before-voiced objections; and (iii) the number of reversals is reduced, which promotes trust in the stability of court judgments and finality in the enforcement of criminal law. *See Puckett*, 556 U.S. at 134; *see also United States v. Hunter*, 786 F.3d 1006, 1111 (D.C. Cir. 2015) (The contemporaneous-objection rule's goal of timely rectifying errors "is not served when a defendant raises an objection after proceedings are complete and a ruling has been handed down.").

On top of that, the record shows that the government did not forfeit its forfeiture argument. Before the Court of Military Commission Review, the government specifically argued that Bahlul "waived all motions, defenses or

objections (except for lack of jurisdiction or failure to allege an offense) when he failed to raise any issues below." Pet. App. 161. Indeed, this court's prior en banc decision acknowledged that the government "argued for plain-error review before the [Court of Military Commission Review], in its original brief to the panel of this Court and in its brief to the *en banc* court." *Bahlul I*, 767 F.3d at 10 n.5; *see also* Brief for the United States at 65, *Bahlul v. United States*, 2013 WL 297726 (D.C. Cir. Jan. 25, 2013) (arguing that Bahlul's Define and Punish Clause, *Ex Post Facto* Clause, and Article III arguments "were forfeited below").

To be sure, at oral argument before the panel, the government suggested that Bahlul's structural argument might not be forfeitable, *see* Pet. Supp. App. 234. But immediately thereafter, counsel asserted that "[t]he structural component of that argument *is* forfeitable," *id.* at 235 (emphasis added). In addition, the government argued that Bahlul had not raised an Article III structural claim at all. *See id.* at 234 ("I do not acknowledge that he was raising [a structural Article III argument]."). In my view, that is far too murky a foundation from which to launch this court into applying an unwarranted standard of review to adjudge the constitutionality of a joint exercise by the President and the Congress of their national security and war powers. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) (joint exercises of power by the Political Branches merit "the widest latitude of judicial interpretation"); *see also Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1328 (2016) ("[F]oreign affairs" is "a domain in which the controlling role of the political branches is both necessary and proper."); *Center for National Security Studies v. United States Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003) ("[T]he judiciary owes some measure of deference to the executive in cases implicating national security[.]").

Nor do I understand why labeling Bahlul's argument as "structural" should change the rules. The Constitution at every turn divides power not only horizontally between the federal branches of government, but also vertically between the national government, the States, and individuals. It is hard to understand why Bahlul's Article III claim is any more structural than Bahlul's Ex Post Facto claim, to which this court sitting en banc accorded only plain-error review. *See also Carmell*, 529 U.S. at 531 n.21 (*Ex Post Facto* Clause is in part "aimed at * * * reinforcing the separation of powers").

The dissenting opinion adds that courts have a "strong interest * * * in maintaining the constitutional plan of separation of powers." Joint Dissent at 9 (quoting *Glidden Co. v. Zdanok*, 370 U.S. 530, 536 (1962)). True. But when the only reason a separation-of-powers claim is not teed up is because the defendant chose not to raise it below, courts routinely apply plain-error review. *See, e.g.*, *United States v. Gonzalez*, 682 F.3d 201, 203 (2d Cir. 2012) (reviewing separation-of-powers claim for plain error "because [the defendant] did not raise the issue[] below"); *United States v. Anderson*, 591 F.3d 789, 792 (5th Cir. 2009) (reviewing for plain error where the defendant "could have mentioned separation of powers [below] but, for whatever reason, he chose not to").[4]

The dissenting opinion also suggests that this really-important-issue exception can be limited to intrusions on the judiciary's Article III turf because then the court is granting *de novo* review for the courts' "own benefit," to "protect the

---

[4] *See also, e.g.*, *United States v. Clark*, 634 F.3d 874, 877 (6th Cir. 2011); *United States v. Carraway*, 612 F.3d 642, 646 (7th Cir. 2010); *United States v. Evans*, 587 F.3d 667, 671 (5th Cir. 2009); *United States v. Rusan*, 460 F.3d 989, 992 (8th Cir. 2006); *United States v. Pojilenko*, 416 F.3d 243, 249 n.6 (3d Cir. 2005).

judiciary's role within our system of divided government," Joint Dissent at 9, 6.  But the Constitution separates power to protect the rights and liberty of the people, not to protect the courts for the courts' sake.  *See New York v. United States*, 505 U.S. 144, 182 (1992) ("T]he constitution divides authority * * * for the protection of individuals.  * * * The Constitution's division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment.").  Plus it seems to me wholly untenable for courts to decide that one criminal defendant's Eighth Amendment challenge to his death sentence fails on plain-error review, *see, e.g.*, *United States v. McGarity*, 669 F.3d 1218, 1255 (8th Cir. 2012), but an enemy combatant's challenge to his capital conviction succeeds because it was to the court's "own benefit" to afford it plenary review.  Whatever considerations may appropriately weigh in favor of a discretionary decision to grant *de novo* review, the dispositive factor in a criminal case should not be that the federal judiciary decides it has skin in the game.

Judge Kavanaugh's concurring opinion concludes that the "extraordinary importance" of the constitutional questions is a reason to excuse Bahlul from the consequences of his forfeiture and grant *de novo* review.  Kavanaugh Concurring Op. at 3 n.1.  I think that gets the constitutional calculus exactly backwards.  The separation of powers should counsel the greatest judicial hesitation when the Political Branches are jointly exercising their judgment in areas of national security, the conduct of war, and foreign relations.  *See generally Youngstown Sheet & Tube Co.*, 343 U.S. at 636–637 (joint actions of the Political Branches "personify the federal sovereignty" and "would be supported by the strongest of presumptions and the widest latitude of judicial interpretation").  Here the constitutional structure itself raises

a yellow caution flag against unnecessary judicial intrusion, making it the better judicial course just to decide "the narrower ground for adjudication of the constitutional questions in [a] case * * * first." *Plaut*, 514 U.S. at 217. Here, that means applying plain-error review.

## III

To prevail on plain-error review, Bahlul must show that the alleged error (i) is plain, (ii) affected his substantial rights, and (iii) seriously affected the fairness, integrity or public reputation of judicial proceedings. *See Olano*, 507 U.S. at 732–737. For an error to be "plain," it must be "clear" or "obvious." *Id.* at 734. "A ruling's error is clear if, at the time it was made, a clear precedent in the Supreme Court or this circuit established its erroneous character." *United States v. Terrell*, 696 F.3d 1257, 1260 (D.C. Cir. 2012).

"Meeting all four prongs" of the plain-error test "is difficult, as it should be." *Puckett*, 556 U.S. at 135 (quotation marks omitted). Doubly so here because the Supreme Court has instructed that the actions of a military commission "are not to be set aside by the courts without the clear conviction that they are in conflict with the Constitution or laws of Congress constitutionally enacted." *Quirin*, 317 U.S. at 2. Bahlul's constitutional claims cannot survive that demanding review.[5]

---

[5] The Supreme Court explained in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), that "the precedent" supporting trial by military commission "must be plain and unambiguous" in those instances "[w]hen * * * neither the elements of the offense nor the range of permissible punishments is defined by statute or treaty," *id.* at 602. That standard does not apply here because the 2006 Act specifically defines the elements of its conspiracy provision and identifies it as

Bahlul's principal argument is that, in authorizing his prosecution before a military commission for what he labels "inchoate conspiracy," Congress exceeded its legislative power under the Define and Punish Clause, U.S. CONST., Art. I, § 8, cl. 10. Specifically, Bahlul argues that the conspiracy for which he was charged and convicted cannot be an "Offence[] against the Law of Nations," within the meaning of Article I of the Constitution, because inchoate conspiracy is not a recognized crime under international law. Bahlul further argues that inchoate conspiracy, as a stand-alone offense, was traditionally triable by jury at common law and for that reason falls exclusively within the Article III judicial power.

Because Bahlul presses only an as-applied challenge to his own conviction under the 2006 Act, *see* Oral Arg. Tr. 6; Pet. Br. 57, I would not decide whether Congress has the constitutional power to authorize the prosecution *generally* of inchoate conspiracies before a military commission. Rather, for five reasons, it is neither clear nor obvious—in other words, it is not plain—that the particular statutory conspiracy of which Bahlul was convicted must be tried in an Article III court.

*First*, in arguing that Congress lacked the legislative authority to assign his conspiracy charge to a military commission for trial, Bahlul places great weight on the government's concession that inchoate conspiracy has not yet been recognized as an offense against international law. Pet. Br. 16; *see* Brief for the United States at 50, *Bahlul v. United States*, 2013 WL 297726 (D.C. Cir. Jan. 25, 2013). But "we are not obligated to accept the Government's concession."

---

an offense triable by military commission. 10 U.S.C. § 950v(b)(28).

*Bahlul I*, 757 F.3d at 18; *see also United States v. Baldwin*, 563 F.3d 490, 491 (D.C. Cir. 2009) ("We are not obligated to accept the government's confession of error, particularly when there is reason to doubt whether the government's position is correct.") (citation omitted). That is because "the separation of powers does not depend on the views of individual Presidents, nor on whether the encroached-upon branch approves the encroachment." *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 497 (2010) (citation and quotation marks omitted). More to the point, plain-error analysis looks at how clearly established governing law is, not the briefing strategies of particular parties.

*Second,* Bahlul's asserted error—Congress's power to criminalize traditional inchoate conspiracy in military commission proceedings—is not in fact implicated by his case. I agree with Judge Wilkins that the statutory conspiracy of which Bahlul was convicted goes beyond the elements of ordinary inchoate conspiracy. Traditionally, a conviction for inchoate conspiracy requires proof of only two elements: agreement between two or more persons, and intent thereby to achieve a certain objective. Wayne R. LaFave, *Substantive Criminal Law* § 12.2 (2015). Proof of neither an overt act nor a completed offense is required. *See United States v. Shabani*, 513 U.S. 10, 13–14 (1994) ("We have consistently held that the common law understanding of conspiracy 'does not make the doing of any act other than the act of conspiring a condition of liability.'") (quoting *Nash v. United States*, 229 U.S. 373, 378 (1913)). Moreover, an inchoate conspiracy could be tied to any object offense. *Hogan v. O'Neill*, 255 U.S. 52, 55 (1921).

Conspiracy under the 2006 Act is materially different. To begin with, in addition to requiring a specific intent to

commit the overt acts, the 2006 Act also requires that the overt acts be committed with the intent "to effect the object of the conspiracy." 10 U.S.C. § 950v(b)(28); *see* Pet. Supp. App. 137. Moreover, the only allowable objects of Bahlul's conspiracy are "substantive offenses triable by military commission under" the Act. 10 U.S.C. § 950v(b)(28). Bahlul does not dispute that those substantive offenses include offenses against the law of war that may be tried before a military commission. On top of that, the statutory scheme seems to anticipate that a conviction will be linked to a completed offense. That is because the statute specifically ties the authorized sentences to the fate of the victims: the crime "shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct." *Id.*

In compliance with the statute, Bahlul was found to have committed ten overt acts, including, for example, preparing a recruiting video celebrating the USS *Cole* attack, acting as bin Laden's personal secretary, and preparing martyr wills for two of the 9/11 hijackers. He was also found guilty of conspiracy to commit seven charged objects, including murder of protected persons, attacking civilians, murder in violation of the law of war, and terrorism.

Importantly, the military judge's instructions to the commission enforced those distinct features of statutory conspiracy. The instructions expressly predicated Bahlul's conviction on a finding "beyond a reasonable doubt" that Bahlul "personally committed at least one of the overt acts" charged. Pet. Supp. App. 140–141. In addition, for each object offense of the conspiracy, the commission was required

to "find beyond a reasonable doubt" that Bahlul (i) "entered into an agreement" to commit the offense; (ii) did so "intentionally"; (iii) "knew the unlawful purpose of the agreement"; (iv) "joined with the intent to further its unlawful purpose"; and (v) "committed an overt act in furtherance of the agreement." *Id.* at 145. The instructions emphasized that the government must "prove[] beyond a reasonable doubt that the agreement intended every element of" any offense that was determined to be an object of the conspiracy. *Id.* at 140.

Along with its guilty verdict, the commission returned detailed factual findings documenting its determination that Bahlul's conspiracy met those statutory elements. The commission found that Bahlul committed ten of the charged overt acts, and entered into an agreement that "intended every element" of all seven alleged object offenses, Pet. Supp. App. 140, including specifically "[m]urder of protected persons," "attacking civilians," "murder in violation of the law of war," and "terrorism," *id.* at 137, each of which violates Article 3 of the Geneva Convention, *see* Geneva Convention (IV) Relative to the Treatment of Prisoners of War art. 3, Aug. 12, 1949, 75 U.N.T.S. 2876 U.S.T. 3516.

Thus, for all of Bahlul's arguments about Congress's power to convict him by military commission of traditional or common-law inchoate conspiracy, the commission convicted him of a different and distinct statutory conspiracy offense, in which Bahlul (i) knew the objects of the conspiracy, which included multiple violations of the international law of war; (ii) joined an agreement to intentionally further those violations of the law of nations; (iii) personally intended to have every element of those international law of war offenses committed; and (iv) intentionally undertook the overt acts to further the agreement's unlawful purposes. Bahlul's use of the common law as a constitutional yardstick thus overlooks

the elements of the statutory offense of which he was actually convicted and the dearth of precedent suggesting that substantive offenses against the international law of war were traditionally tried in courts at common law. Accordingly, whatever the scope of congressional authority to consign other stand-alone conspiracy offenses to a non-Article III tribunal, it is not plain that conspiracy to commit international war crimes as carefully defined in the 2006 Act falls exclusively within the Article III judicial power.

*Third*, given the specific elements of Bahlul's conspiracy conviction, any delta between his conspiracy offense and those offenses that international law proscribes is too narrow to rise to the level of plain constitutional error.

To begin with, international law has recognized conspiracy as a stand-alone offense for certain illegal acts that bear a close resemblance to Bahlul's charged conduct. For example, international law has long allowed prosecution for conspiracy to wage aggressive war (also known as common plan to wage aggressive war). *See* 1 TRIAL OF THE MAJOR WAR CRIMINALS BEFORE THE INTERNATIONAL MILITARY TRIBUNAL: NUREMBERG, 14 November 1945–1 October 1946, p. 225 (1947). In that respect, international law recognizes that "[p]lanning and preparation are essential to the making of war," and "[c]ontinued planning, with aggressive war as the objective" may be punished as a violation of the law of war. *Id.* at 224–225; *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 610 (2006) (plurality opinion) (describing "common plan to wage aggressive war" as "a crime against the peace [that] requires for its commission actual participation in a 'concrete plan to wage war'") (quoting 1 TRIAL OF MAJOR WAR CRIMINALS, *supra*, at 225).

Like Bahlul's conviction, conspiracy to commit aggressive war at Nuremberg turned on the commission of overt acts directly tied to waging aggressive war and an object offense that was itself a crime against international law. Nothing in constitutional text or settled precedent plainly foreclosed Congress from bridging the gap between the formal waging of such war by officials of Nazi Germany and al Qaeda's waging of terrorist aggression against the United States.

Modern statutes defining international law offenses also permit punishment for conspiracy to commit genocide as a stand-alone offense. *See* Updated Statute of the International Criminal Tribunal for the Former Yugoslavia Art. 4 (2009) (ICTY Statute); Statute of the International Tribunal for Rwanda Art. 2 (1994); Convention on the Prevention and Punishment of the Crime of Genocide Art. 3, Dec. 9, 1948, 78 U.N.T.S. 277. The Statute of the International Tribunal for the Former Yugoslavia, for example, expressly recognizes "conspiracy to commit genocide." *Id.*, Art. 4. The statute defines genocide as, *inter alia*, "killing members of [a] group," "causing serious bodily or mental harm to members of [a] group," or "deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part," "with intent to destroy, in whole or in part, [that] national, ethnical, racial or religious group[.]" *Id.*, Art. 4(2)(a); *see Simon v. Republic of Hungary*, 812 F.3d 127, 143 (D.C. Cir. 2016) (similar, citing the Convention on the Prevention of the Crime of Genocide).

Of course, the object offenses tied to Bahlul's conviction do not include genocide. But Bahlul's overt acts do include attempts to kill and cause serious bodily and mental harm on members of a specific group at least in part because of their protected characteristics. Bahlul's video celebrating the USS

*Cole* attack calls for jihad against the United States and blames "Western infidels" for Muslim suffering. *Bahlul I*, 767 F.3d at 5–6. Bahlul's video has been translated into several languages and widely distributed. *Id.* at 6. Given that international law proscribes a calculated conspiracy to exterminate individuals on the basis of their nationality (outside the context of formal war), constitutional law does not *plainly* foreclose Congress from using its Define and Punish Clause authority to outlaw a conspiracy to intentionally commit mass murder of and to incite acts of violence against Americans, at least when combined with an overt act furthering an object offence that violates international law.

On top of that, international law recognizes some conspiracy offenses as an independent source of criminal liability. In particular, international law permits conviction for joint criminal enterprise where "a plurality of persons participat[es] in the criminal plan"; there is "a common purpose which amounts to or involves the commission of a crime"; and "the accused[] participat[es] in the common design." Guilia Bigi, *Joint Criminal Enterprise in the Jurisprudence of the International Criminal Tribunal for the Former Yugoslavia and the Prosecution of Senior Political and Military Leaders*, in 14 MAX PLANCK YEARBOOK OF UNITED NATIONS LAW 56 (2010). The Rome Statute, for example, makes a person "criminally responsible and liable for punishment for a crime" if that person "contributes to the commission or attempted commission of such a crime by a group of persons acting with a common purpose." Rome Statute of the International Criminal Court Art. 25(3)(d), July 17, 1998, 2187 U.N.T.S. 90. The contribution must be "intentional," and must be "made with the aim of furthering the criminal activity or criminal purpose of the group" or "in the knowledge of the intention of the group to commit the

crime." *Id.* Given its settled roots in international law, there is no dispute that Congress could authorize a military commission prosecution for joint criminal enterprise. *See* Oral Arg. Tr. 10.

Classically, joint criminal enterprise differs from ordinary inchoate conspiracy by its requirement of *action* in furtherance of the agreement. *See* Allison Marston Danner & Jenny S. Martinez, *Guilty Associations: Joint Criminal Enterprise, Command Responsibility, and the Development of International Criminal Law*, 93 CAL. L. REV. 75, 119 (2005). The offense is also doctrinally distinct from traditional conspiracy because it is a form of liability, while inchoate conspiracy is a freestanding substantive crime. *Id.* at 119; *see also Hamdan*, 548 U.S. at 610 n.40 (plurality opinion) ("[J]oint criminal enterprise" is a "species of liability for the substantive offense (akin to aiding and abetting), not a crime on its own.").

But as applied to this case, the distinctions between a conspiracy conviction under the 2006 Act and what a conviction for joint criminal enterprise would have entailed are narrower than they would be for traditional inchoate conspiracy. Bahlul's conspiracy charge under the 2006 Act *did* require explicit proof of an overt act and involved a completed object offense. As a result, "it is not clear whether th[e] formal distinction between [joint criminal enterprise] and conspiracy carries much practical weight." Danner & Martinez, *supra*, at 119; *see* Peter Margulies, *Defining, Punishing and Membership in the Community of Nations*, 36 FORDHAM INT'L L.J. 1, 86 (2013) (The "pairing of joint intention with action [in the Rome Statute's codification of Joint Criminal Enterprise] is very close to conspiracy—close enough that no individual charged with the latter as a mode of liability can claim lack of notice."). Whatever the distinctions

between the two, they do not make a clear or plain constitutional difference.

Beyond that, Bahlul conceded at oral argument, Oral Arg. Tr. 9–10, that the Constitution would permit his trial before a military commission on a *Pinkerton* conspiracy theory of liability, *see Pinkerton v. United States*, 328 U.S. 640 (1946). The *Pinkerton* doctrine of conspiracy holds an individual vicariously liable for reasonably foreseeable substantive crimes committed by his co-conspirators in furtherance of the conspiracy. *See id.* at 646–647.

*Pinkerton* "intertwines conspiracy as a substantive crime with conspiracy as a theory of liability[.]" Danner & Martinez, *supra*, at 116; *see, e.g.*, *United States v. Edmond*, 924 F.2d 261, 268 (D.C. Cir. 1991) (*Pinkerton* established that commission of a substantive offense and conspiracy to commit it are distinct crimes, and simultaneously authorized holding a conspirator responsible for substantive criminal acts committed by a co-conspirator). But *Pinkerton* liability is distinct from inchoate conspiracy because it relies on the imputation of co-conspirators' completed offenses, and requires a finding that they were "reasonably foresee[able] as a necessary or natural consequence of the unlawful agreement." *Pinkerton*, 328 U.S. at 648; *see also* Danner & Martinez, *supra*, at 115–116. In Bahlul's case, because he joined agreements to intentionally commit war crimes, acted in furtherance of those agreements, and was intricately involved in preparing two 9/11 perpetrators for their attacks, it is far from plain that the acts of terrorism that flowed directly from his conspiratorial activities were not precisely what he intended to have happen, let alone "reasonably foresee[able] as a necessary or natural consequence of the unlawful agreement." *Pinkerton*, 328 U.S. at 648. At least the gap

between the two forms of conspiracy is not so clear as to tie Congress's legislative hands on plain-error review.

Bahlul's position—essentially adopted by the dissenters, *see* Joint Dissent at 52–60—is that, although a hypothetical conviction for common plan to wage aggressive war, joint criminal enterprise, or *Pinkerton* conspiracy would have been valid, his conviction here was unconstitutional because the 2006 Act outlaws a stand-alone "conspiracy." Oral Arg. Tr. 9–10. But there is no dispute that the law of nations permits *some* freestanding conspiracy convictions—for aggressive war and genocide. So the fact that the 2006 Act denominates a stand-alone conspiracy offense cannot make all the difference.

If Bahlul means by this argument that the 2006 Act might allow someone else to be convicted of ordinary, common-law-like conspiracy, that is not his argument to make. Outside the First Amendment context (which is not plausibly implicated here), a criminal defendant whose culpable conduct falls within the constitutional range cannot upend that conviction just because the statute's alleged overbreadth might permit the unconstitutional conviction of another individual. *See United States v. Williams*, 553 U.S. 285, 304 (2008) ("[O]rdinarily 'a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'") (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)) (alteration omitted).

What matters here is that Bahlul's own conviction was not for ordinary inchoate conspiracy. It was for a carefully crafted form of statutory conspiracy that, on the record of this case, resembles in important ways those forms of conspiracy or collective action that get the international-law nod of

approval. Surely plain-error review cannot turn on the same nuances of varying conspiracy-liability theories that confound most first-year law students. *See Terrell*, 696 F.3d at 1260 (requiring on-point precedent in the Supreme Court or this circuit to establish clear error).

Contrary to the worry expressed in the dissenting opinion (at 55–60), that conclusion does not find Bahlul guilty of a crime for which he was not charged or convicted. Instead, I decide only that, given the elements of the statutory crime of which Bahlul *was convicted* and its comparability in some key respects to conspiracies that the parties agree transgress international law, Bahlul's conviction of conspiracy under the 2006 Act did not *plainly* exceed Congress's constitutional authority.

*Fourth*, Supreme Court precedent has not required slavish adherence to the precise contours of explicitly recognized international law as a precondition to Congress's exercise of its power under the Define and Punish Clause. For instance, in *United States v. Arjona*, 120 U.S. 479 (1887), the Court held that the Define and Punish Clause gave Congress the authority to punish an individual who counterfeited another nation's securities, *id.* at 487–488. The Court did not identify any express international proscription on counterfeiting securities, but explained that the prohibition on counterfeiting money might, "with just propriety, be extended to the protection of this more recent custom among bankers of dealing in foreign securities[.]" *Id.* at 486. For that reason, the Supreme Court concluded, "a law which is necessary and proper to afford this protection" fell within Congress's Article I power because the law was "needed to carry into execution a power conferred by the constitution on the government of the United States exclusively." *Id.*

*Arjona* thus held that Congress's power to criminalize an offense did not turn on whether the act was expressly prohibited by international law. Instead, it was sufficient that proscribing certain conduct was "necessary and proper" to protect rights implicitly recognized by the law of nations.

Likewise, in *In re Yamashita*, 327 U.S. 1 (1946), the Supreme Court affirmed the conviction of a Japanese military commander before a military commission for "permitting [his troops] to commit brutal atrocities and other high crimes against people of the United States and of its allies and dependencies," *id.* at 13–14. Even though international law had not expressly recognized liability for such supervisorial conduct, the Court noted that international law outlined the commander's duty to uphold the law of war. *See id.* at 15–16 (Geneva Conventions imposed on the commander an affirmative "duty * * * to provide for the details of execution of the foregoing articles (of the convention)"); *cf. id.* at 40 (Murphy, J., dissenting) (protesting that Yamashita's conviction was not "based upon charges fairly drawn in light of established rules of international law and recognized concepts of justice"). What proved critical in *Yamashita* was that the commander's offense—the failure to restrain subordinate troops—"would almost certainly result in violations which it is the purpose of the law of war to prevent." *Id.* at 15 (majority opinion).

So too here. Bahlul's statutory conspiracy conviction and the commission's factual determinations on which it rested are closely tied to offenses against the "Law of Nations" within the meaning of the Constitution's Define and Punish Clause, Art. I, § 8, cl. 10. At a bare minimum, plain-error review does not leave Congress powerless to do nothing more than mimic the precise contours of extant international precedent.

*Fifth* and finally, plain-error review requires Bahlul to identify "clear precedent" from this court or the Supreme Court "establish[ing] [the] erroneous character" of his conspiracy conviction, *Terrell*, 696 F.3d at 1260. But the closest precedent from this court is our prior en banc decision in *Bahlul I*, which points in the opposite direction. There, a majority of this court held that it is not "plain" that conspiracy falls outside the statutory limits on crimes triable by military commission. 767 F.3d at 22. Because the *Ex Post Facto* Clause, U.S. CONST., Art. I, § 9, cl. 3, forbade reliance on the 2006 Act, the court had to determine whether Bahlul's inchoate conspiracy conviction fell plainly outside the "law of war" within the meaning of the Articles of War, 10 U.S.C. § 821. *See Bahlul I*, 767 F.3d at 22. Under the Articles of War, conspiracy had to be an offense that "by the law of war may be tried by military commissions." 10 U.S.C. § 821.

As this court explained in *Bahlul I*, the Supreme Court has not yet resolved the question whether "law of war" means only the international law of war or includes "the common law of war developed in U.S. military tribunals." 767 F.3d at 22–23. But on plain-error review, it was sufficient that the Supreme Court has relied on domestic precedent in addition to international law to ascertain whether a crime is triable as an offense against the "law of war." *Id.* at 23–24 (citing *Hamdan*, 548 U.S. at 603–609 (plurality opinion); *id.* at 689–704 (Thomas, J., dissenting); *Quirin*, 317 U.S. at 31–35, 42 n.14; *Yamashita*, 327 U.S. at 19–20).

So too here, three examples of domestic wartime precedent make it far from plain that conspiracy under the 2006 Act would not be triable by military commission.

For starters, the individuals held responsible for President Lincoln's assassination were charged with and convicted of

"combining, confederating, and conspiring together * * * to kill and murder, within the Military Department of Washington, and within the fortified and intrenched lines thereof, Abraham Lincoln[.]" H.R. Doc. No. 314, 55th Cong., 3d Sess., 696 (1899). President Andrew Johnson personally approved the convictions, relying in part on the opinion of Attorney General James Speed advising that the individuals could be tried for conspiracy before a military commission. 11 Op. Att'y Gen. at 297. As this court explained in *Bahlul I*, "this highest-level Executive Branch deliberation is worthy of respect in construing the law of war." 767 F.3d at 25 (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733–734 (2004)).

In addition, Nazi saboteurs who entered the United States intending to destroy industrial facilities were convicted of conspiracy in *Quirin* and in *Colepaugh v. Looney*, 235 F.2d 429, 431–432 (10th Cir. 1956). While the Supreme Court and the Tenth Circuit each affirmed the saboteurs' convictions based on other charges, those decisions are "prominent example[s]" of conspiracy charges reached in law-of-war military commissions, approved by the executive, and permitted by the judiciary, including the Supreme Court. *Bahlul I*, 767 F.3d at 26.

Lastly, during the Korean War, General Douglas MacArthur ordered that persons accused of "conspiracies and agreements to commit * * * violations of the laws and customs of war of general application" be tried by military commission. Letter Order, Gen. HQ, United Nations Command, Tokyo, Japan, *Trial of Accused War Criminals* (Oct. 28, 1950) (Rules of Criminal Procedure for Military Commissions, Rule 4).

While not definitively answering the ultimate constitutional question, "the historical practice of our wartime

tribunals is sufficient to make it not 'obvious' that conspiracy was not traditionally triable by [a] law-of-war military commission" under the Articles of War as an offense against the law of war. *Bahlul I*, 767 F.3d at 27 (citing *Olano*, 507 U.S. at 734). Further, because the "law of war" in the Articles of War "incorporate[s] by reference, as within the jurisdiction of military commissions, all offenses which may constitutionally be included within that jurisdiction," *Quirin*, 317 U.S. at 30, those same domestic precedents underscore the absence of any plain constitutional error in Bahlul's statutory conspiracy conviction by a military commission.

**IV**

Bahlul's other constitutional challenges also cannot surmount plain-error review.

*First*, he argues that his conspiracy conviction runs afoul of the Constitution's Judicial Power Clause, Art. III, § 2, cl. 1. But precedent has long established that criminal prosecutions for violations of the law of war do not fall within the exclusive jurisdiction of Article III courts. *See, e.g.*, *Johnson v. Eisentrager*, 339 U.S. 763, 786 (1950) (lawfulness of military commission jurisdiction is "well-established"); *Bahlul II*, 792 F.3d at 7 (citing *Quirin*, 317 U.S. at 46). Bahlul's argument that his statutory conspiracy conviction falls beyond the law of nations amounts to nothing more than a repackaging of his Define and Punish Clause argument. The error—if any—is just as far from plain under Article III as it is under Article I.

*Second*, Bahlul contends that his conviction violated his right to a trial by jury. Bahlul is correct that Article III, Section 2, Clause 3 of the Constitution provides that "[t]he Trial of all Crimes, except in Cases of Impeachment, shall be

by Jury." But if any error occurred, it was not plain or obvious.

To begin with, no established precedent even extends the jury trial right to non-citizens being held outside the United States' sovereign territory. In *Boumediene v. Bush*, 553 U.S. 723 (2008), the Supreme Court for the first time extended constitutional protection to an alien at Guantanamo Bay, *id.* at 795. That holding, however, was "explicitly confined * * * 'only' to the extraterritorial reach of the Suspension Clause," and expressly "disclaimed any intention to disturb existing law governing the extraterritorial reach of any constitutional provisions, other than the Suspension Clause." *Rasul v. Myers*, 563 F.3d 527, 529 (D.C. Cir. 2009) (quoting *Boumediene*, 553 U.S. at 795). And it is settled that certain other constitutional provisions do not protect aliens outside the sovereign United States. *See, e.g.*, *United States v. Verdugo-Urquidez*, 494 U.S. 259, 261 (1990) (the Fourth Amendment does not apply to the search and seizure of property owned by a nonresident alien and located abroad); *Kiyemba v. Obama*, 555 F.3d 1022, 1026 & n.9 (D.C. Cir. 2009) (Due Process Clause of Fifth Amendment does not apply to aliens at Guantanamo), *vacated*, 559 U.S. 131 (2010) (per curiam), *reinstated on remand*, 605 F.3d 1046 (D.C. Cir. 2010) (per curiam), *cert. denied*, 563 U.S. 954 (2011).

If anything, precedent undermines Bahlul's claim. In *Quirin*, the Supreme Court held that Nazi saboteurs had no right to trial by jury, explaining that "trial by a jury of the vicinage where the crime was committed" was a "procedure[] unknown to military tribunals, which are not courts in the sense of the Judiciary Article." 317 U.S. at 39. Article III's Jury Trial Clause, the Supreme Court elaborated, "preserve[d] unimpaired trial by jury in all those cases in which it had been recognized by the common law." *Id.* But it did not go so far

as "to have extended the right to demand a jury to trials by military commission, or to have required that offenses against the law of war not triable by jury at common law be tried only in the civil courts." *Id.* at 40.

Bahlul contends that, under *Quirin*, the jury-trial right hinges on whether a charge was triable by jury at common law, not whether the charge was also properly tried before the military commission. Pet. Br. 27; Oral Arg. Tr. 15–16. The sabotage charge in *Quirin* did not entail a jury trial right at common law, but conspiracy did. *See Callan v. Wilson*, 127 U.S. 540, 549 (1888).

Subsequent precedent indicates otherwise. *See Whelchel v. McDonald*, 340 U.S. 122, 127 (1950) ("The right to trial by jury guaranteed by the Sixth Amendment is not applicable to trials by courts-martial or military commission."); *Sanford v. United States*, 586 F.3d 28, 35 (D.C. Cir. 2009) ("[T]he Sixth Amendment right to a criminal jury trial does not, itself, apply to the military."); *cf. Granfinanciera S.A. v. Nordberg*, 492 U.S. 33, 53 (1989) ("[I]f Congress may assign the adjudication of a statutory cause of action to a non-Article III tribunal, then the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder."). There accordingly is nothing plain or obvious about Bahlul's entitlement to a trial by jury.

*Third*, Bahlul argues that the First Amendment's free speech guarantee forecloses a conviction for his political speech, namely the al Qaeda recruitment video he created about the terrorist attack on the USS *Cole*. Pet. Br. 38, 40, *Bahlul II*, 2014 WL 3962849. As with Bahlul's claimed jury-trial right, no governing precedent extends First Amendment protection to speech undertaken by non-citizens on foreign soil, so no plain error occurred.

What is settled, moreover, is that the First Amendment offers no shield to speech like Bahlul's that is "directed to inciting or producing imminent lawless action and * * * [is] likely to incite or produce such action." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 43–44 (2010) (alterations omitted; quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam)); *see also Bahlul*, 820 F. Supp. 2d at 1249 (Bahlul's USS *Cole* recruitment video was "aimed at inciting viewers to join al Qaeda, to kill Americans, and to cause destruction.").

*Fourth*, Bahlul argues that the 2006 Act violates the Fifth Amendment's guarantee of equal protection because it authorized trials before a military commission for alien enemy combatants, but not for enemy combatants who are U.S. citizens. The short answer is that no relevant precedent plainly or clearly supports the application of equal protection principles in this law-of-war context to foreign enemy combatants.

## V

In sum, I would review Bahlul's constitutional challenges only for plain error. Under that standard, I would hold that his conviction for conspiracy under the 2006 Act by a law-of-war military commission did not plainly exceed Congress's power under Article I's Define and Punish Clause or trench upon Article III's assignment of the judicial power to federal courts. Nor did his conviction violate any of the other constitutional protections Bahlul invokes. I accordingly concur in the judgment affirming Bahlul's conviction.

WILKINS, *Circuit Judge*, concurring: I agree with much of the reasoning in section III of Judge Millett's opinion, but my view of this case differs in two ways. First, I do not believe a plain error standard applies. For the reasons set forth in the 2015 panel opinion, Bahlul cannot forfeit his structural Article III claim. *See Al Bahlul v. United States*, 792 F.3d 1, 3-7 (D.C. Cir. 2015), *vacated by order granting rehearing* en banc, *Al Bahlul v. United States*, No. 11-1324 (D.C. Cir. Sept. 25, 2015); *see also Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850-51 (1986). "Every extension of military jurisdiction is an encroachment on the jurisdiction of the civil courts," *Bahlul*, 792 F.3d at 5 (quoting *Reid v. Covert*, 354 U.S. 1, 21 (1957) (plurality)), meaning Bahlul's challenge "goes to the heart of the judiciary's status as a coordinate branch of government," *id.* at 6. Whether his conspiracy conviction falls within the Article III exception for law-of-war military commissions should be a question for *de novo* review.

The second reason I write separately is because there is no constitutional violation under a *de novo* standard. "Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973); *see also New York v. Ferber*, 458 U.S. 747, 767 (1982). Accordingly, to review Bahlul's claim, we must test the premise of his contention as applied to him. His particular conviction is far from one for ordinary, inchoate conspiracy. An examination of the record shows Bahlul was really convicted of an offense tantamount to substantive war crimes under a *Pinkterton* theory of liability. It is not that "any delta between his conspiracy offense and those offenses that international law proscribes is too narrow to rise to the level of plain constitutional error." Millett Op. 32. There is no

delta. The government proved beyond a reasonable doubt that Bahlul knowingly took part in al-Qaeda's plan on September 11, 2001 to murder American civilians. His statutory conspiracy conviction does not violate international law, which recognizes what is essentially *Pinkerton* liability, and it therefore comports with Article III. *See Bahlul*, 792 F.3d at 22 ("The international law of war limits Congress's authority because the Constitution expressly ties that authority to 'the Law of Nations.'") (quoting U.S. CONST. art. I, § 8, cl. 10).

## I.

Bahlul attacks his conviction for conspiracy under Section 950v(b)(28) of the 2006 Military Commission Act ("2006 MCA"), Pub. L. No. 109-366, 120 Stat. 2600. He alleges that the MCA conspiracy crime violates Article III because the prosecution of inchoate conspiracy violates international law. In other words, Bahlul mounts a facial challenge to the statute, and in so doing assumes that his conviction in fact implicates inchoate conspiracy. But we cannot take Bahlul at his word. Instead, we must scrutinize the statute, and then examine the specific facts of his conviction to see whether it actually bears on the constitutional principle asserted. *See United States v. Stevens*, 559 U.S. 460, 474 (2010); *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982). In line with decades of express Supreme Court instruction in this regard, we must treat this case as an as-applied challenge. And when we ask ourselves whether Bahlul was really prosecuted for inchoate conspiracy, the answer is clearly no.

This framework of examining Bahlul's constitutional challenge to his MCA conviction "[b]y focusing on the factual situation before us" is long-accepted practice. *Ferber*, 458 U.S. at 768; *see also Sabri v. United States*, 541 U.S. 600,

609 (2004); *Chapman v. United States*, 500 U.S. 453, 467 (1991); *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484-85 (1989); *N.Y. State Club Ass'n, Inc. v. City of N.Y.*, 487 U.S. 1, 11 (1988); *Vill. of Hoffman Estates*, 455 U.S. at 495 n.7; *United States v. Mazurie*, 419 U.S. 544, 550 (1975); *Broadrick*, 413 U.S. at 610; *United States v. Powell*, 423 U.S. 87, 92 (1975).

It is by now a maxim that a facial attack on a criminal statute simply cannot prevail where the law is constitutional as applied to a defendant's own conduct. *See Schall v. Martin*, 467 U.S. 253, 268 n.18 (1984) ("[O]utside the limited First Amendment context, a criminal statute may not be attacked as overbroad.") (citing *Ferber*, 458 U.S. 747); *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) ("[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.") (citing *Vill. of Hoffman Estates*, 455 U.S. at 495). The Supreme Court has often cautioned that "[f]acial challenges of this sort are especially to be discouraged," *Sabri*, 541 U.S. at 609, and "[t]he fact that [a criminal statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid."[1]

---

[1] There is some controversy in recent years about whether the *Salerno* standard universally applies. *See Hodge v. Talkin*, 799 F.3d 1145, 1156 (D.C. Cir. 2015) ("[T]he Court has also indicated that the standard for facial invalidity may be less stringent in some situations, instead turning on whether the statute lacks any 'plainly legitimate sweep.'" (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008))). At the very least, "all agree that a facial challenge must fail where the statute has a plainly legitimate sweep," *id.* at 450 (internal quotations marks omitted), a standard Bahlul's conviction necessarily survives given that the facts of his own case do not violate Article III. *See also id.*

*United States v. Salerno*, 481 U.S. 739, 745 (1987). "Indeed, this is why facial constitutional challenges [have been] . . . unsuccessful as defenses to criminal prosecutions for non-expressive conduct."[2] *Coleman v. DeWitt*, 282 F.3d 908, 914 n.3 (6th Cir. 2002).

While Bahlul attempts to deflect attention from his own circumstances by erecting a straw man, it is not our job to answer the abstract question of whether prosecuting inchoate conspiracy violates our separation of powers – we do not even examine whether the elements of Section 950v(b)(28) generally equate to a prosecution for inchoate conspiracy. Rather, we examine whether the acts committed and proven in the course of this specific prosecution really equate with inchoate conspiracy. This jurisprudential approach does not "violate basic principles of criminal justice," as the dissent urges. *See* Dissenting Op. at 53. We employ it not just with regard to criminal statutes, but throughout constitutional adjudication, including in the Article III context. We treat a facial separation of powers challenge "as if it were an as-applied challenge," and reject it where the particular application of the statute at issue was constitutional. *U.S. ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1235 & n.7 (D.C. Cir. 2012) (citing *Texas v. Johnson*, 491 U.S. 397, 403 n.3 (1989)); *see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 537 F.3d 667, 670 (D.C. Cir. 2008) ("To succeed in its facial challenge to Title I of the Act under the

("[W]e must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases.").

[2] As Judge Millett's opinion points out, the First Amendment context is not implicated here by Bahlul's Article III challenge. *See* Millett Op. 37.

Appointments Clause and separation of powers, the Fund bears a heavy burden to show that the provisions of which it complains are unduly severe in all circumstances and cannot be constitutionally applied.") (footnote omitted), *aff'd in part, rev'd in part and remanded*, 561 U.S. 477 (2010).

Evaluated in this way, Bahlul's facial challenge must fail because his own conviction does not violate Article III. *See infra* Part III. He was not convicted of inchoate conspiracy. It does not matter that Bahlul framed his argument as a facial attack; an appellant cannot change our approach to deciding constitutional issues "by concession, inadvertence, poor oral advocacy or otherwise."[3] Millett Op. 22 (quoting *Bahlul*, 792 F.3d at 32 n.3 (Henderson, J., dissenting)). Waiver and forfeiture rules have no application in this regard. Nor are there any "serious due process concerns" raised by this approach to Bahlul's collateral attack, brought at the eleventh hour following a trial during which he presented no defense, and after he admitted to all but one of the factual allegations against him. Dissenting Op. at 61. It would be particularly ill-advised to ignore the "usual judicial practice" of deciding the as-applied question before proceeding to a facial challenge, *Fox,* 492 U.S. at 484, given that "[s]triking down an Act of Congress 'is the gravest and most delicate duty that this Court is called on to perform.'" *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2631 (2013) (quoting *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J., concurring)). This "delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to

---

[3] For this same reason, the Court did not consider itself restricted to Citizens United's exact framing of its challenge on appeal. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) ("The parties cannot enter into a stipulation that prevents the Court from considering certain remedies if those remedies are necessary to resolve a claim that has been preserved.").

hypothetical cases thus imagined." *United States v. Raines*, 362 U.S. 17, 22 (1960). But that is what we would be doing if we allowed ourselves to be hurled headlong into the structural Article III claim served up by Bahlul, despite the fact that the record of his conviction raises no such constitutional concern.

While the separation of powers question potentially implicated by this case is a critical one, it is not actually implicated by the facts before us. If it were, I would be inclined to agree with the dissent. However, I cannot join that opinion today on account of the specifics of Bahlul's conviction, which, for the following reasons, shows he was not convicted of inchoate conspiracy.

## II.

There are several features of inchoate conspiracy that make it the "darling of the modern prosecutor's nursery." *Harrison v. United States*, 7 F.2d 259, 263 (2d Cir. 1925). At its "essence," conspiracy is "an agreement to commit an unlawful act." *Iannelli v. United States*, 420 U.S. 770, 777 (1975). The agreement is the prohibited *actus reus*. 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 12.2(a) (2d ed. 2003). It is not necessary that the parties to the conspiracy actually succeed in committing the crime. *See United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003). Many jurisdictions require an overt act in furtherance of the conspiracy, but the overt act itself does not have to be unlawful. LAFAVE § 12.2(b). The government often proves the existence of the agreement through circumstantial evidence, *id.* § 12.2(a), and does not need to show express agreement to the plan's every detail, *see Blumenthal v. United States*, 332 U.S. 539, 557 (1947). Impossibility is not a defense, the merger rule does not apply, and withdrawal from the conspiracy is difficult, requiring an affirmative step.

*See* Neal Katyal, *Conspiracy Theory*, 112 YALE L.J. 1307, 1309 (2003).

Conspiracy's detractors therefore disapprove of it as a vague, "elastic, sprawling and pervasive offense." *Krulewitch v. United States*, 336 U.S. 440, 445 (1949) (Jackson, J., concurring). At the same time, outlawing conspiracy is important to prevent crimes before they are actually committed. *See* LAFAVE § 12.1(c); *see also* Katyal, *supra*, at 1313 ("[W]ith giving prosecutors more tools for leverage over conspirators comes the possibility of . . . preventing some crime before it happens."). We punish inchoate crimes precisely because they constitute "[a] step toward the commission of another crime, the step in itself being serious enough to merit punishment." *Inchoate Offense*, BLACK'S LAW DICTIONARY (10th ed. 2014). Put another way, waiting for the crime to be completed needlessly puts people at risk. *See* Br. of Amici Curiae Former Gov't Officials *et al.* 15 [hereinafter Former Gov't Officials]. Conspiracy is particularly advantageous in this regard because the crime is complete at the moment of agreement; unlike an attempt crime, it can be punished even before a substantial step towards the offense is taken. *See* LAFAVE § 12.1(c).

Importantly, conspiracy is at once a stand-alone crime, and also a theory of liability. As a stand-alone crime against the United States, for example, conspiracy requires several things. *See* 18 U.S.C. § 371. There must be an agreement by two or more persons to commit an offense. The defendant must deliberately join the conspiracy with knowledge of this purpose. And, one of the conspiracy members must, at some time during its existence, perform an overt act to further or advance the purpose of the agreement. *See id.*; *United States v. Treadwell*, 760 F.2d 327, 333 (D.C. Cir. 1985); *see also* 2

KEVIN F. O'MALLEY ET AL., FEDERAL JURY PRACTICE & INSTRUCTIONS § 31:03 (6th ed. 2008) [hereinafter FED. JURY].

Alternatively, as a form of vicarious liability – so-called *Pinkerton* liability – a member to a conspiracy can be held liable for reasonably foreseeable offenses committed by others in the group. *See Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946) ("And so long as the partnership in crime continues, the partners act for each other in carrying it forward"). Under a *Pinkerton* theory, a defendant's responsibility for the underlying offense generally requires that the substantive offense be reasonably foreseeable and committed in furtherance of the conspiracy's objectives, all while the defendant was a member of the conspiracy. *See United States v. Washington*, 106 F.3d 983, 1011 (D.C. Cir. 1997); FED. JURY § 31:10.

Bahlul argues that conspiracy is "dangerously broad in its sweep when used to punish the enemy in war." Pet'r Br. 24. He and Amici essentially warn that all the so-called evils of inchoate conspiracy – that it is easy to charge, overbroad, and difficult to defend – are amplified when the offense is tried by a law-of-war military commission, as opposed to an Article III court. *See* Pet'r Br. 29, 33-34; Br. of Amici Curiae Int'l Law Scholars 16-19. That may be true, but for the reasons that follow, Bahlul's conviction shares little in common with the above-described features of inchoate conspiracy, and instead bears a close kinship to a conviction under a *Pinkerton* theory, which does not offend the Constitution.

**III.**

The 2006 MCA contained important limitations on military commission authority that distinguish this prosecution from that of ordinary, vanilla conspiracy. As

Judge Millett's opinion points out, there is a real question as to whether the conspiracy offense codified by the MCA amounts to inchoate conspiracy. *See* Millett Op. 29-30. Significantly, the statute specifically references victims, containing two sentencing variations depending on whether anybody dies as a result of the conspiracy. 10 U.S.C. § 950v(b)(28) (2006). In other words, by conditioning punishment on either death or other harm befalling another person, the MCA's version of conspiracy contemplates the completion of a substantive offense. That is a far cry from inchoate conspiracy, which is achieved "even though the substantive offence is not successfully consummated." *Inchoate*, BLACK'S LAW DICTIONARY (10th ed. 2014) (quoting Andrew Ashworth, PRINCIPLES OF CRIMINAL LAW 395 (1991)). Bahlul does not ask us to decide if the MCA's version of conspiracy always requires a completed offense, but in this case there is one: the September 11th attacks.

Consider next that in a typical prosecution for inchoate conspiracy, the government need only prove that someone who was a member of the conspiracy committed the requisite overt act. *Pinkerton*, 328 U.S. at 646-47 ("It is settled that 'an overt act of one partner may be the act of all without any new agreement specifically directed to that act.'") (quoting *United States v. Kissel*, 218 U.S. 601, 608 (1910)); FED. JURY § 31:07. Accordingly, ordinary conspiracy jury instructions say that the acts of co-conspirators can be considered proof of the conspiracy charge against the defendant. FED. JURY § 31:06. No similar instruction was given in Bahlul's trial. By contrast, the MCA's version of conspiracy requires, and the commission was instructed that it must find, that Bahlul committed an overt act himself. *See* 10 U.S.C. § 950v(b)(28); Trial Tr. 846 (directing that the panel find Bahlul "knowingly committed at least one of the following overt acts for the

purpose of bringing about one of the objects of the agreement.").

Not only does the MCA's statutory conspiracy require a victim and a defendant's own overt act, but what was proven at Bahlul's trial also goes far beyond conspiracy's traditional requirements. The commission's special verdict form and ten factual findings show that Bahlul was on trial for something that he himself did as part of al-Qaeda's criminal plan to kill nearly 3,000 civilians by flying planes into the World Trade Center. *See* App. 116-17. And according to the evidence and the commission's findings, he did a lot. He played a particularly valuable role supporting two of the 9/11 hijackers, Mohammed Atta and Ziad al Jarrah. Although at the time he was not aware of the specifics of the September 11th plan, the prosecution introduced evidence that Bahlul roomed with Atta and al Jarrah in Afghanistan, the roommate's role typically being to motivate and focus the operatives, as well as to keep an eye on them in case they decide to change their minds. Trial Tr. 555-56. More than that, in a 2005 letter, Bahlul admitted that he arranged for Atta and al Jarrah to pledge their loyalty oaths to bin Laden, and "also typed their martyr wills on a computer and personally handed it to Sheikh Usamah Bin-Landin [sic]." App. 145 (Prosecution Ex. 15). Martyr wills are a crucial aspect of al-Qaeda's twisted ideology and operations. They are declarations that a suicide operative reads into a camera, describing in general terms the terrorist act he is yet to carry out. Trial Tr. 554. The point of the videotaped message is to motivate the operative, incite others to follow his example, spread fear among al-Qaeda's enemies, and allow the organization to later prove its responsibility for the terrorist act. *Id.* at 554, 798-99, 808. "I praise Almighty Allah," wrote Bahlul, "for allowing me to have [this] simple and indirect role" in the 9/11 events. App. 145 (Prosecution Ex. 15).

All of this amounts to Bahlul's *Pinkerton* liability for at least the murder of protected persons. *See* 10 U.S.C. §§ 950v(a)(2), (b)(1) (outlawing "murder of protected persons," defined as "any person entitled to protection under one or more of the Geneva Conventions"); *see also* Millett Op. 31 (describing the MCA object offenses that violate Article 3 of the Geneva Conventions). The record shows that, during his membership in the conspiracy, Bahlul helped further the conspiracy's goal of committing substantive war crimes. Even though the commission was instructed that "[p]roof that [a substantive offense] of [murder of protected persons, etc.] . . . actually occurred is not required," Trial Tr. 848, it nonetheless twice confirmed just that; the commission returned specific findings that Atta and al Jarrah committed the September 11, 2001 attacks, App. 117, and that "at the direction of Usama bin Laden, [Bahlul] researched the economic effect of September 11, 2001, attacks on the United States and provided the result of his research to Usama bin Laden," App. 117. The entire aim of the conspiracy was to murder civilians. *See* App. 115; Trial Tr. 849 (explaining it necessary to prove beyond a reasonable doubt that "the agreement intended every element" of the substantive war crimes). And the commission found that Bahlul purposefully joined al-Qaeda, App. 116, was a conspiracy member during and after the attacks, *see* App. at 117, as well as prepared the martyr wills of Atta and al Jarrah "*in preparation for* the acts of terrorism perpetrated . . . on September 11, 2001,"[4] App. at 117 (emphasis added); *see also* Trial Tr. 849 (instructing that "[t]he overt act . . . must be a clear indication that the

_____

[4] Bahlul's counsel suggests he transcribed the martyr wills "apparently after the September 11th attacks." Pet'r Br. 3 (citing Pet'r App. 141-45). In any case, the commission specifically found that Bahlul prepared them before September 11, 2001. App. 117.

conspiracy is being carried out."). In sum, the government proved all of the *Pinkerton* elements beyond a reasonable doubt.

At oral argument, Bahlul's counsel conceded that a conviction under the *Pinkerton* doctrine does not violate the Constitution. Oral Arg. Tr. 9-10. He could not have answered otherwise, as joint criminal enterprise ("JCE") is a recognized theory of vicarious liability within the international community.[5] *See Hamdan v. Rumsfeld*, 548 U.S. 557, 611 n.40 (2006) (plurality); Br. of Amici Curiae Int'l Law Scholars 10; Br. of Amici Curiae Former Gov't Officials 6. There are actually three forms of JCE. *See* Prosecutor v. Tadíc, Case No. IT-94-1-A, Judgment, ¶ 220 (Int'l Crim. Trib. for the Former Yugoslavia July 15, 1999). The third variant, or "extended" JCE, occurs when there is "a common purpose to commit a crime where one of the perpetrators commits an act which, while outside the common purpose, is nevertheless a natural and foreseeable consequence of the effecting of that common purpose." Prosecutor v. Vasiljevic, Case No. IT-98-32-A, Judgment, ¶ 99 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 25, 2004); *see also id.* at ¶¶ 94-101 (summarizing elements of JCE I-III); Tadíc, Case No. IT-94-1-A, Judgment, at ¶ 204. This is essentially the *Pinkerton* doctrine.[6] *See* Elies van

---

[5] "[V]ariously called joint criminal enterprise, common purpose, or common plan liability," JCE finds support "in World War II-era jurisprudence and in cases from the [International Criminal Tribunal for the Former Yugoslavia]." Brief for Specialists in Conspiracy and International Law as Amici Curiae Supporting Petitioner at 19, *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) (No. 05-184) [hereinafter *Hamdan* Amici].

[6] The *Hamdan* Amici argued that JCE "differs sharply" from *Pinkerton* liability, but offered little more than an explanation that

Sliedregt, *Criminal Responsibility in International Law*, 14 EUR. J. CRIME, CRIM. L. & CRIM. JUST. 81, 97 (2006) ("The closest national equivalent of Third Category JCE is the so-called American concept of 'Pinkerton conspiracy.'"); Jens David Ohlin, *Joint Intentions to Commit International Crimes*, 11 CHI. J. INT'L L. 693, 703 (2011) ("The standard itself for JCE III stems from the *Pinkerton v United States* doctrine . . . . Indeed, even the language in *Tadíc* is borrowed, inter alia, from *Pinkerton*.").

Because the factual elements that were proven during Bahlul's prosecution were indistinguishable from a theory recognized under international law, it does not offend the Constitution. *See Bahlul*, 792 F.3d at 24 (Tatel, J., concurring) ("[T]he weight of the Court's language in *Quirin* strongly indicates that the law-of-war exception is exclusively international."). As a result, I do not believe we should reach out and decide additional constitutional issues not necessary to resolve this appeal, which is why I am unwilling to wade into the waters pursued by Judge Kavanaugh. *See Ex parte Quirin*, 317 U.S. 1, 45-46 (1942) ("We have no occasion now to define with meticulous care the ultimate boundaries of the jurisdiction of military tribunals to try persons according to the law of war. It is enough that petitioners here, upon the

---

JCE, as a theory of vicarious liability, is not the same as an inchoate offense. *Hamdan* Amici at 20. *Amici* in our case do not make a similar claim. That argument is perhaps driven by the need to "distance" JCE from "a formulation that sounds too much like conspiracy. The received wisdom among international lawyers is that conspiracy is a decidedly common law doctrine that finds insufficient international support to be considered part of international criminal law. Consequently, if JCE amounts to ersatz conspiracy, it will be rejected too." Jens David Ohlin, *Joint Intentions to Commit International Crimes*, 11 CHI. J. INT'L L. 693, 696 (2011).

conceded facts, were plainly within those boundaries . . . ."); *see also Rasul v. Bush*, 542 U.S. 466, 485 (2004) (limiting its holding to only "[w]hat is presently at stake" before the Court). It is first and foremost a conviction we are reviewing. When considering the particular record before us, it shows that the government proved Bahlul joined a conspiracy to murder Americans prior to the September 11, 2001 attacks, remained a member following those attacks, and himself committed overt acts in furtherance of the conspiracy both before and after September 11, 2001. *See* App. 116-17. As tantamount to a *Pinkerton* conviction, it does not raise the concerns that have caused critics to reject the prosecution of inchoate conspiracy as a violation of international law. The charge was not overbroad, the commission was never instructed that the acts or intentions of Bahlul's co-conspirators should be deemed his acts or intentions, there was a completed offense, and Bahlul admitted that he himself committed several overt acts in furtherance of the completed offense. *See Al Bahlul v. United States*, 767 F.3d 1, 7 (D.C. Cir. 2014) (en banc). His conviction is very much the opposite of the "overbroad application of the conspiracy principle . . . [that] drag[s] innocent people into the prosecution's net." Br. of Amici Curiae Int'l Law Scholars 6 (quoting Telford Taylor, *Anatomy of the Nuremberg Trials: A Personal Memoir* 553 (1992)).

\*\*\*

When I look at what Bahlul was really convicted of, I see a war crime. Thus, his conviction does not violate the law of nations, or our separation of powers – even under a *de novo* standard. I further concur with rejecting Bahlul's additional constitutional challenges on the bases set forth in section IV of Judge Millet's opinion. For these reasons we should affirm the conviction.

ROGERS, TATEL, and PILLARD *Circuit Judges*, dissenting: When confronted with the facts of this case, one is tempted to search for a way to sustain Ali Hamza Ahmad Suliman al Bahlul's conviction for the crime of inchoate conspiracy to violate the laws of war. After all, he has admitted that he swore an oath of loyalty to Osama bin Laden, served as bin Laden's personal secretary, and made al Qaeda recruitment videos. But tempting as it may be, too much is at stake to affirm. The prosecution of al Bahlul in a law-of-war military commission for inchoate conspiracy infringes the judiciary's power to preside over the trial of all crimes, as set forth in Article III of the Constitution. History and precedent have established a narrow, atextual exception to Article III under which the military may try enemy belligerents for offenses against the international "laws of war," but inchoate conspiracy is not such an offense.

The challenges of the war on terror do not necessitate truncating the judicial power to make room for a new constitutional order. "The laws and Constitution are designed to survive, and remain in force, in extraordinary times. Liberty and security can be reconciled; and in our system they are reconciled within the framework of the law." *Boumediene v. Bush*, 553 U.S. 723, 798 (2008). The exceptional authority the government seeks here falls outside the bounds established by more than a century of constitutional practice. Equally important, the government here has never contended that such authority is even necessary. The prosecution could have charged al Bahlul with recognized war crimes using conspiracy as a theory of liability or it could have charged him before an Article III court with inchoate conspiracy and any number of other crimes triable there but it chose neither course. The circumstances of this case thus present no occasion for the judicial branch to abandon its responsibility to enforce the constitutional plan of separated powers.

2

Accordingly, for the reasons set forth below, we respectfully dissent from the judgment affirming al Bahlul's conviction. We begin in Part I with the standard of review, concluding—along with the majority of this court—that al Bahlul's separation-of-powers claim is properly reviewed de novo. In Part II we set forth the relevant precedent governing that claim, explaining that it fails to provide support for the government's prosecution of al Bahlul in a military commission for the crime of inchoate conspiracy. We also respond to the government's key arguments for upholding al Bahlul's conspiracy conviction, finding none persuasive. Part III then responds to several of our colleagues' arguments, and Part IV addresses the potential consequences of the government's asserted authority. We conclude by emphasizing that, in keeping with our Constitution's commitment to judicial independence, a majority of this court declines to cede the requested judicial authority to the military.

**I.**

As a threshold matter, the government argues that during the military commission proceedings, al Bahlul failed to raise each of the challenges he now advances against his conspiracy conviction and that he has, therefore, forfeited them. Resp't's Br. 17–18; *see* Millett Op. at 8–11. If al Bahlul did forfeit them, this court would ordinarily review those claims only for plain error—a highly deferential standard. *See Al Bahlul v. United States (Al Bahlul I)*, 767 F.3d 1, 9–10 (D.C. Cir. 2014) (en banc). The challenge we address, however, asks whether trying al Bahlul for the crime of inchoate conspiracy in a law-of-war military commission violates the separation-of-powers principles enshrined in Article III, § 1 of the Constitution. That question warrants de novo review.

As this court has recognized, a party can waive or forfeit the argument that an opposing party has waived or forfeited a claim. *See, e.g.*, *Solomon v. Vilsack*, 763 F.3d 1, 13 (D.C. Cir. 2014) ("By failing to argue forfeiture or a failure to properly plead the claims before the district court, the Secretary has—in a word—forfeited his forfeiture argument here."); *United States v. Delgado-Garcia*, 374 F.3d 1337, 1340 (D.C. Cir. 2004) (holding that, by failing to advance it, the government had "waived its waiver argument"). Here, the government has undoubtedly forfeited any argument it might have had that al Bahlul failed to pursue (and thereby forfeited) his "structural" Article III claim. In its first en banc brief to this court, the government forcefully argued that al Bahlul had forfeited his ex post facto challenge by failing to raise it at trial and that the challenge was consequently subject to plain error review. Brief for the United States 63, *Al Bahlul I*, 767 F.3d 1 (No. 11-1324), 2013 WL 3479237, at *63. But the government never suggested that al Bahlul had similarly forfeited his Article III objection or that this court should review that claim only for plain error. *Id.* at 70–71. That was so even though al Bahlul had expressly sought de novo review of that claim. *See* Brief for Petitioner 13, *Al Bahlul I*, 767 F.3d 1 (No. 11-1324), 2013 WL 2325912, at *13. Later, on remand to the original panel, the government again failed to argue that al Bahlul had forfeited his structural Article III claim. Instead, it expressed its belief that the claim was nonforfeitable and thus subject to de novo review. *See* Transcript of Oral Argument at 29–30, *Al Bahlul v. United States (Al Bahlul II)*, 792 F.3d 1 (D.C. Cir. 2015) (No. 11-1324) ("Q: Are you also saying that the structural Article 3 claim is forfeitable? A: I am saying that argument is not forfeitable."). Now, after four years of litigation before this court, the government changes its tune and, for the very first time, argues that al Bahlul forfeited the structural claim at trial. Because the government

long ago "forfeited [its] forfeiture argument" with respect to that claim, *Solomon*, 763 F.3d at 13, this court properly reviews it de novo. *See* Kavanaugh Op. at 3 n.1.

Even if the government had, from the outset, pressed its view that al Bahlul forfeited his structural Article III claim, we would still review it de novo. The Supreme Court has made clear that ordinary forfeiture and waiver principles do not apply to structural Article III claims like this one. As the Court has explained, Article III, § 1, which vests "[t]he judicial Power of the United States, . . . in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish," serves two distinct purposes. First, it "safeguard[s] litigants' right to have claims decided before judges who are free from potential domination by other branches of government." *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 848 (1986) (internal quotation marks omitted). Second, it "protect[s] the role of the independent judiciary within the constitutional scheme of tripartite government." *Id.* (internal quotation marks omitted). As with other constitutional rights, litigants can waive or forfeit their *personal* right to an Article III adjudication. *See id.* at 848–49; *Wellness International Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1949 (2015) (remanding the case for the lower court to determine whether the litigant forfeited his personal right to an Article III adjudication). But because the provision also protects "institutional interests that the parties cannot be expected to protect," the Supreme Court has held that when courts are presented with structural Article III, § 1 claims, "notions of consent and waiver cannot be dispositive." *Schor*, 478 U.S. at 851. Instead, where structural principles are implicated, courts may ignore a party's waiver or forfeiture to consider an Article III, § 1 claim de novo. *See, e.g.*, *id.* at 850–57 (examining whether an Article I tribunal's adjudication of a state law counterclaim impermissibly

infringed on the judiciary's domain despite the petitioning party having waived his right to pursue the claim in an Article III tribunal).

The Court has repeatedly reaffirmed this approach. In *Plaut v. Spendthrift Farm, Inc.*, the Court stated that courts have discretion to excuse waivers where parties purport to waive "doctrines central to the courts' structural independence" such as *res judicata*. 514 U.S. 211, 231–32 (1995). Most recently, in *Wellness International Network v. Sharif*, the Court demonstrated once again that a litigant's waiver or forfeiture of the "personal right" to an Article III adjudication presents no bar to courts' consideration of structural Article III claims on the merits. 135 S. Ct. at 1943 (quoting *Schor*, 478 U.S. at 850) (emphasis added). Despite recognizing that Sharif may have forfeited his personal right to have a so-called *Stern* claim adjudicated before an Article III judge, *id.* at 1941 n.5, 1949, the Court proceeded to consider whether allowing bankruptcy courts to adjudicate *Stern* claims with the parties' consent would "impermissibly threaten the institutional integrity of the Judicial Branch," *id.* at 1944–46 (internal quotation marks and alteration omitted). Thus, rather than following ordinary rules of appellate procedure under which it would have declined to review a potentially waived or forfeited claim, the Court disregarded the potential forfeiture and considered the structural issue on the merits.

Putting aside whether cases like *Schor* and *Sharif* should be read to hold that structural Article III, § 1 claims can never be waived or forfeited, *see Al Bahlul II*, 792 F.3d at 3–7 (explaining how the *Schor* line of cases may be read to prohibit waiver or forfeiture of structural Article III claims); *id.* at 23–24 (Tatel, J., concurring) (same), those cases stand, at the very least, for the proposition that courts should not

reflexively apply ordinary rules of waiver and forfeiture to dispose of such claims. Instead, under that line of cases, courts may exercise their discretion to protect the judiciary's role within our system of government. We believe this is one of those cases in which the court should exercise that discretion.

To be sure, al Bahlul is hardly a sympathetic litigant, and it is tempting to cut him no slack. Not only has he admitted nearly all of the allegations against him, including that he pledged an oath of loyalty to Osama bin Laden and produced al Qaeda recruiting materials, but during his trial he "flatly refused" to put on any defense, conducting a self-styled boycott instead. *Al Bahlul I*, 767 F.3d at 5–7, 10. The question presented by *Schor* and its progeny, however, is not whether this court should exercise its discretion for al Bahlul's sake. The question is whether the court should exercise its discretion to "safeguard[] the role of the Judicial Branch in our tripartite system." *Schor*, 478 U.S. at 850. In our view, the answer here is plainly yes.

As Justice Kennedy observed in *Hamdan v. Rumsfeld*, "[t]rial by military commission raises separation-of-powers concerns of the highest order." 548 U.S. 557, 638 (2006) (Kennedy, J., concurring). Here, al Bahlul presents substantial questions as to whether the political branches have invaded the judiciary's domain. Specifically, he argues that Congress and the executive branch have ventured beyond the scope of the Article III exception for law-of-war military commissions sanctioned in *Ex parte Quirin*, 317 U.S. 1 (1942), a case four Justices recently described as "the high-water mark of military power to try enemy combatants for war crimes." *Hamdan*, 548 U.S. at 597 (plurality opinion). Determining whether such an expansion of military power is constitutional is especially critical as our nation enters a new era in which

many of the traditional constraints on the political branches' authority to prosecute individuals in military commissions—including wars' temporal limits and the presence of clearly defined enemies—are dissipating. *See, e.g.*, *Legal Issues Regarding Military Commissions and the Trial of Detainees for Violations of the Law of War: Hearing Before the Senate Committee on Armed Services*, 111th Cong. 11 (2009) (statement of David Kris, Assistant Attorney General, National Security Division, Department of Justice) ("In the past, military commissions have been associated with a particular conflict of relatively short duration. In the modern era, . . . the conflict could continue for a much longer time.").

In this new context, it is also essential that courts give Congress and the President clear guidance on the offenses that can be tried by law-of-war military commissions. The purpose of such tribunals has long been to "dispense swift justice" in the midst of battle. *Hamdan*, 548 U.S. at 607 (plurality opinion). But in recent years, the uncertainty surrounding the legal limits on military commissions has made this form of justice anything but swift. Indeed, Congress first codified conspiracy as an offense triable by military commission a decade ago, and al Bahlul was convicted of inchoate conspiracy over seven years ago. Nevertheless, the legitimacy of that charge remains in doubt. Because clear limits can assist Congress and the Executive as they continue to combat al Qaeda and its associated forces and as they consider the United States' role in future conflicts, it would be unwise to put off final resolution of the commissions' authority to preside over such charges for still more years to come. *Cf. id.* at 589 (majority opinion) (declining the government's request to abstain from reaching the merits of an unlawful enemy combatant's challenge to a military commission's authority because, among other things, he and the government both had

"a compelling interest in knowing in advance whether [he] may be tried by a military commission").

Asked at oral argument why the court should not exercise its discretion to review this question de novo, the government principally argued that constitutional avoidance principles counseled against it. *See* Oral Arg. Tr. 58–60 (Dec. 1, 2015). But on that logic, courts would never exercise their discretion to consider structural Article III claims because such claims always implicate constitutional questions. That outcome would stand in direct conflict with the Supreme Court's instruction that a party's waiver or forfeiture of a structural Article III claim not be dispositive as to whether a court reaches the claim on the merits.

Although acknowledging that "*Schor* affords this court some discretion to review a forfeited Article III claim *de novo*," Millett Op. at 17, Judge Millett would decline to exercise that discretion here, *id.* at 17–27. In our view, her reasons for doing so insufficiently account for the central teaching of *Schor* and its progeny and overstate the consequences of exercising our discretion. In particular, although it is true that the Supreme Court has typically invoked *Schor* to ignore a party's waiver or forfeiture of a structural Article III claim in *civil* cases involving adjudicatory systems premised on the parties' consent—that is, in cases where parties necessarily waived their right to later challenge the adjudication of their claims in non-Article III fora, *see id.* at 20–21—those cases recognize that Article III, § 1 protects the judiciary's role in our system of government and that the judiciary cannot be wholly dependent on litigants to assert its institutional interests, *see, e.g.*, *Schor*, 478 U.S. at 851. This principle—that there are Article III, § 1 guarantees that are not the parties' to waive or forfeit—applies at least as strongly in criminal as in civil cases. *See*

*Peretz v. United States*, 501 U.S. 923, 925, 937–39 (1991) (acknowledging in the context of a criminal case that, under *Schor*, there may be structural principles litigants cannot waive or forfeit); *id.* at 950 (Marshall, J., dissenting) ("Although parties may waive their personal guarantee of an independent Article III adjudicator, parties may *not* waive Article III's structural guarantee." (internal citation omitted)).

For similar reasons, Judge Millett's concern that the court not "reward[]" al Bahlul for his refusal to participate in the military proceedings and that excusing al Bahlul's forfeiture would undermine the judicial process, Millett Op. at 21, misses the point. As already noted, the court, in exercising its discretion to consider the matter de novo, is doing so for the judicial branch's own benefit, not for al Bahlul's. And although enforcing forfeitures generally ensures timely raised objections, deters sandbagging of the other party, and enables timely fact-finding and error correction, *see id.* at 9–10, those concerns are not compelling here because future litigants will have no way of knowing in advance whether courts will exercise their discretion to consider structural Article III claims. Moreover, any disruption to normal appellate process, *see id.* at 21–22, is "plainly insufficient to overcome the strong interest of the federal judiciary in maintaining the constitutional plan of separation of powers." *Glidden Co. v. Zdanok*, 370 U.S. 530, 536 (1962); *see Kuretski v. Commissioner of Internal Revenue Service*, 755 F.3d 929, 936 (D.C. Cir. 2014).

In sum, although the government now claims that al Bahlul forfeited his personal right to a trial in an Article III court, it conceded otherwise at every prior stage of this litigation, thereby "forfeiting the forfeiture." In any event, strong reasons counsel in favor of exercising our discretion to consider the matter de novo. We therefore ask whether

Congress has, in the Military Commissions Act of 2006, impermissibly encroached on the province of Article III courts by authorizing law-of-war military commissions to try alien unlawful enemy combatants for the crime of conspiracy. On that question, too, we think the answer is clear: it has.

**II.**

By its text, Article III commits the entire "judicial Power of the United States" to the Supreme Court and "such inferior Courts as the Congress may from time to time ordain and establish." U.S. CONST. art. III, § 1. It further provides that "[t]he judicial Power shall extend to all Cases, in Law and Equity, arising under th[e] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority," *id.* § 2, cl. 1; that the judges who sit on Article III courts shall enjoy life tenure and salary protections, *id.* § 1; and that "[t]he Trial of all Crimes, except in Cases of Impeachment, shall be by Jury," *id.* § 2, cl. 3.

Over time, the Supreme Court has recognized certain limited exceptions, based on principles "rooted in history and the Constitution," *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 74 (1982) (plurality opinion), to Article III's commitment of the judicial power to constitutional courts and the judge and jury protections that go along with it. Thus, Congress may create non-Article III courts to try cases in the District of Columbia and U.S. territories. *Palmore v. United States*, 411 U.S. 389, 390–91 (1973); *American Insurance Co. v. 356 Bales of Cotton*, 26 U.S. (1 Pet.) 511, 546 (1828); *see* U.S. CONST. art. I, § 8, cl. 17. It may assign to administrative agencies the adjudication of private disputes involving "public rights" stemming from federal regulatory programs. *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272,

284 (1855); *see* U.S. CONST. art. I, § 8, cl. 1. It may also assign certain criminal prosecutions of individuals connected to military service to courts martial. *Dynes v. Hoover*, 61 U.S. (20 How.) 65, 79 (1857); *see* U.S. CONST. art I, § 8, cl. 14. Finally, at issue here, the Supreme Court has upheld a narrow Article III carve-out for military commissions. *See Quirin*, 317 U.S. at 39–41.

Historically, the government has established military commissions in three situations in which wartime necessity has required them: First, it has established commissions to operate as general courts in areas under martial law. *See Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 127 (1866) (recognizing that "there are occasions when martial rule can be properly applied"). Second, the government has employed military commissions as general courts in areas that the military temporarily occupies. *See Madsen v. Kinsella*, 343 U.S. 341 (1952) (upholding a military commission's jurisdiction to try a civilian for murder in occupied Germany). Third, the government has created commissions to punish enemy belligerents who commit offenses against the laws of war during an armed conflict. *See Quirin*, 317 U.S. 1; *see also Hamdan*, 548 U.S. at 595–97 (plurality opinion); WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS 836–40 (rev. 2d ed. 1920) [hereinafter WINTHROP, MILITARY LAW].

The parties agree that al Bahlul was tried before the third type of tribunal—that is, a law-of-war military commission. They part ways, however, in defining the permissible scope of those commissions' jurisdiction. Al Bahlul contends that law-of-war military commissions may try only offenses against the *international* laws of war, and that the sole remaining charge here, the standalone crime of conspiracy, is not such an offense. The government responds to al Bahlul's constitutional challenge in two ways. First, it contends that

Congress may authorize military commissions to try enemy belligerents for violations of the international laws of war *as well as* any other offenses Congress defines as violations of the "laws of war." Following from this point, the government asserts that although conspiracy to commit war crimes is not recognized as an international law-of-war offense, Congress in the Military Commissions Act of 2006 lawfully vested military commissions with authority to try individuals like al Bahlul for the crime of conspiracy. In doing so, the government takes the position that international law imposes no constraints on the kinds of offenses Congress can make triable by military commission. Alternatively, the government takes the slightly narrower position that the military can try enemy belligerents for international war crimes, as well as any offenses punishable under a "U.S. common law of war," by which the government means any offenses traditionally tried by military commission in the United States. On this point, the government contends that there is sufficient historical precedent for trying conspiracy before law-of-war military commissions, and that the charge against al Bahlul was, therefore, lawful. Based on the Supreme Court precedent most directly on point—which we, as a lower court, must follow—al Bahlul has the better of these arguments.

**A.**

The principal decision that governs here is *Ex parte Quirin*, a case in which seven Nazi saboteurs challenged the government's authority to try them in a military, as opposed to civilian, tribunal. Prior to their arrests, the saboteurs had received military training at a sabotage school in Germany, traveled to the United States by submarine, discarded their military uniforms once ashore, and then traveled to various locales in civilian dress with the apparent intent to destroy U.S. war industries and facilities. 317 U.S. at 21. After they

were apprehended and detained, President Roosevelt issued an executive order establishing a military commission to try them for offenses against the laws of war and the Articles of War. *Id.* at 22. Pursuant to that order, the Army Judge Advocate General prepared four charges against the saboteurs, which read as follows:

> 1.    Violation of the law of war.
> 2.    Violation of Article 81 of the Articles of War, defining the offense of relieving or attempting to relieve, or corresponding with or giving intelligence to, the enemy.
> 3.    Violation of Article 82, defining the offense of spying.
> 4.    Conspiracy to commit the offenses alleged in charges 1, 2 and 3.

*Id.* at 23.

Focusing on the first charge alone, the Supreme Court upheld the commission's jurisdiction to try the defendants. It observed that "[a]n important incident to the conduct of war is the adoption of measures by the military command not only to repel and defeat the enemy, but to seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military effort have violated the law of war." *Id.* at 28–29. It further found that Congress had authorized the use of law-of-war military commissions in Article 15 of the Articles of War. Article 15 directed that "the provisions of the[] articles conferring jurisdiction upon courts-martial shall not be construed as depriving military commissions . . . of concurrent jurisdiction in respect of *offenders or offenses that by statute or by the law of war may be triable by such military commissions.*" *Id.* at 27–28

(emphasis added). By enacting that provision, the Court explained, Congress had

> exercised its authority to define and punish offenses against the law of nations by sanctioning, within constitutional limitations, the jurisdiction of military commissions to try persons for offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals.

*Id.* at 28.

Stating that the term "law of war" refers to a "branch of *international* law," *id.* at 29 (emphasis added); *see also id.* at 27–28, the Court proceeded to consider whether the defendants had been charged with a violation of the international rules governing armed conflicts, *id.* at 30–31, 35–36. It ultimately concluded that they had been, expressing its belief that passing behind enemy lines in civilian dress with the purpose of committing hostile acts was then an offense under international law. *Id.* at 31. According to the Court, the "precept" that "those who during time of war pass surreptitiously from enemy territory into our own, discarding their uniforms upon entry, for the commission of hostile acts involving destruction of life or property, [are] . . . punishable . . . by military commission" was "so recognized in practice both here and abroad" and "so generally . . . accepted as valid by authorities on international law" that it had to be "regarded as a rule or principle of the law of war recognized by this Government by its enactment of the Fifteenth Article of War." *Id.* at 35–36.

After concluding that Congress had lawfully authorized the military-commission trial of the offense specified in the

first charge, the Court turned to consider whether, despite Congress's authorization, the jury trial protections in Article III, § 2 and the Fifth and Sixth Amendments nonetheless barred the saboteurs' prosecution in a military commission. Concluding that they did not, the Court emphasized that military tribunals "are not courts in the sense of the Judiciary Article," *id.* at 39, and that the adoptions of Article III, § 2 and the Fifth and Sixth Amendments were in no way intended to deprive the military of its traditional ability to try enemy belligerents for offenses against the laws of war, *id.* at 39–41. Violations of the laws of war, the Court observed, have, "since the founding of our government," been cognizable by military tribunals. *Id.* at 41. For support, the Court pointed to an 1806 statute subjecting alien spies to death, "according to the law and usage of nations, by sentence of a general court martial." *Id.* at 41. That statute, the Court explained, provided a "contemporary construction of both Article III, § 2, and the Amendments as not foreclosing trial by military tribunals, without a jury, of offenses against the law of war committed by enemies not in or associated with our Armed Forces." *Id.* at 41. Thus, in *Quirin* the Supreme Court recognized an exception to Article III and its judge and jury protections for military trials of violations of the "laws of war"—a body of law that, as noted above, the Court described as international. *Id.* at 29.

For over seventy years, the Court has treated the phrase "law of war" as referring to a body of international law, thus reinforcing the idea that *Quirin* recognized an Article III exception for international law-of-war offenses. For instance, only four years after *Quirin*, in *In re Yamashita*, 327 U.S. 1 (1946), the Court, reaffirming *Quirin*'s "governing principles," *id.* at 9, considered whether a military commission could try a Japanese Commanding General for the "plain violations of the law of war" committed by his

troops, based on a command theory of responsibility, *id.* at 16. Continuing to rely on the Articles of War as having provided congressional authorization for military commissions to try enemy combatants for offenses against the "law of war," *id.* at 7, the Court concluded that the commission had jurisdiction over the specified offense, *id.* at 17–18. Importantly for our purposes here, the Court looked to *international* sources to determine whether the charges specified offenses against the "laws of war." *Id.* at 15–16.

Four years later, the Court again addressed the scope of law-of-war military commissions' jurisdiction in *Johnson v. Eisentrager*, 339 U.S. 763 (1950). The Court reiterated the principles laid out in *Quirin* and *Yamashita*, observing that "[t]he jurisdiction of military authorities, during or following hostilities, to punish those guilty of offenses against the *laws of war* is long-established." *Id.* at 786 (emphasis added). It again looked only to international sources to conclude that the conduct with which the petitioners were charged—"[b]reach of the terms of an act of surrender"—violated the international laws governing armed conflicts. *Id.* at 787–88.

*Quirin*, as reinforced by *Yamashita* and *Eisentrager*, thus upheld the authority of military commissions to try enemy belligerents for violations of the international laws of war without running afoul of Article III. But those cases went no further. And while it is true that those cases did not address the question presented here—i.e., whether military commissions can exercise jurisdiction over crimes unrecognized under international law without offending Article III's structural principles—we, as a lower court, should be hesitant to stretch the exception recognized in those cases in the ways the government suggests. For one thing, a Supreme Court plurality has already described *Quirin* as "the high-water mark of military power to try enemy combatants

for war crimes." *Id.* at 597. For another, law-of-war military commissions present an atextual exception to Article III's vesting of the judicial power in civilian courts, requiring that we construe the exception narrowly. Finally, expanding the scope of military commissions' jurisdiction would erode their historical and theoretical underpinnings as an important mechanism for punishing enemy combatants who fail to abide by the internationally agreed upon rules governing the conduct of war.

**B.**

Given the foregoing principles, the Article III inquiry in this case turns on whether conspiracy to commit war crimes is an offense under the international laws of war. As the government candidly and rightly concedes, it is not. *See* Brief for the United States 34, *Al Bahlul I*, 767 F.3d 1 (No. 11-1324), 2013 WL 3479237, at *34 ("[T]he government has acknowledged that conspiracy has not attained recognition at this time as an offense under customary international law. This is true even when the objects of the conspiracy are offenses prohibited by customary international law, as some of them are in this case." (internal citation omitted)); *see also* Government Response to Defense Motion to Dismiss for Lack of Lack of [*sic*] Jurisdiction Over the Charge of Conspiracy, AE048A, at 21–22, *United States v. Al-Nashiri* (M.C. Mar. 26, 2012) ("[H]istory reflects a lack of international consensus for treating the standalone offense of conspiracy as a war crime as a matter of customary international law . . . ." (emphasis omitted)).

To begin, neither the Hague nor the Geneva Conventions—"the major treaties on the law of war," *Hamdan*, 548 U.S. at 604 (plurality opinion)—mention conspiracy, *see* Convention with Respect to the Laws and

Customs of War on Land (Hague II), July 29, 1899, 32 Stat. 1803; Convention Respecting the Laws and Customs of War on Land (Hague IV), Oct. 18, 1907, 36 Stat. 2277; Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31; Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85; Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287; Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I), June 8, 1977, 1125 U.N.T.S. 3; Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), June 8, 1977, 1125 U.N.T.S. 609.

International tribunals established for the prosecution of war crimes, crimes against humanity, and crimes against peace have also declined to recognize conspiracy as a war crime. For instance, the London Charter, which established the International Military Tribunal at Nuremberg for the prosecution of major Nazi war criminals after World War II, did not list conspiracy among the punishable war crimes. *See* Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, Aug. 8, 1945, 82 U.N.T.S. 279 (London Charter). Indeed, the tribunal dismissed a charge for conspiracy to commit war crimes and crimes against humanity because "the Charter d[id] not define as a separate crime any conspiracy except the one to commit acts of aggressive war." 22 TRIAL OF THE MAJOR WAR

CRIMINALS BEFORE THE INTERNATIONAL MILITARY TRIBUNAL 469 (1948).

The same is true of the charter for the International Military Tribunal for the Far East, *see* Supreme Commander for the Allied Powers at Tokyo, General Order No. 20, Special Proclamation for the Establishment of an International Military Tribunal for the Far East, Apr. 26, 1946, T.I.A.S. No. 1589, 4 Bevans 20; International Military Tribunal for the Far East, Judgment of 4 November 1948, *in* 22 THE TOKYO WAR CRIMES TRIAL: THE COMPLETE TRANSCRIPTS OF THE PROCEEDINGS OF THE INTERNATIONAL MILITARY TRIBUNAL FOR THE FAR EAST 48,448–51 (R. John Pritchard and Sonia M. Zaide eds. 1981), and the law conferring authority on the forces occupying post-war Germany to punish lower-level Nazi officials for war crimes, *see, e.g.*, 2 TRIALS OF WAR CRIMINALS BEFORE THE NURENBERG MILITARY TRIBUNALS UNDER CONTROL COUNCIL LAW NO. 10, at 122, 174 (1949). As a tribunal established under the latter explained, "[N]either the Charter of the International Military Tribunal nor Control Council Law No. 10 has defined conspiracy to commit a war crime or crime against humanity as a separate substantive crime; therefore, this Tribunal has no jurisdiction to try any defendant upon a charge of conspiracy considered as a separate substantive offense." *Id*.

More recently, the statutes for the International Criminal Tribunal for the Former Yugoslavia, the International Criminal Tribunal for Rwanda, and the Special Court for Sierra Leone did not identify conspiracy as a violation of the laws of war. *See* Statute of the International Tribunal for the Former Yugoslavia, annexed to Report of the Secretary-General Pursuant to Paragraph 2 of Security Council Resolution 808 (1993) S/25704 (May 3, 1993), adopted by S.C. Res. 827 (May 25, 1993), *reprinted in* 32 I.L.M. 1159

[hereinafter ICTY Statute]; Statute of the International Tribunal for Rwanda, adopted by S.C. Res. 955, U.N. Doc. S/RES/955 (1994), *reprinted in* 33 I.L.M. 1598 [hereinafter ICTR Statute]; Statute of the Special Court for Sierra Leone, Jan. 16, 2002, 2178 U.N.T.S. 138. And, quite tellingly, the Rome Statute, which established the International Criminal Court and which "catalogues an extensive list of international war crimes," *Hamdan v. United States*, 696 F.3d 1238, 1251 (D.C. Cir. 2012), *overruled on other grounds*, *Al Bahlul I*, 767 F.3d at 11, does not list conspiracy to commit war crimes as itself a war crime. *See* Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90 [hereinafter Rome Statute].

Other sources on the laws of war likewise recognize that international law has declined to adopt conspiracy to commit war crimes as a standalone offense. *See, e.g.*, ANDREA BIANCHI & YASMIN NAQVI, INTERNATIONAL HUMANITARIAN LAW AND TERRORISM 244 (2011); ANTONIO CASSESE, INTERNATIONAL CRIMINAL LAW 191, 197 (2003). Domestic jurists confirm that international law has long rejected conspiracy as a law-of-war offense. Professor George Fletcher observes that, "Since 1948 and the residue of the Genocide Convention in the statutes of the ad hoc tribunals, every relevant international treaty on international humanitarian law or international criminal law had deliberately avoided the concept and language of conspiracy." George P. Fletcher, Hamdan *Confronts the Military Commissions Act of 2006*, 45 COLUM. J. TRANSNAT'L L. 427, 448 (2007). William Winthrop, the "Blackstone of military law," *Reid v. Covert*, 354 U.S. 1, 19 (1957) (plurality opinion), noted that conspiracy was not a law-of-war offense. WINTHROP, MILITARY LAW, *supra*, at 842, *cited in Hamdan*, 548 U.S. at 597. Where Winthrop listed the law-of-war violations that had

principally been charged in U.S. military commissions, conspiracy was not among them. *See id.* at 839–40.

Significantly for the issue before us, international law has adopted conspiracy as a standalone offense in only two circumstances. First, it has recognized conspiracy to commit genocide as a crime against humanity. *See, e.g.*, Convention on the Prevention and Punishment of the Crime of Genocide, art. 3(b), Dec. 9, 1948, 78 U.N.T.S. 277; ICTY Statute, *supra*, art. 4; ICTR Statute, *supra*, art. 2. Second, it has acknowledged conspiracy to wage aggressive war as a crime against peace. *See* London Charter, art. 6(a). Outside of these two contexts, however, the crime of conspiracy has gained no traction in international law. *Hamdan*, 548 U.S. at 610 (plurality opinion). Those exceptions are plainly not at issue here, for al Bahlul was charged with neither.

The limited international acceptance of conspiracy is not due to a lack of consideration. For instance, during negotiations over the London Charter in 1945, the concept of conspiracy as a separate offense generated considerable debate. *See* BRADLEY F. SMITH, REACHING JUDGMENT AT NUREMBERG 51 (1977); ROBERT H. JACKSON, REPORT OF UNITED STATES REPRESENTATIVE TO THE INTERNATIONAL CONFERENCE ON MILITARY TRIALS, at vii (1947) ("Another point on which there was a significant difference of viewpoint concerned the principles of conspiracy as developed in Anglo-American law, which are not fully followed nor always well regarded by Continental jurists."). Although the prosecution, led by Justice Robert Jackson, charged the defendants with conspiracy to commit war crimes and crimes against humanity, the tribunal rebuffed the effort, *see* 22 TRIALS OF THE MAJOR WAR CRIMINALS BEFORE THE INTERNATIONAL MILITARY TRIBUNAL 412, 469 (1948); SMITH, *supra*, at 135–37, likely due to the controversy surrounding those charges,

*see* CASSESE, *supra*, at 197; SMITH, *supra*, at 121 (reporting that the lead French judge raised several objections to the conspiracy charges, "[b]eginning with the obvious objection that the crime of conspiracy was unknown to both continental and international law"); *see also* TELFORD TAYLOR, FINAL REPORT TO THE SECRETARY OF THE ARMY ON THE NUERNBERG TRIALS UNDER CONTROL COUNCIL LAW NO. 10, at 70 n.188, 227 (1949) (speculating that the tribunals established in post-war Germany under Control Council Law No. 10 rejected charges for conspiracy to commit war crimes and crimes against humanity because of "the hostility of the French (and probably Soviet) judges to the concept of conspiracy" and recounting that during the proceedings under the London Charter "many European jurists view[ed] the Anglo-Saxon concept of criminal conspiracy with deep suspicion"). Indeed, after returning from Nuremberg, even Justice Jackson wrote approvingly of the "more discriminating principles upon which to prosecute criminal gangs, secret associations and subversive syndicates" that he had learned of from British, French, Soviet, and German lawyers. *Krulewitch v. United States*, 336 U.S. 440, 450 (1949) (Jackson, J., concurring).

To take a more recent example, during negotiations over the Rome Statute for the International Criminal Court, the concept of conspiracy again presented a "very divisive issue." Per Saland, International Criminal Law Principles *in* THE INTERNATIONAL CRIMINAL COURT: THE MAKING OF THE ROME STATUTE 189, 199 (Roy S. Lee ed., 1999). At least one proposal would have made conspiracy to commit any of the other substantive crimes a punishable offense. *See* 2 Report of the Preparatory Committee on the Establishment of an International Criminal Court, U.N.GAOR, 51st Sess., Supp. No. 22A, at 94–95, U.N. Doc. A/51/22 (1996), *reprinted in* M. CHERIF BASSIOUNI, THE STATUTE OF THE INTERNATIONAL

CRIMINAL COURT: A DOCUMENTARY HISTORY 489–90 (1998). But the final statute did not incorporate the idea. *See* Rome Statute. It appears that conspiracy was ultimately excluded as a substantive offense because of "conceptual differences concerning conspiracy among the different legal systems" and because of a belief among some that inchoate conspiracy should be punishable only when its object is an "exceptionally serious crime." 2 Report of the Preparatory Committee, *supra*, at 95; *see also, e.g.*, Rapporteur for the Preparatory Committee on the Establishment of an International Criminal Court, Summary of the Proceedings of the Preparatory Committee During the Period 25 March–12 April 1996, at 75–77, A/AC.249/1 (May 7, 1996) (reporting a Japanese proposal to exclude punishment for conspiracy except where it relates to "exceptionally serious offences," for which "it may be necessary to punish a conduct of plot or preparation before the commencement of the execution of a crime").

The emphasis that international tribunals have placed on distinguishing concepts like joint criminal enterprise as a liability theory from the standalone crime of conspiracy further demonstrates conspiracy's lack of acceptance within international law. For example, in rejecting a challenge to the prosecution's ability to charge a defendant with substantive offenses like murder on a joint criminal enterprise theory of liability—a concept discussed in greater detail below—the Appeals Chamber for the International Criminal Tribunal for the Former Yugoslavia stressed: "Criminal liability pursuant to a joint criminal enterprise is not a liability for mere membership or for conspiring to commit crimes, but a form of liability concerned with the participation in the commission of a crime as part of a joint criminal enterprise, a different matter." *Prosecutor v. Milutinović*, Case No. IT-99-37-AR72, Decision on Dragoljub Ojdanić's Motion Challenging Jurisdiction—Joint Criminal Enterprise, ¶ 26 (Int'l Crim.

Trib. for the Former Yugoslavia, Appeals Chamber, May 21, 2003).

In sum, conspiracy to violate the laws of war is not a punishable offense under international law. *Cf. Hamdan*, 696 F.3d at 1249–51 (looking to similar sources to conclude that material support for terrorism is not a violation of the international laws of war). Indeed, not only has the government conceded as much, but a plurality of the Supreme Court has already so found. *See Hamdan*, 548 U.S. at 610 (plurality opinion). Accordingly, Congress cannot vest military commissions with jurisdiction to try enemy combatants for that offense without running afoul of Article III.

## C.

With inchoate conspiracy lying beyond the reach of any accepted understanding of the international laws of war, the government offers a different interpretation of *Quirin* and other relevant precedents. Its arguments are unpersuasive.

First, the government insists that *Quirin* itself demonstrates that the atextual Article III exception for military trials of "law of war" offenses extends to purely domestic war crimes. In support, it claims that "spying and the kindred offense of sabotage"—the offenses the Court examined in *Quirin*—were not, and have never been, offenses against the international laws of war. Resp't's Br. 44–45; *see* Kavanaugh Op. at 9–12 & nn.6–7. In its view, this shows that the "law of war" to which the Court referred in carving out an Article III exception includes purely domestic offenses.

The greatest flaw in the government's argument is that the Court expressly identified the "law of war" as a branch of

international law. *See Quirin*, 317 U.S. at 29. That definition was consistent with the widely recognized understanding of that term. *See, e.g.*, WINTHROP, MILITARY LAW, *supra*, at 773 (defining the law of war as a "branch of International Law"); *Laws of War*, BLACK'S LAW DICTIONARY (3d ed. 1933) ("This term denotes a branch of public international law, and comprises the body of rules and principles observed by civilized nations for the regulation of matters inherent in, or incidental to, the conduct of a public war . . . ."). It was also consistent with the *Quirin* parties' understanding of the term. *See* Brief for the United States 29, *Quirin*, 317 U.S. 1 (describing the "law of war" as a "centuries-old body of largely unwritten rules and principles of international law which governs the behavior of both soldiers and civilians during time of war" (citing, *inter alia*, WINTHROP, MILITARY LAW, *supra*, at 773)); Brief for Petitioners 28, *Quirin*, 317 U.S. 1 ("[T]he alleged Law of War which is asserted by the prosecution is a species of international law analogous to common law."). Had the Court thought that the term actually encompassed a domestic "common law of war," it likely would have said as much. Thus, we should apply *Quirin*'s Article III exception for military trials of "law of war" offenses as the *Quirin* Court defined it—that is, as an exception for military trials of those who violate the internationally agreed upon rules governing armed conflict.

But the government's argument suffers from yet another major flaw—the Supreme Court's analysis makes clear that it viewed "spying and the kindred offense of sabotage" as offenses against the international laws of war. The Court began its analysis from the premise that Congress had authorized the use of military commissions for "offenders or offenses against the law of war," *Quirin*, 317 U.S. at 28, which, as noted above, the Court identified as a "branch of international law," *id.* at 29; *see* Part II.A, *supra*. Thus, when

it concluded that Congress had vested military commissions with jurisdiction over the offense of having passed behind enemy lines with the intent to commit espionage or sabotage, *see Quirin*, 317 U.S. at 35–36, it implicitly concluded that those offenses violated the international laws of war.

Further to the point, in analyzing the charge, the Court looked to "[a]uthorities on International Law" who "regarded as war criminals" saboteurs who passed behind enemy lines without uniform, *id*. at 35 n.12, and it relied on international sources to establish that the offense was, "[b]y universal agreement and practice," recognized as an international law violation, *id.* at 30 & n.7, 31 n.8, 35 n.12. It also quoted early statutes and military proceedings that appeared to identify spying as punishable by military tribunal according to the "law and usage of nations"—that is, according to international practice. *Id.* at 31 n.9, 41. Accordingly, although the government points to scholarly criticism of the Court's treatment of spying, *see* Resp't's Br. 33–35, we are bound by the Court's own analysis, which was premised on the understanding that spying and sabotage were international law-of-war offenses. *See Quirin*, 317 U.S. at 35–36.

The government pushes back, pointing out that *Quirin* surveyed American historical practice in determining whether the conduct described in the first charge constituted a violation of the "law of war." In its view, this shows that the Court believed that the "law of war" encompassed domestic offenses. But, once again, the Court in *Quirin* expressly defined the law of war as a body of international law. *Quirin*, 317 U.S. at 28–29. It would have been strange for the Court to have defined it as such if it understood that it also encompassed a domestic body of law. Considered in its proper context, then, *Quirin*'s analysis of domestic precedents for trying spying and sabotage reflect an effort to confirm that

our law did not *preclude* a military trial for the specified offense. That is, the Court referred to U.S. cases to discern potential domestic limits on the prosecution of law-of-war offenses. The Court explained that there might be offenses that

> would not be triable by military tribunal here, either because they are not recognized by our courts as violations of the law of war or because they are of that class of offenses constitutionally triable only by a jury.

*Id*. at 29; *see id*. (citing, as an example of the latter, *Ex parte Milligan*, 71 U.S. (4 Wall.) 2). The government's position gains no support from *Hamdan*'s consideration of domestic precedents in determining whether inchoate conspiracy qualified as a violation of the "law of war," as that term is used in 10 U.S.C. § 821. The plurality looked to domestic precedent in just the same way the *Quirin* Court had: as a potential limitation on military-commission jurisdiction. *See Hamdan*, 548 U.S. at 603, 610 (plurality opinion); *Al Bahlul II*, 792 F.3d at 8–9; *id.* at 25–26 (Tatel, J., concurring).

The government next argues that Article III must be construed in light of Congress's Article I powers and that those powers enable Congress to go beyond international law in determining the offenses triable by military commission. In support, the government notes that *Quirin* and its progeny indicate that Congress's power to create military commissions derives from its war powers. Resp't's Br. 29–30 (citing, *inter alia*, *Yamashita*, 327 U.S. at 11). It then argues that Congress's power to codify offenses triable by such tribunals must stem from those powers as well. Those powers include the power to "declare War," U.S. CONST. art. I, § 8, cl. 11, "raise and support Armies," *id.* § 8, cl. 12, "provide and maintain a Navy," *id.* § 8, cl. 13, "make Rules for the

Government and Regulation of the land and naval Forces," *id.* § 8, cl. 14, and "provide for calling forth the Militia," *id.* § 8, cl. 15. Pointing out that these powers, unlike the define and punish power, contain no textual limitation based on international law, the government concludes that Congress's power to define offenses triable by military commissions must be similarly unconstrained. *See* Resp't's Br. 30–32; *see also* Kavanaugh Op. at 4–19.

As an initial matter, although it is true that *Quirin*, *Yamashita*, and *Hamdan* looked to the war powers in discussing congressional authority to *establish* military commissions, *see Hamdan*, 548 U.S. at 591 (plurality opinion); *Yamashita*, 327 U.S. at 12; *Quirin*, 317 U.S. at 26; *see also* WINTHROP, *supra*, at 831 (stating that Congress's power "to 'declare war' and 'raise armies'" provided the "original sanction" for military commissions), they consistently looked to the Define and Punish Clause alone in addressing Congress's authority to confer *jurisdiction over particular offenses*. *See Hamdan*, 548 U.S. at 601–02 (plurality opinion); *Yamashita*, 327 U.S. at 7; *id.* at 26 (Murphy, J., dissenting); *Quirin*, 317 U.S. at 28. For instance, in *Yamashita*, the Court explained that "the [military] commission derives its *existence*" from the war powers, 327 U.S. at 12 (emphasis added), but that its jurisdiction over specific offenses comes from Congress's "exercise of the power conferred upon it by Article I, § 8, cl. 10 of the Constitution to 'define and punish * * * Offenses against the Law of Nations * * *,' of which the law of war is a part." *Id.* at 7 (alteration in original). Winthrop endorsed this distinction, stating that Civil War-era legislation subjecting "spies and guerillas" to military jurisdiction "may be regarded as deriving its authority from" the Define and Punish Clause. WINTHROP, *supra*, at 831.

The government argues that it would be "anomalous"—and three of our colleagues call it "absurd"—to conclude that the war powers authorize Congress to establish military commissions but not vest them with jurisdiction over specific offenses. *See* Resp't's Br. 31; Kavanaugh Op. at 7 n.5. But as noted above, the Supreme Court has repeatedly drawn this precise distinction. Thus, even were we to determine the scope of the Article III exception by reference to Congress's Article I powers, it would still be constrained by international law.

Despite *Quirin*'s discussion of Congress's Article I powers in determining whether the President and Congress had the authority to establish military commissions, *Quirin* did not look to Congress's Article I powers in determining the scope of the Article III exception. *See Quirin*, 317 U.S. at 39–41. Rather, it looked to historical practice regarding military commissions at the time that the Constitution was adopted to conclude that Article III posed no bar to military trials of enemy combatants who violate the laws of war. *Id.*

The government next argues that Congress may define conspiracy to commit war crimes as a law-of-war offense by virtue of its power to define and punish offenses against the "Law of Nations." *See* Resp't's Br. 55; *see also* Millett Op. at 38–39. In support, it claims that international law includes sufficiently analogous notions of criminal liability. Resp't's Br. 3.

But, as the government admits, "[w]hen conspiracy is used as a mode of liability under international law, there is generally a requirement that the object offense be completed or attempted." Resp't's Br. 56. The military commission in al Bahlul's case was instructed that it could convict him of conspiracy without "[p]roof that the offense[s]" that were the

objects of the conspiracy—murder, attacking civilians or objects, murder and destruction of property in violation of the law of war, terrorism, and providing material support for terrorism—"actually occurred." Trial Tr. 848. Neither, under these instructions, did al Bahlul's overt act in furtherance of the conspiracy have to be a criminal act; as an element of proof of a standalone conspiracy charge, the overt act serves merely as "a clear indication that the conspiracy is being carried out." *Id.* at 849.

The government also points to prosecutions for conspiracy brought under the domestic laws of individual allied governments following World War II, *see* Resp't's Br. 55, but those prosecutions are irrelevant to whether conspiracy was a punishable offense against international law. Many offenses that are punished by many, if not all, countries are not of concern to international law because "international law addresses only those 'wrong[s]' that are 'of *mutual,* and not merely *several,* concern' to States." *Flores v. Southern Peru Copper Corp.*, 414 F.3d 233, 249 (2d Cir. 2003) (quoting *Filartiga v. Pena-Irala*, 630 F.2d 876, 888 (2d Cir. 1980)); *see also United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1252 (11th Cir. 2012).

To be sure, when Congress legislates for the punishment of war crimes outside of Article III courts, it may have authority to clarify somewhat murky areas of international law. *See* U.S. CONST. art. I, § 8, cl. 10. But Congress certainly has no power to make up that law entirely. *See, e.g., Military Commissions*, 11 Op. Att'y Gen. 297, 299 (1865) ("To *define* is to give the limits or precise meaning of a word or thing *in being*; to make is to call into being. Congress has power to *define*, not to make, the laws of nations . . . .") (second emphasis added); *see also* 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 615 (Max Farrand ed., rev. ed. 1937)

(Statement of Gouverneur Morris); *Bellaizac-Hurtado*, 700 F.3d at 1250 ("The insertion of the power to "define" enabled Congress to provide notice to the people through codification; it did not enable Congress to create offenses that were not recognized by the law of nations."); *cf. United States v. Furlong*, 18 U.S. (5 Wheat.) 184, 198 (1820) (when exercising its power to define and punish piracy, Congress cannot redefine that offense). Indeed, in clear contrast to Congress's authority to "*make* Rules for the Government and Regulation of the land and naval Forces," U.S. CONST. art. I, § 8, cl. 14 (emphasis added), Congress has the authority only to "define" offenses against the law of nations. *See also* NOAH WEBSTER, 1 A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE 79 (1806) ("define" means "to explain, limit, mark out, fix, decide"); SAMUEL JOHNSON, 1 A DICTIONARY OF THE ENGLISH LANGUAGE, at dlvii (6th ed. 1785) ("define" means "to give definition, to explain a thing by its qualities and circumstances"; or "to circumscribe, to mark the limit, to bound").

Here, as the government asserts, Congress in the Military Commissions Act of 2006 has done much more than codify an accepted but not fully defined concept of international law; it has *made* a new war crime, one that the international community has repeatedly declined to adopt. *See* Part II.B, *supra*. Whether Congress might be entitled to the type of leeway the government suggests when it exercises its define and punish powers to legislate for the punishment of crimes in *Article III courts*, it did no such thing in the Military Commissions Act. That Act legislated for the punishment of crimes in *military commissions*. In doing so, it ran up against a clear constitutional limit: Article III's commitment of the "judicial Power" to the Supreme Court and "such inferior Courts as Congress may from time to time ordain and establish." U.S. CONST. art. III, § 1.

The government also invokes the Necessary and Proper Clause, U.S. CONST. art. I, § 8, cl. 18, which authorizes Congress to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers." The government argues that Congress may enact legislation necessary to comply with the nation's "international responsibilities," and that Congress was reasonably seeking to fulfill its obligation to prevent acts of terrorism and war crimes when it made conspiracy punishable by military commission. Resp't's Br. 58. It points to the nation's responsibilities under the *Geneva Convention Relative to the Protection of Civilian Persons in Time of War*, *supra*, 6 U.S.T. 3516, 75 U.N.T.S. 287, which prohibits "[c]ollective penalties and likewise all measures of intimidation or of terrorism." *Id.* art. 33. The Convention requires signatories to "undertake to enact any legislation necessary to provide effective penal sanctions for persons committing, or ordering to be committed, any of the grave breaches of the present Convention," *id.* art. 146, which include the "willful killing . . . of a protected person," *id.* art. 147, defined as "those who . . . find themselves, in case of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power of which they are not nationals," *id.* art. 4.

But the Necessary and Proper Clause does not allow Congress to do what it is otherwise expressly barred from doing. *See United States ex rel. Toth v. Quarles*, 350 U.S. 11, 21–22 (1955). And however it may affect Congress's define and punish power when it legislates for the punishment of international offenses in Article III courts, the Necessary and Proper Clause cannot be read to allow Congress to do an end run around the constitutional limit imposed by Article III. *See id.* at 22; *Reid*, 354 U.S. at 22 (plurality opinion); *see also Northern Pipeline*, 458 U.S. at 73 (plurality opinion)

("[W]here Art. III does apply, all of the legislative powers specified in Art. I and elsewhere are subject to it.").

Article III's limitations on congressional power apply even where Congress exercises its powers to enact "legislation necessary to carry out its international obligation to prevent terrorism as a mode of warfare." Resp't's Br. 57. The political branches' efforts to comply with international obligations must also comply with the Constitution. *See Medellin v. Texas*, 552 U.S. 491, 520 (2008); *Reid*, 354 U.S. at 16 (plurality opinion). Even assuming that Congress could only meet its international obligations by criminalizing conduct not recognized as an offense against international law, the government never explains why its asserted authority to do so under Article I would imply the power to establish military jurisdiction over that conduct. *See United States v. Arjona*, 120 U.S. 479, 484 (1887).

Ultimately, whether Congress's authority to codify the offenses triable by military commissions is grounded in its define and punish powers or its war powers is beside the point. So too is the Necessary and Proper Clause's impact on Congress's Article I authority to comply with its international obligations by going somewhat beyond the current scope of international law. Whichever clause in Article I, § 8 grants Congress the authority to establish and determine the offenses triable by military commissions, and whatever the impact of the Necessary and Proper Clause on Congress's Article I powers, Congress may not transgress the bounds of Article III. Article III does include an exception for law-of-war military commissions. But that has been narrowly defined by reference to the international laws and customs governing war. *Quirin*, 317 U.S. at 38–41.

**D.**

The government last falls back on the idea that Article III's scope must be determined by reference to historical practice. This argument comes in two forms. First, the government maintains that spying and aiding the enemy are not violations of the international laws of war but that Congress has made those offenses triable by military commission since the early days of the Republic. This, its argument continues, shows that early congresses believed Article III poses no bar to making domestic crimes punishable by military commission. Second, the government maintains that "the experience of our wars and the acts and orders of our wartime tribunals reflect a long history of trying conspiracy to violate the laws of war in a military commission," Resp't's Br. 2–3; *see* Kavanaugh Op. at 14–19, 21, and that Article III must be considered in light of that practice. Neither argument advances the government's cause.

With respect to the first, it is true that Congress has long made spying and aiding the enemy punishable by military commission. *See, e.g.*, An Act for Establishing Rules and Articles for the Government of the Armies of the United States, § 2, 2 Stat. 359, 371 (1806) (Articles of War). But the government's reliance on early congressional statutes making spying and aiding the enemy punishable by military commission suffers from two flaws. First, the government cites nothing indicating early congresses actually *knew* that those two offenses did not violate the international laws of war, and some sources suggest they might well have believed that those offenses did. For instance, an 1806 statute "imposed the death penalty on alien spies 'according to the law and usage of nations, by sentence of a general court martial.'" *Quirin*, 317 U.S. at 41 (quoting Act of Congress of Apr. 10, 1806, 2 Stat. 359, 371). A 1776 Resolution adopted

by the Continental Congress contained a nearly identical provision. *See* Resolution of Aug. 21, 1776, 5 JOURNALS OF THE CONTINENTAL CONGRESS 693 (Ford ed. 1906). In 1865, the Attorney General of the United States, James Speed, also concluded in a formal opinion that "every lawyer knows that a spy was a well-known offender under the laws of war, and that under and according to those laws he could have been tried and punished without an act of Congress." 11 Op. Att'y Gen. at 312, 313. Thus, we cannot infer from those early statutes that early congresses understood Article III to pose no bar to the punishment of domestic war crimes in military tribunals.

But even were there evidence that early congresses understood that spying and aiding the enemy were not international law-of-war offenses, it would shed little light on whether early congresses felt free to punish purely domestic offenses as they saw fit. Both spying and aiding the enemy have been subject to military jurisdiction since the ratification of the Constitution. *See Quirin*, 317 U.S. at 41; Resolution of Aug. 21, 1776, 5 JOURNALS OF THE CONTINENTAL CONGRESS 693 (Ford ed. 1906) ("[A]ll persons, not members of, nor owing allegiance to, any of the United States of America . . . who shall be found lurking as spies . . . shall suffer death, according to the law and usage of nations, by sentence of a court martial . . . ."); Resolution of Sept. 20, 1776, 5 JOURNALS OF THE CONTINENTAL CONGRESS 799 (Ford ed. 1906) ("Whosoever shall relieve the enemy with money, victuals, or ammunition, or shall knowingly harbour or protect an enemy, shall suffer death, or such other punishment as by a court-martial shall be inflicted."); Act of Apr. 10, 1806, 2 Stat. 371. As a result, those two offenses may well fit within an established historical exception.

Indeed, although the government and four of our colleagues contend that Congress's longstanding practice of making spying and aiding the enemy triable by military tribunal "strongly supports the conclusion that international law is not a constitutional constraint on Congress's authority to make particular crimes triable by military commission," Kavanaugh Op. at 12; *see* Resp't's Br. 32–33; Henderson Op. at 1, *incorporating by reference Al Bahlul II*, 792 F.3d at 69 (Henderson, J., dissenting), it seems that, if anything, Congress's consistent decision to codify those two offenses— and those two offenses alone—undermines that conclusion. Had Congress, over the last two hundred years, actually believed itself free to punish by military tribunal whatever wartime conduct it deemed necessary, it would be rather surprising that it codified only two offenses, both of which were subject to military trial at the time the Constitution was adopted. Thus, while these two offenses may fall within an Article III exception based on longstanding historical practice, we find them uninformative regarding Congress's general authority to make purely domestic crimes punishable by military commission.

This brings us to the government's final contention that conspiracy has long been tried by military commission in the United States and that it must therefore fall within a historical exception to Article III. Here, too, it falters.

Importantly, when the Supreme Court has relied on historical practice to determine where one branch's powers end and another's begin, it has required robust evidence of a historical practice. For instance, in *Myers v. United States*, 272 U.S. 52, 175 (1926), in examining the President's removal power, the Court found more than seven decades in which Presidents had a continuous practice of removing executive branch officers without congressional involvement,

and on that basis held Congress lacked authority to restrict the President's removal power. In *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 322 (1936), the Court pointed to an "unbroken legislative practice which has prevailed almost from the inception of the national government to the present day" to reject a constitutional nondelegation challenge to a joint resolution of Congress authorizing the President to determine whether to embargo the sale of arms and munitions to belligerents in a foreign war. Recently, in *National Labor Relations Board v. Noel Canning*, 134 S. Ct. 2550 (2014), the Court invoked a lengthy and dense historical practice defining the scope of the President's authority under the Recess Appointments Clause, U.S. CONST. art. II, § 2, cl. 3. Upon identifying "thousands of intra-session recess appointments" and noting that "Presidents since Madison have made many recess appointments filling vacancies that initially occurred prior to a recess," *id.* at 2562, 2571, the Court concluded that the Clause authorized such appointments. By contrast, where the Court found only a handful of instances in which a President had made a recess appointment during an inter-session recess lasting less than ten days, the Court held that those recesses were "presumptively too short to fall within the Clause." *Id.* at 2567.

There is no such robust history of trying inchoate conspiracy before law-of-war military commissions. *See Hamdan*, 548 U.S. at 604 (plurality opinion). The government has identified only a handful of at best ambiguous examples, *see* Resp't's Br. 40–43, and none in which a conviction was for inchoate conspiracy by a law-of-war commission that was affirmed by the Judicial Branch. The examples are unpersuasive in themselves and insufficient to establish a longstanding historical practice that would justify a more expansive understanding of the law-of-war military commission exception to Article III.

First, the government places substantial reliance on Civil War era historical practice, but that practice does not support its case. For instance, although the charges against the Lincoln assassins referred to conspiracy, the specifications listed the elements of the completed offense—"traitorously" murdering President Lincoln. *See* J. Holt & T. Ewing, CHARGE AND SPECIFICATION AGAINST DAVID E. HEROLD, ET AL. 3 (1865); *see also Hamdan*, 548 U.S. at 604 n.35 (plurality opinion); *id.* at 609; General Court-Martial Orders No. 356, War Dep't (July 5, 1865), *reprinted in* H.R. Doc. No. 55-314, at 696 (1899). The Attorney General's formal opinion in 1865 also described the charge as "the offence of having assassinated the President." 11 Op. Att'y Gen. at 297; *see id.* at 316–17. As such, it appears that conspiracy was at most a theory of liability on which to hold each of the partners to account for the assassination completed by Booth alone.

Construing the Lincoln assassins' case as a conspiracy conviction is anachronistic and conflates conspiracy as a theory of liability with inchoate conspiracy as a standalone offense. *See* Kavanaugh Op. at 15–16. Prosecution of conspiracy as a standalone offense, chargeable apart from and in addition to the crimes that are the conspiracy's object and carrying their same penalties, is a modern innovation. *See Iannelli v. United States*, 420 U.S. 770, 781 & n.13 (1975) (citing Hampton L. Carson, *The Law of Criminal Conspiracies and Agreements as Found in the American Cases*, *in* R. WRIGHT, THE LAW OF CRIMINAL CONSPIRACIES AND AGREEMENTS 191 (1887)). At the time of the Lincoln assassination, it was unclear that conspiracy could even be charged separately from its object offense, once completed. *See id.* And when Congress first codified conspiracy as a crime in 1867, it carried only a two-year penalty. *See* Act of

Mar. 2, 1867, 14 Stat. 471, 484. Conspiracy as then understood would hardly have been an appropriate principal charge against the President's assassins. The government mistakenly reads our modern understanding of conspiracy into events, including the Lincoln assassins' conviction, from an era in which that understanding had not yet taken hold, a move that fundamentally miscasts that earlier precedent.

Further, Winthrop noted that the Lincoln assassins' tribunal was a mixed martial-law and law-of-war military commission. *See* WINTHROP, MILITARY LAW, *supra*, at 839 & n.5; *cf. id.* at 842. The unreported district court opinion in *Ex parte Mudd*, 17 F. Cas. 954 (1868), *see* Kavanaugh Op. at 15–16, does not undermine that conclusion; the district court described the offense as "assassination" of the Commander in Chief and only used "conspiracy" in the same terms as the charging document, while distinguishing *Ex parte Milligan* based on the state of war in the Capital, not based on the nature of the offense. *Ex parte Mudd*, 17 F. Cas. at 954. Thus, "even if [it could be] properly classified as a trial by law-of-war commission, [the Lincoln assassins' trial] is at best an equivocal exception." *Hamdan*, 548 U.S. at 604 n.35 (plurality opinion) (internal citation omitted); *see also Al Bahlul II*, 792 F.3d at 12.

Second, the government asserts that other Civil War precedents show that defendants were charged with conspiracies as unconsummated offenses. Resp't's Br. 42–43. The examples on which it relies do not support its position. Col. George St. Leger Grenfel was convicted by a military tribunal of conspiracy to free prisoners of war in Chicago and to destroy that city. *See* GENERAL COURT MARTIAL ORDERS No. 452, War Dep't (Aug. 22, 1865), *reprinted in* H.R. Doc. No. 55-314, at 724–35. As al Bahlul points out, Grenfel's commission, like that of the Lincoln assassins, was a

"hybrid" commission exercising jurisdiction based in part on the President's declaration of martial law. *See* Reply Br. 20 (citing *Hamdan*, 548 U.S. at 609 n.37 (plurality opinion); WINTHROP, MILITARY LAW, *supra*, at 839 n.5); S. STARR, COLONEL GRENFEL'S WARS: THE LIFE OF A SOLDIER OF FORTUNE, 5, 219 (1971) (cited in Resp't's Br. 41). Such hybrid commissions "regularly tried war crimes and ordinary crimes together," *Hamdan*, 548 U.S. at 608, and the crimes charged were, "'[n]ot unfrequently[,] . . . a combination of the two species of offenses'"—that is, hybrid versions of law-of-war offenses and domestic crimes, *id.* (quoting C. HOWLAND, A DIGEST OF OPINIONS OF THE JUDGE ADVOCATES GENERAL OF THE ARMY 1071 (1912)). These cases thus provide little insight into the traditional jurisdiction of pure law-of-war military commissions. Indeed, in defending the jurisdiction of the Grenfel commission, the prosecution relied on the fact that "martial law obtained throughout the United States and the Territories during the continuance of the [Civil] [W]ar." Judge Advocate's Reply, Courtroom, Cincinnati, Ohio, Jan. 17, 1865, *United States v. Walsh, et al.*, *reprinted in* H. EXEC. DOC. NO. 50, 39th Cong., 2d Sess., at 20. The Grenfel commission, like the Lincoln assassins' commission, "is at best an equivocal" example. *Hamdan*, 548 U.S. at 604 n.35 (plurality opinion).

The government's reliance on the case of Confederate Army Captain Henry Wirz is similarly misplaced; in his case conspiracy served only as a mode of liability for the completed law-of-war offenses of abusing, torturing, and murdering war prisoners. GENERAL COURT MARTIAL ORDERS, No. 607, War Dep't (Nov. 6, 1865), *reprinted in* H.R. Doc. No. 55-314, at 785, 789.

Also unavailing are the government's citations to William Winthrop's *1880 Digest of Opinions of the Judge*

*Advocate General of the Army* and to Charles Roscoe Howland's *1912 Digest of Opinions of the Judge Advocate General of the Army*. Both stated that, during the Civil War, one of the principal offenses charged in military commissions as an offense against the laws of war was "[c]onspiracy by two or more to violate the laws of war by destroying life or property in aid of the enemy." W. WINTHROP, A DIGEST OF OPINIONS OF THE JUDGE ADVOCATE GENERAL OF THE ARMY 329 (1880); HOWLAND, *supra*, at 1071. But a Supreme Court plurality has already examined the cases cited and concluded that they provide "no support for the inclusion of conspiracy as a violation of the law of war." *Hamdan*, 548 U.S. at 607 (plurality opinion). And, as that plurality further noted, Winthrop's subsequent treatise, *Military Law and Precedents*, does not list conspiracy as an offense against the laws of war. *Id.* at 608 (citing WINTHROP, MILITARY LAW, *supra*, at 839–40).

Indeed, in his later treatise, Winthrop clarified the issue. In describing the mixed jurisdiction of military commissions during the Civil War, he noted that the tribunals presided over two classes of offenses—"(1) Crimes and statutory offenses cognizable by State or U.S. courts, and which would properly be tried by such courts if open and acting; [and] (2) Violations of the laws and usages of war cognizable by military tribunals only." WINTHROP, MILITARY LAW, *supra*, at 839. He identified criminal conspiracy as a crime of the first class, but made no mention of conspiracy in the second. In a footnote, he also identified many of the conspiracy cases to which the government now points, including those of Wirz, Grenfel, and the Lincoln assassins, as having been of the first class (i.e., cases charging crimes normally triable only in civil court) or "of the first and second classes combined," *id.* at 839 n.5, that is, cases charging "species of compound offense[s] of the type tried by the hybrid military commissions of the Civil War,"

*Hamdan*, 548 U.S. at 608 (plurality opinion). Those cases thus fail to support the government's contention that there is a robust history of trying conspiracy in pure law-of-war military commissions.

Third, the government draws on World War II-era practice. Although the charges against the Nazi saboteurs in *Quirin* included conspiracy, the Supreme Court upheld the jurisdiction of the law-of-war military commission only as to the charge of passing behind enemy lines with hostile purpose and did not mention conspiracy in its analysis. *See Quirin*, 317 U.S. at 46. Similarly, although William Colepaugh was convicted of sabotage and spying, in addition to conspiracy to commit those offenses, the U.S. Court of Appeals for the Tenth Circuit affirmed the jurisdiction of the military tribunal in view of the law-of-war offense of unlawful belligerency only, without addressing the conspiracy charge. *See Colepaugh v. Looney*, 235 F.2d 429, 431–32 (10th Cir. 1956).

The government insists that these cases are nonetheless important because "despite such judicial review, 'no U.S. court has ever cast any doubt on the landmark military commission convictions embracing conspiracy charges, or the validity of trying conspiracy by military commission.'" Resp't's Br. 37–38 (quoting *Al Bahlul I*, 767 F.3d at 70 (Kavanaugh, J., concurring in the judgment in part and dissenting in part)) (alterations omitted). To this, it adds that executive branch officials, including the President, approved the charges in both cases, thereby giving their "imprimatur" to the convictions. *Id.* at 38.

But at most those cases underscore the uncertain position that the crime of conspiracy has occupied in the history of military commissions. The defendants in both *Quirin* and

*Colepaugh* challenged the conspiracy charges on the ground that the military commissions lacked jurisdiction over that offense, *see* Brief for Petitioner at 29, *Quirin*, 317 U.S. 1; Opinion of Special Board of Review, *United States v. Colepaugh*, CM 276026, at 28 (Mar. 27, 1945), suggesting that it was in no sense well established that military tribunals had jurisdiction to preside over conspiracy charges. Additionally, the court in each case focused on completed violations of the international laws of war and declined to address the legitimacy of the conspiracy charges, indicating that those charges may have presented difficult questions. In *Hamdan*, four Justices recognized as much, stating:

> If anything, *Quirin* supports Hamdan's argument that conspiracy is not a violation of the law of war. Not only did the Court pointedly omit any discussion of the conspiracy charge, but its analysis of Charge I placed special emphasis on the *completion* of an offense; it took seriously the saboteurs' argument that there can be no violation of the law of war—at least not one triable by military commission—without the actual commission of or attempt to commit a hostile and warlike act.

548 U.S. at 606–07 (plurality opinion) (internal quotation marks omitted)). Thus, these cases appear neutral at best and, more likely, undermine the government's position.

The government also relies on evidence that the executive branch has viewed conspiracy as triable by military commission, suggesting that this is entitled to some weight. Resp't's Br. at 34–46; *see* Kavanaugh Op. at 14–18. But the executive branch opinions on which it relies rest on shaky foundations. For example, although Assistant Attorney General Tom Clark concluded in a memorandum that

William C. Colepaugh could be tried for conspiracy in a law-of-war military commission, the sources on which he relied drew almost exclusively from martial-law commissions that exercised plenary jurisdiction, not law-of-war military commissions of the kind at issue here. *See* Memorandum from Tom C. Clark, Assistant Attorney General, to Myron C. Kramer, Judge Advocate General (Mar. 12, 1945), reprinted in Government Supplemental Appendix 104–10 (citing, inter alia, the Lincoln Assassins and Captain Wirz).

The orders of General MacArthur from the Korean Conflict, *see* Resp't's Br. 39; Millet Op. at 41, also offer little, if any, support for the government because the *en banc* court has viewed such military orders as unpersuasive for lack of high-level Executive Branch consultation. *See Al Bahlul I*, 767 F.3d at 25 n.16. And during the Korean Conflict there apparently were no prosecutions conducted by United Nations Military Commissions. *See* JORDAN J. PAUST ET AL., INTERNATIONAL CRIMINAL LAW: CASES AND MATERIALS 724 (1996).

In sum, the Supreme Court has recognized a limited Article III exception for the prosecution of internationally recognized war crimes in military tribunals. The government has offered no reason—rooted in history, the Constitution, case law, or anything else—for extending that exception further.

## III.

We turn now to the additional arguments of our colleagues.

**A.**

Four of our colleagues believe that *Hamdan* supports the notion that Congress can vest law-of-war military commissions with jurisdiction over inchoate conspiracy without transgressing the bounds of Article III because several Justices in *Hamdan* "expressly invited Congress to clarify the scope of military commission power" without "even hint[ing] at a lurking constitutional problem with trying conspiracy offenses before military commissions." Kavanaugh Op. at 26; *see also* Henderson Op. at 1, *incorporating by reference Al Bahlul II*, 792 F.3d at 50-52 (Henderson, J., dissenting); Resp't's Br. 53.

The Justices' invitation to Congress in *Hamdan* is, however, a thin reed on which to rest. For one thing, it is far from clear that the invitation was in any way related to Congress's ability to make inchoate conspiracy punishable by military commission. *Hamdan*'s principal holding was that the commissions convened under Military Commission Order No. 1, such as Salim Hamdan's, were invalid because their procedures failed to comport with statutory requirements. 548 U.S. at 613. The Justices' may have thus intended their "invitation" to underscore nothing more than Congress's power to authorize the invalidated procedures. *See id.* at 636 (Breyer, J., concurring) ("Congress has denied the President the legislative authority to create military commissions of the kind at issue here. Nothing prevents the President from returning to Congress to seek the authority he believes necessary.").

Perhaps equally important, the issues presented in *Hamdan* did not include the question we consider here, i.e., whether Article III limits Congress's authority to vest military commissions with jurisdiction over conspiracy charges. The

two questions on which the Supreme Court granted certiorari asked: (1) whether the President required congressional authorization to establish law-of-war military commissions and, if so, whether the President had received such authorization; and (2) whether Guantanamo detainees could enforce the provisions of the 1949 Geneva Conventions in habeas corpus proceedings. Although the parties' briefs in *Hamdan* touched on related issues, neither side squarely addressed Article III's limits on military-commission jurisdiction. This court should, accordingly, not read too much into the Justices' invitation.

Next, Judge Kavanaugh, like the government, believes that Congress derives its authority to determine the offenses triable by military commission from its war powers and that those powers are unconstrained by international law. In his view, the Constitution cannot possibly give the international community—through the development of international law—the ability to limit Congress's exercise of its war powers. Kavanaugh Op. at 8–9. It is not international law, however, that constrains Congress's authority here—it is Article III. The Framers of the Constitution expected Article III courts to have jurisdiction over the trial of all crimes, *Toth*, 350 U.S. at 15; *Reid*, 354 U.S. at 21 (plurality opinion), save for a few narrow exceptions, such as battlefield prosecutions of enemy combatants who "in their attempt to thwart or impede our military effort have violated the law of war," *Quirin*, 317 U.S. at 28–29; *id.* at 41–42. The international-law constraint that *Quirin* recognized and that we would apply here functions not as an independent constraint on the political branches' powers to wage war, but rather as an essential demarcation between military and civilian jurisdiction. Without it, "the line between civilian and military jurisdiction could become elusive—if not altogether illusory." National Institute of Military Justice Amicus Br. 29. We find apt here the Supreme Court's

warning in *Northern Pipeline*, 458 U.S. at 73–74 (plurality opinion), against constitutional interpretations that would "replace the principles delineated in [Supreme Court] precedents, rooted in history and the Constitution, with a rule of broad legislative discretion that could effectively eviscerate the constitutional guarantee of an independent Judicial Branch of the Federal Government."

The idea that international law has a role to play in our constitutional framework is also not as surprising as one might think. The Framers of the Constitution well understood that our country's newly forged sovereignty brought with it both rights and obligations. John Jay, the first Chief Justice of the United States, explained in 1793 that the United States "had, by taking a place among the nations of the earth, become amenable to the laws of nations." *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 474 (1793) (opinion of Jay, C.J.). Embracing the law of nations and adhering to its principles, he further explained, was the new nation's "duty" and in its own "interest." *Id.*; *see also* Who Privileged from Arrest, 1 Op. Att'y Gen. 26, 27 (1792) (The law of nations' "obligation commences and runs with the existence of a nation.").

There is nothing anomalous or contrary to national security in vesting Article III courts with exclusive power to try all crimes except for internationally recognized war crimes that have been traditionally tried by military commission. Our military has long abided by the international laws of war. For instance, in its 1940 Rules of Land War, it noted that the "well-established rules known as the rules or laws of war" that govern the conduct of war among civilized nations "are binding upon all civilized nations," and are to "be strictly observed by our forces." War Department, Rules of Land Warfare 1–2 (1940). Both the Framers' and our military's

desire to adhere to the law of nations and, more specifically, the laws of war appears sound: "If the United States now decides that it can hold foreign personnel accountable for violating 'national' law-of-war rules, other states will be entitled to assert the same authority." Glazier Amicus Br. 27; *see Arjona*, 120 U.S. at 487 ("[W]hat is law for one is, under the same circumstances, law for the other.").

Standing firm on the constitutionally prescribed boundaries between civilian and military jurisdiction is compelled by Supreme Court precedent and doubly compelled where, as here, the government has made no claim of military necessity. Military exigency, although insufficient to justify military jurisdiction, is nevertheless a necessary condition. *Hamdan*, 548 U.S. at 590. But remarkably, throughout this protracted litigation, the government has offered no reason to believe that expanding the traditionally understood scope of Article III's exception for law-of-war military commissions is necessary to meet a military exigency. We claim no authority to determine military necessity; we simply note that the government has asserted no such exigency here. Perhaps the government has eschewed a claim of military necessity because of the many other tools at its disposal. Congress remains free to enact, and the President to employ, domestic laws to bring terrorists to justice before Article III courts, as they have on hundreds of occasions already with remarkable success. *See Al Bahlul II*, 792 F.3d at 27 (Tatel, J., concurring); Center on Law and Security, New York University School of Law, Terrorist Trial Report Card: September 11, 2001–September 11, 2011, at 2, 7, tbl.1, available at http://goo.gl/Ks3Okc (reporting that in the ten years after September 11, 2001, federal prosecutors had obtained convictions in almost 200 "jihadist-related" terrorism and national security cases); Press Release, Department of Justice, Fact Sheet: Prosecuting and Detaining

Terror Suspects in the U.S. Criminal Justice System (June 9, 2009) (citing Richard B. Zabel & James L. Benjamin, Jr., Human Rights First, In Pursuit of Justice: Prosecuting Terrorism Cases in the Federal Courts 23 (May 2008), *available at* http://www.humanrightsfirst.org/resource/ pursuit-justice); *see also, e.g.*, *Nizar Trabelsi*, No. 15-3075 (D.C. Cir., argued May 17, 2016); *United States v. Ghailani*, 733 F.3d 29 (2d Cir. 2013).

For detainees ill-suited for prosecution in Article III courts, the government has other options. It may detain them as enemy belligerents. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 518–24 (2004) (plurality opinion). It may continue to try violations of the laws of war in military commissions. *See, e.g.*, Government Response to Defense Motion to Dismiss for Lack of Jurisdiction, AE107A, at 1, *United States v. Mohammad* (M.C. Jan. 16, 2013) (acquiescing to Khalid Shaikh Mohammad's and his codefendants' motion to dismiss charges for inchoate conspiracy, but continuing to pursue charges of recognized law-of-war offenses, including attacking civilians on September 11, 2001). It might also help craft new international conventions to address the demands of new kinds of war and implement appropriate procedures for prisoners of war. *See generally Hamdan*, 548 U.S. at 619.

On this note, it is worth remembering that, historically, the military has not been in the business of prosecuting individuals for crimes and locking them up for life. Its primary mission has always been to defeat our enemies on the battlefield. *Cf. Reid*, 354 U.S. at 35 (plurality opinion) ("[T]he business of soldiers is to fight and prepare to fight wars, not to try civilians for their alleged crimes."); *Toth*, 350 U.S. at 17 ("Unlike courts, it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise. . . . [T]rial of soldiers to maintain discipline is merely

incidental to an army's primary fighting function."). To be sure, punishing enemy belligerents who violate the international rules governing armed conflicts is an "important incident" to waging war. *Quirin*, 317 U.S. at 28. Such punishment helps encourage adherence to the laws of war. But restricting the military's ability to intrude on the judiciary's domain hardly raises the types of concerns that enforcing the limits on the President's other war powers could.

## B.

Judge Millett and Judge Wilkins take a very different tack. Although seeming to recognize the lack of legal support for prosecuting inchoate conspiracy before pure law-of-war military commissions, they believe that we can nonetheless affirm al Bahlul's conviction because they think the facts, as they understand them to have been found by the military commission members, necessarily show that al Bahlul engaged in conduct for which he could have been tried and punished in a military commission. *See* Millett Op. at 2, 29–38; Wilkins Op. at 1, 8–14. In other words, they would overlook the fact that al Bahlul was charged only with conspiracy as a standalone crime because, as they see it, record evidence could have supported criminal liability under international law—e.g., for the murder of protected persons under a joint criminal enterprise theory of liability—and there is, therefore, no Article I or Article III problem. Millett Op. at 29–38; Wilkins Op. at 13–14. That approach suffers from several flaws.

Most critically, the government never even hinted at such an approach in its brief. To the contrary, at every turn, the government defended al Bahlul's conviction on the ground that it could lawfully charge and prosecute him in a military

commission for the crime of inchoate conspiracy to violate the laws of war. For instance, in response to al Bahlul's contention that military commissions have historically taken cognizance of only completed war crimes, Pet'r's Br. 13, the government did not argue that the court could sustain his conviction on the ground that al Bahlul was essentially found guilty of participating in a completed war crime. It tacked in the opposite direction, asserting that there is historical precedent for trying conspiracy in cases where the object offenses were never completed. *See* Resp't's Br. 42–43. Moreover, in arguing that Congress acted consistently with international law, the government did not take the opportunity to defend al Bahlul's conviction as resting on conduct virtually the same as conduct for which he could have been punished under international law. *See id.* Instead, it acknowledged that the crime for which al Bahlul was charged and convicted differed from any recognized international law concept of criminal liability, because to support a war crime conviction on a joint criminal enterprise theory of liability international law generally "require[s] that the object offense be completed or attempted," *id.* at 56, and the government stressed that the MCA's "requirement that the defendant personally commit an overt act is not the same as the requirement that the object crime be completed," *id.*

It is by now well established that this court ordinarily declines to decide cases based on arguments not raised by either party. As we have explained on numerous occasions, "[t]he premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983). Rather, we sit as "arbiters of legal questions presented and argued by the parties before [us]." *Id.*; *see United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 60 n.2 (1981) ("We decline to consider this argument since it was not raised by

either of the parties here or below."); FED. R. APP. P. 28(a)(8)(A), (B) (requiring parties to set forth their legal and factual contentions, "the reasons for them," and "citations to the authorities and parts of the record" on which they rely). The reason for restraint is obvious: "Rulings on issues that have not been fully argued run the risk of being improvident or ill-advised." *United States v. West*, 392 F.3d 450, 459 (D.C. Cir. 2004) (internal quotation marks omitted); *cf. Hamdan*, 548 U.S. at 601 n.32 (plurality opinion) (criticizing Justice Thomas's focus on crimes not charged and noting that "the Government plainly had available to it the tools and the time it needed to charge petitioner with the various crimes [Justice Thomas] refer[red] to, if it believed they were supported by the allegations."). Here, venturing down the path proposed by Judge Millett and Judge Wilkins without the aid of the parties runs the risk of misinterpreting record evidence and failing to anticipate legal objections that the parties might have to this approach.

We put those concerns aside only to explain why we believe that Judge Millett's and Judge Wilkins's analysis is incorrect. First, we fail to see how their emphasis on facial versus as-applied challenges makes a difference with respect to al Bahlul's Article III claim. The Article III inquiry focuses on the nature of the offense charged. It is true that courts generally should not concern themselves with the application of statutes beyond the facts of the cases before them, but al Bahlul never asks us to do so. The circumstances of his prosecution make plain that *his* conviction runs afoul of Article III because *he* was charged and prosecuted in a military commission for a crime that is not triable before such a tribunal. Thus, in seeking to overturn his conviction, al Bahlul does not ask the court to consider the rights of hypothetical defendants or to consider whether the MCA might impermissibly authorize trial by military commission

for offenses other than what was charged here. He asks this court to consider only the circumstances of his own prosecution and conviction. And, for the reasons stated in Part II, *supra*, his prosecution and resulting conviction in a military commission for inchoate conspiracy was invalid.

Attempting to avoid this conclusion, our colleagues suggest an "as-applied" approach under which the court would look past the charges against al Bahlul and uphold his conviction so long as the military commission members' findings could have supported criminal liability for a law-of-war offense. *See* Millett Op. at 2, 29–38; Wilkins Op. at 1-5, 8–14. That, we think, not only asks the wrong question, but would raise other serious problems with al Bahlul's conviction. Most critically, it would violate basic principles of criminal justice, including that an accused know the charge against him and that a conviction match the charge. Importantly, al Bahlul was neither charged with nor convicted of substantive war crimes, such as the murder of protected persons, on a joint criminal enterprise or conspiracy theory of liability. Instead, as seven members of this court recognize, al Bahlul was charged with, tried for, and convicted of the standalone crime of conspiracy. *See* Kavanaugh Op. at 1; Henderson Op. at 1, *incorporating by reference Al Bahlul II*, 792 F.3d at 47 (Henderson, J., dissenting).

In the United States, conspiracy is both a crime and a theory of liability. Although the two concepts share the same name, they are quite distinct. The *crime* of conspiracy makes it unlawful for two or more persons to *agree* to commit a crime. *See, e.g.*, *Iannelli*, 420 U.S. at 777; *Smith v. United States*, 133 S. Ct. 714, 719 (2013); Model Penal Code § 5.03(1). The crime of conspiracy is therefore complete as soon as two or more conspirators enter into an agreement to commit an unlawful act (and, depending on the jurisdiction,

as soon as one of the conspirators commits an overt act in furtherance of the conspiracy's objectives). It matters not at all whether the conspiracy ever achieves its intended purpose.

By contrast, conspiracy as a *theory of liability* is a mechanism for holding individuals responsible for *crimes committed* pursuant to a conspiratorial agreement. For instance, if A and B agree to murder someone and A shoots the gun while B acts as a lookout, B can be held just as responsible for the murder as A. Under the *Pinkerton* doctrine, an individual who joins a conspiracy can be held responsible for completed crimes he or she agreed to as part of the conspiracy and for any other crimes committed in furtherance of the conspiracy that were its reasonably foreseeable result. *See Pinkerton v. United States*, 328 U.S. 640, 646–47 (1946). Critically, when conspiracy serves as a *mode of liability*, the defendant is charged with, tried for, and convicted of substantive crimes, such as murder, bank robbery, or wire fraud, that were committed in the course of a conspiracy. That is, the indictment or charge sheet against the defendant will list murder, bank robbery, or wire fraud as the criminal offense for which the defendant is being tried, and the final judgment of conviction will identify murder, bank robbery, or wire fraud as the crime committed; conspiracy simply acts as the theory on which the defendant is held accountable for those crimes.

As explained previously, international law has repeatedly rejected conspiracy to commit war crimes as a standalone offense. *See* Part II.B, *supra*. It does, however, embrace a species of conspiracy liability known as joint criminal enterprise. *Hamdan*, 548 U.S. at 611 n.40 (plurality opinion); *see Milutinović*, Decision on Dragoljub Ojdanić's Motion Challenging Jurisdiction—Joint Criminal Enterprise, ¶ 26. Under one formulation of joint criminal enterprise liability,

akin to *Pinkerton* liability, an individual can be held responsible for the criminal acts of other members of an enterprise so long as those acts were a "natural and foreseeable consequence of the . . . [enterprise's] common purpose." *Prosecutor v. Tadić*, Case No. IT-94-1-A, Judgement, ¶ 204 (Int'l Crim. Trib. for the Former Yugoslavia, Appeals Chamber, July 15, 1999).

As mentioned above, Judge Millett and Judge Wilkins would ignore the government's prosecutorial choice to charge al Bahlul with, and convict him of, the *crime* of conspiracy, *see* Charge Sheet, AE01, *United States v. al Bahlul* (M.C. Feb. 26, 2008); *see* 10 U.S.C. § 950v(b)(28) (2006), and would instead uphold his conviction on the ground that he could have been punished in a military commission for other international law-of-war offenses—like the murder of protected persons on September 11, 2001—based on a joint criminal enterprise or *Pinkerton* theory of liability, *see* Millett Op. at 29–38; Wilkins Op. at 8–14. Meanwhile, our other colleagues simply do not address the distinction between the standalone crime of inchoate conspiracy of which al Bahlul was convicted, and conspiracy as a theory of liability for proven war crimes. *See, e.g.*, Kavanaugh Op. at 15-19.

The basic point here is an important one: the government chose not to pursue charges against al Bahlul for the murder of protected persons, attacking civilians, or any other recognized war crime for which he could have been tried under the 2006 MCA. *See* Charge Sheet, *supra*; *see also* Trial Tr. 109–113; Oral Arg. Tr. 46–47 (Dec. 1, 2015) (acknowledging that the government did not pursue a joint criminal enterprise theory of liability for substantive war crimes). Nor did the commission convict al Bahlul of murdering protected persons, attacking civilians, or committing any other substantive law-of-war offense. *See*

Findings Worksheet, AE074, *United States v. al Bahlul* (M.C. Oct. 31, 2008). In fact, the military judge expressly instructed commission members that in order to convict al Bahlul on Charge I, the conspiracy charge, they did not need to find that any of the alleged objects of the conspiracy—such as the murder of protected persons—actually occurred. *See* Trial Tr. 848. They had to find only: (1) that al Bahlul entered into an agreement with Osama bin Laden and others to commit an offense triable by military commission; (2) that al Bahlul knew the purpose of the agreement and joined it willingly and with the intent to further that purpose; and (3) that al Bahlul committed one of several overt acts in furtherance of the agreement, none of which had to be criminal, much less an international law-of-war offense. *See id.* 846, 849.

If two of our colleagues believe that the military commission members actually found al Bahlul guilty of substantive offenses based on a conspiracy theory of liability because they indicated on their Findings Worksheet that al Bahlul was "guilty" of each object offense, including murder of protected persons, *see* Millett Op. at 2, 31; *see also* Findings Worksheet at 2, they are mistaken. Although that section of the worksheet somewhat confusingly begins "Guilty of Some, but Not All Objects of the Conspiracy" and then gives the members a place to circle "guilty" or "not guilty" next to each of the alleged objects of the conspiracy, it is clear that by circling "guilty" next to each substantive offense, the members were indicating only that al Bahlul had joined a conspiracy that had as its object each of the listed offenses. The charge was identified as "conspiracy," Findings Worksheet at 2, and the military commission judge expressly instructed the members that "[i]n the specification of Charge I, the accused is charged with the *offense* of conspiracy," Trial Tr. 845 (emphasis added). The judge never so much as hinted that Charge I also encompassed substantive offenses on a

conspiracy theory of liability. *See id.* When one looks at the Findings Worksheet as a whole, it is also clear that the sections permitting the members to find al Bahlul "guilty" or "not guilty" of specific objects of the conspiracy and specific overt acts merely provided the members the opportunity to find, with respect to the specification for Charge I, that the conspiracy had some but not all of the alleged offenses as its objects or that al Bahlul had committed some but not all of the alleged overt acts. Tellingly, too, the government has never argued that the Findings Worksheet shows that the commission members actually found al Bahlul guilty of substantive offenses.

There is simply no basis for upholding a conviction for the crime of inchoate conspiracy on the ground that a defendant could have been charged with and convicted of some other crime. To do so would violate the most fundamental tenets of our criminal justice system—that a defendant is entitled to notice of the charges against him and that a conviction match the charge or be a lesser included offense. As the Supreme Court has explained, due process demands that a defendant have "notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge." *Cole v. Arkansas*, 333 U.S. 196, 201 (1948). "It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made." *Id.* The Court has thus squarely rejected the notion that an appellate court can sustain a conviction under a provision never charged, explaining that "[t]o conform to due process of law, [defendants] [a]re entitled to have the validity of their convictions appraised on consideration of the case as it was tried and as the issues were determined in the trial court." *Id.* at 202. We sincerely doubt that these most basic principles of due process—well established under both

American and international law—can be cast aside in the military commission context. *See id.*; *see also, e.g.*, Geneva Convention Relative to the Treatment of Prisoners of War, *supra*, art. 105, 6 U.S.T. at 3396, 75 U.N.T.S. at 214 ("Particulars of the charge or charges on which the prisoner of war is to be arraigned, as well as the documents which are generally communicated to the accused by virtue of the laws in force in the armed forces of the Detaining Power, shall be communicated to the accused prisoner of war in a language which he understands, and in good time before the opening of the trial."); ICTY Statute, *supra*, arts. 18, 20–21; ICTR Statute, *supra*, arts. 17, 19–20; *cf. Rome Statute*, art. 22, § 2, *supra*; *United States v. Longmire*, 39 M.J. 536, 538 (A.C.M.R. 1994) (recognizing in the court-martial context that a "basic principle of due process" is that "an individual should not be made to face criminal charges without having been notified of what he must defend against and without having been protected against double jeopardy").

But we have no need to rely on constitutional or international-law principles to question the validity of an affirmance on grounds other than those charged and tried, as both the Military Commissions Act of 2006 and the rules promulgated thereunder incorporate these same notice principles. The Act "establish[es] a two-step process for initiating a trial before a military commission," *Obaydullah v. Obama*, 609 F.3d 444, 445–46 (D.C. Cir. 2010), pursuant to which an authorized person subject to the Uniform Code of Military Justice must swear a charge, under oath, against a defendant, 10 U.S.C. § 948q(a); *see* Manual for Military Commissions, Rule for Military Commissions (R.M.C.) 307, at II-15 (2007). The Act further requires that, once charges are sworn against an accused, he be promptly informed of them. 10 U.S.C. § 948q(b); *see* R.M.C. 308. The Act also specifies, in language similar to that used in the Geneva Conventions,

*see* Geneva Convention Relative to the Treatment of Prisoners of War, *supra*, art. 105, 6 U.S.T. at 3396, 75 U.N.T.S. at 214, that the government must serve the accused with "a copy of the charges upon which trial is to be had in English and, if appropriate, in another language that the accused understands, sufficiently in advance of trial to prepare a defense," 10 U.S.C. § 948s. With minor exceptions not relevant here, any fact that increases the maximum punishment authorized must be alleged in the charge's specification, R.M.C. 307(c)(3), and substantive changes to the charges cannot be made without newly referring charges and notifying the accused, R.M.C. 603(d). Finally, Rule 801(d) on "[u]ncharged offenses" provides that, "[i]f during the trial there is evidence that the accused may be guilty of an untried offense not alleged in any specification before the commission, the commission shall proceed with the trial of the *offense charged*." R.M.C. 801(d) (emphasis added). Upholding al Bahlul's conviction on the ground that he could have been tried for and convicted of some other offense would, at the least, raise serious questions as to whether this court has departed from Congress's express instructions regarding the rights and procedural protections to which alien enemy belligerents are entitled.

Even if that were not enough, our colleagues' approach would usurp the fact-finding role of the military commission members, *see* 10 U.S.C. § 949*l*; R.M.C. 502(a)(2) ("The members of a military commission shall determine whether the accused is proved guilty . . . ."); R.M.C. 921 (addressing the members' responsibility to determine guilt with respect to each charge and specification), and transgress the statutory limits on this court's appellate review. Perhaps most importantly, this court's authority under the MCA is limited to "approv[ing]" a finding of guilty or "affirm[ing] . . . so much of the finding as includes a lesser included offense." 10

U.S.C. § 950a; *see id.* § 950g. The offenses our colleagues glimpse in the record are neither the charged inchoate conspiracy nor lesser-included offenses of that crime. *See Kelly v. United States*, 370 F.2d 227, 228 (D.C. Cir. 1966); FED. R. CRIM. P. 31(c).

Finally, our colleagues seem to rely on a narrow reading of the 2006 MCA's conspiracy provision as evidence that the government really obtained a conviction for al Bahlul's participation in a conspiracy that resulted in completed war crimes, an offense that they believe would be triable in a military commission because it would be akin to holding an individual responsible under international law for completed war crimes on a joint criminal enterprise theory of liability. They believe that the statute's reference to "victims," *see* 10 U.S.C. § 950v(b)(28) (2006), requires that there be a completed law-of-war offense to convict an individual of "conspiracy" within the meaning of that provision, *see* Millett Op. at 30; Wilkins Op. at 9. We think it quite unwise to opine on the meaning of the statute's opaque reference to "victims" without the aid of briefing, especially given that, during its more than four years of litigating this case, the government has never pressed such an interpretation of the statute and has instead repeatedly insisted that the statute criminalizes inchoate conspiracy. Even if our colleagues are correct, that would have no effect on the proper outcome in this case. It would only raise additional questions as to whether al Bahlul's trial for the crime of inchoate conspiracy was statutorily authorized. The Article III problem lying at the heart of this case thus cannot be solved by reimagining the statute under which al Bahlul was convicted or the crimes for which he was charged, as doing so only raises other fundamental legal problems.

To be sure, Judge Millett and Judge Wilkins's approach would allow us to sustain the conviction of a man who—by his own admission—proudly assisted the terrorist group responsible for one of the most terrible attacks ever perpetrated against the United States. But that approach is unavailable to us. The government chose to prosecute al Bahlul in a military commission for the crime of inchoate conspiracy. It also never suggested that this court can uphold al Bahlul's conviction on the ground that he could have been convicted of other charges—and for good reason. That approach raises serious due process concerns and conflicts with the military-commission procedures Congress requires.

## IV.

One may wonder, "why the fuss?" *Stern v. Marshall*, 564 U.S. 462, 502 (2011). After all, the government is not seeking to prosecute cyber or drug crimes before military commissions; it is seeking only to prosecute conspiracies to commit recognized war crimes. Can such a modest expansion of military-commission jurisdiction really threaten the Constitution's separation of powers? As in *Stern v. Marshall*, "[t]he short but emphatic answer is yes." *Id.* "[O]ur Constitution . . . commands that the independence of the Judiciary be jealously guarded . . . ." *Northern Pipeline*, 458 U.S. at 60 (plurality opinion). The political branches "may no more lawfully chip away at the authority of the Judicial Branch than [they] may eliminate it entirely." *Stern*, 564 U.S. at 503. And "[a]lthough it may be that it is the obnoxious thing in its mildest and least repulsive form, we cannot overlook the intrusion: illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure." *Id.* (internal quotation marks omitted).

Here, it is easy to see how allowing the political branches to stretch Article III's exception for law-of-war military commissions to encompass inchoate conspiracy charges could represent just the first step toward a much greater usurpation of the judiciary's domain. Against the backdrop of the war on terror, in which many of the traditional constraints on the use of law-of-war military commissions are disappearing, the government articulates a breathtakingly expansive view of the political branches' authority to subject non-servicemembers to military trial and punishment. Indeed, it admits only two constitutional constraints on its power to try individuals in law-of-war military commissions: the charges must allege (1) that the individuals are "enemy belligerents" who (2) engaged in proscribed conduct "in the context of and associated with hostilities." Oral Arg. Tr. 37–38 (Dec. 1, 2015).

Critically, the government's suggestion that the defendant's status as an enemy belligerent in the context of hostilities suffices to subject him to trial by military commission ignores the Supreme Court's focus on the *offenses* triable to law-of-war military commissions, in addition to the status of the offenders. Thus the Court has focused on "the question whether it is within the constitutional power of the national government to place petitioners upon trial before a military commission for the *offenses* with which they are charged." *Quirin*, 317 U.S. at 29 (emphasis added). In *Quirin*, the Court "assume[d] that there are *acts*" that could not be tried by military commission "because they are of that class of *offenses* constitutionally triable only by a jury." *Id.* (emphases added). So, too, in *Yamashita.* 327 U.S. at 8. And in *Hamdan*, the Court explained that the status of the offender (being a member of a foreign armed force) and the nature of the offense were *both* necessary conditions for the exercise of jurisdiction by a law-

of-war military commission. *See Hamdan*, 548 U.S. at 597–98 (plurality opinion) (citing Winthrop, Military Law, *supra*, at 836–39); *accord id.* at 683 (Thomas, J., dissenting).

But putting that aside, the extent to which the government's proposed limits have any force is far from clear. What does it mean, for instance, for an individual to have committed an offense in the context of hostilities? The answer is uncertain, both as a temporal and geographic matter. We would be willing to wager that if you asked Americans when the United States' "war" with al Qaeda began, most would say September 11, 2001. Even executive branch officials often cite that date as the beginning of hostilities against al Qaeda and its affiliates. For example, for certain naturalization purposes, the President "designate[d] as a period in which the Armed Forces of the United States were engaged in armed conflict with a hostile foreign force the period beginning on September 11, 2001." E.O. 13,269, 67 Fed. Reg. 45,287 (July 3, 2002); *see* Memorandum for the Attorney General, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Determination of Enemy Belligerency and Military Detention* (June 8, 2002), *available at* 2002 WL 34482990, at *7 ("[T]he September 11, 2001 attacks on the World Trade Center and the Pentagon began an international armed conflict between the United States and the al Qaeda terrorist organization."). But in a pending military-commission case, the government seeks to hold an alleged member of al Qaeda responsible for a failed attack on a U.S. vessel that occurred in January 2000. It takes the position in that case that the United States' war with al Qaeda goes back "to at least 1998," and it appears to believe that the conflict may date as far back as 1992. *See* Brief for the United States 5, 41, *United States v. Al-Nashiri*, Nos. 15-5020 & 15-1023 (D.C. Cir. Dec. 28, 2015). *But see United States v. Al-Nashiri*, --- F.3d --- (D.C. Cir. 2016) (recognizing

as unsettled for purposes of mandamus when hostilities began against Al Qaeda).

If the government's view in this case that military commission jurisdiction is limited only by Congress' war powers were to prevail, Congress and the President could authorize military prosecutions in many situations that we traditionally think of as within the exclusive province of domestic law enforcement agencies and civilian courts. Suppose, for instance, that the FBI launches an investigation into three lawful permanent residents who have lived in the United States since early childhood. Searching an apartment in Virginia that the three share, it discovers pipe bombs, al Qaeda propaganda, and a map of the Washington, D.C. metro system. The government arrests the three and wishes to prosecute them for conspiracy to kill innocent civilians. Under the government's view of things, the Constitution would pose no bar to transferring the individuals into military custody and prosecuting them before a military commission. In fact, when presented with this hypothetical at oral argument, government counsel conceded that these facts "might well be enough" to try the individuals in a military tribunal. Oral Arg. Tr. 51–53 (Dec. 1, 2015); *see also* Kavanaugh Op. at 30–31. This is a dangerous suggestion to say the least. *Cf. Reid*, 354 U.S. at 23–24 (plurality opinion) ("The Founders envisioned the army as a necessary institution, but one dangerous to liberty if not confined within its essential bounds.").

But the government's position gets more dangerous still. Now suppose that the three are U.S. citizens. Could the government do an end run around Article III solely because they had *some* connection to the "war" on terrorism? It would seem so. *See Quirin*, 317 U.S. at 37–38 (holding that a saboteur's U.S. citizenship was irrelevant to a commission's

authority to try him for law-of-war offenses). What if the FBI instead discovered that the three U.S. citizens sent $200 to the humanitarian wing of an organization that the United States designated a foreign terrorist organization, earmarked for training in human-rights advocacy that the donors hope will turn the organization away from terrorist activities? Could the three be shipped off to a military base and tried for material support for terrorism—an offense unrecognized under international law but made punishable under the Military Commissions Act? 10 U.S.C. § 950t(25); *cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 7–11 (2010). The government seems to think so.

According to Judge Kavanaugh's opinion, the court need not concern itself with the limits (or lack thereof) on the political branches' authority to make conduct punishable by military commission because whatever those limits might be, the punishment of conspiracies to commit war crimes certainly falls within them. *See* Kavanaugh Op. at 25. But if international law does not mark the boundaries between civilian and military jurisdiction, what does? On this, our colleagues are silent. Based on the principles articulated by the government and embraced in Judge Kavanaugh's opinion, however, it would seem that Congress and the President could vest military commissions with authority to try enemy belligerents for almost any crime so long as it related in some way to "hostilities." *Id.* at 24–25. Especially in this new era of "war" against difficult-to-identify enemies on difficult-to-identify "battlefields," such positions would appear to leave few, if any, enforceable limits on the political branches' authority to avoid Article III courts and prosecute individuals in military commissions. Thus, although allowing military commissions to take cognizance of inchoate conspiracy charges might seem to some a small and harmless encroachment on the judiciary's domain, it could very well

open the door to much broader intrusions. Any such intrusion would be all the more pernicious here and corrosive of Article III given that, in this case, the government has made no effort to demonstrate the "military necessity" that has traditionally been a prerequisite to resort to military commissions. *Hamdan*, 548 U.S. at 590; *see also id.* at 598–99 (plurality opinion); *id.* at 646 (Kennedy, J., concurring). To accept the government's position would embed the use of military commissions "more deeply in our law and thinking," ready to be "expand[ed] . . . to new purposes." *Korematsu v. United States*, 323 U.S. 214, 246 (1944) (Jackson, J. dissenting). A majority of this court declines today to deal any such "blow to liberty." *Id.*

\* \* \*

Before concluding, we think it worth underscoring the result of today's decision. Eight of the nine judges deciding this appeal believe that the question lying at the heart of it, i.e., whether Congress can lawfully vest military commissions with jurisdiction over the crime of inchoate conspiracy, is deserving of de novo review. Only four of those considering the question de novo answer it in the affirmative. Accordingly, the majority of judges declines to endorse the government's view of the Constitution. Today's decision thus provides no precedential value for the government's efforts to divert the trial of conspiracy or any other purely domestic crime to law-of-war military commissions.

We, for the reasons discussed, see no lawful basis for the government's claimed power. Whatever deference the judiciary may owe to the political branches in matters of national security and defense, it is not absolute. Far from it, it is the duty of the courts "in time of war as well as in time of peace, to preserve unimpaired the constitutional safeguards of

civil liberty." *Quirin*, 317 U.S. at 19. And although the government might well be entitled to detain al Bahlul as an enemy belligerent, *see Hamdi*, 542 U.S. at 518–24 (plurality opinion), it does not have the "power to switch the Constitution on and off at will," *Boumediene*, 553 U.S. at 766. Its prosecution of al Bahlul in a military commission for conspiracy to violate the laws of war exceeded the scope of Article III's exception for law-of-war military commissions and, as a result, violated Article III. Accordingly, we would vacate his conspiracy conviction.